FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2009 OCT 12 P 1: 15

LUIS G. LARA and OLGA M. GARCIA
on behalf of themselves and others
similarly situated
12777 Crossman Creek Way
Bristow, Virginia 20136

       Plaintiffs,

       V.

Case No.: 1:09cv1269
GBL/TRJ

GMAC MORTGAGE, LLC, a Delaware LLC
100 Witmer Road
P.O. Box 963
Horsham, PA 19044

       Serve: Registered Agent
       Corporation Service Corporation
       11 South 12th Street
       P.O. Box 1463
       Richmond, VA 23218

and

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
a Delaware corporation, DE File No. **2543543**, dated **10/16/1995 (MERS1)**
1818 Library Street
Reston, VA 20190

and

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
a Delaware corporation, DE File No. **2990193**, dated **01/01/1999 (MERS2)**
1818 Library Street
Reston, VA 20190

       SERVE: Registered Agent for **MERS1** and **MERS2**
       Sharon Horstkamp, Esq.
       1818 Library Street, Suite 300
       Reston, VA 20190

and

SAMUEL I. WHITE, P.C.
5040 Corporate Woods Drive, Suite 102
Virginia Beach, VA 23462

       SERVE: Registered Agent
       WM. Adam White, Esq.
       5040 Corporate Woods Drive, Suite 102
       Virginia Beach, VA 23462

and

GREENPOINT MORTGAGE FUNDING, INC.
a New York Corporation
       SERVE: Registered Agent
       Corporation Service Corporation
       11 South 12th Street
       PO Box 1463
       Richmond, VA 23218

and

JOSE (TONY) A. BONILLA
Present exact whereabouts unknown
       Last known address to SERVE:
       LOPEZ REALTORS
       8622 Centreville Road
       Manassas, VA 20110

and

ANGELMAR REALTORS, LLC
       SERVE: Registered Agent
       LUCILLE NEWMAN
       6869 Springfield Blvd., Ste 201
       Springfield, VA 22150

and

GUSTAVO H. OSSA
6021 Smooth Stone Place
Haymarket, VA 20169

and

ROSA MARIA OSSA
6021 Smooth Stone Place
Haymarket, VA 20169

and

MORTGAGE UNLIMITED SERVICES, LLC
      SERVE: Registered Agent
      Jenie Iparraguire
      3611 Chain Bridge Road, Suite A
      Fairfax, VA 22030

and

JOHN DOE AND JANE DOE
Individuals yet to be determined, if any, also
Involved in the real estate purchase and real estate
loan transactions involved in this case

and

ABC CORPORATION
Corporations, Partnerships, LLCs, entities yet to be
determined, if any, also involved in the real estate
purchase and real estate loan transactions
involved in this case

        Defendants.

**LUIS G. LARA AND OLGA M. GARCIA**

**COMPLAINT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

**TABLE OF CONTENTS**

COMPLAINT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN
          DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION ............................... 4
TABLE OF CONTENTS ................................................................................... 4
TABLE OF AUTHORITIES ............................................................................ 5
COMPLAINT AND REQUEST FOR JURY TRIAL, CLASS CERTIFICATION,
          DECLARATORY INJUNCTION AND DECLARACTORY ACTIONS ..... 9
I.      INTRODUCTION AND PRELIMINARY STATEMENTS ......................... 9
       I. A. STATEMENT OF THE CASE ............................................................ 9
       I. B. MISCONCEPTION THAT ONLY BORROWERS ARE AT FAULT ............... 10
       I. C. BASIC ISSUES BEING CHALLENGED BY THIS LAW SUIT ...................... 11
       I. D. DROWNING IN THE POOL - SIMPLIFYING THE ISSUES OF A VERY
             COMPLICATED MESS ............................................................... 19
II.     PARTIES ......................................................................................... 30
III.    GENERAL BACKGROUND.............................................................. 36
       III. A.    GENERAL ALLEGATIONS....................................................... 36
       III. B.    DEFENDANTS' LOANS ARE STRUCTURALLY UNFAIR AND
               DIFFICULT TO UNDERSTAND DUE TO THEIR MULTIPLE LAYERS
               OF RISK ...... 52
       III. C.    DEFENDANTS ENCOURAGED MORTGAGE BROKERS' UNFAIR AND
               DECEPTIVE CONDUCT..................................................... 54
       III. D.    THE ROLE OF *MERS* IN THE SUB-PRIME MARKET & THIS CASE ... 57
IV.    JURISDICTION ............................................................................... 67
V.     FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS.............. 68
VI.    FACTUAL ALLEGATIONS FOR THE LARA/GARCIAS ....................... 77
VII.   THE GENERAL SCHEME AND ENTERPRISE ....................................... 91
VIII.  CLASS ACTION ALLEGATIONS ....................................................... 97
IX.    CONSPIRACY ................................................................................. 104
X.     RICO ALLEGATIONS: THE GREENPOINT-GMAC BROKER ENTERPRISE..... 106
XI.    ALTERNATIVE ENTERPRISE ALLEGATIONS:.................................... 107
       THE GREENPOINT-GMAC ENTERPRISE............................................. 107
XII.   PREDICATE ACTS .......................................................................... 109
XIII.  VIOLATIONS OF 18 U.S.C. § 1341 and 18 U.S.C. § 1343 ....................... 109
XIV.  GREENPOINT AND GMAC HAD A DUTY TO DISCLOSE.................... 110
XV.   PATTERN OF RACKETEERING ACTIVITY ......................................... 113
XVI.  RICO VIOLATIONS.......................................................................... 114
XVII. VIOLATIONS ALLEGED.................................................................. 115
COUNT 1.      LACK OF STANDING TO FORECLOSE OR COLLECT A DEBT........ 115

COUNT 2.        VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT
                (RESPA)........................................................................................ 116
COUNT 3.        VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
                (FDCPA)....................................................................................... 118
COUNT 4.        VIOLATIONS OF RESPA - FEE SPLITTING ........................................ 119
COUNT 5.        VIOLATION OF RICO 18 U.S.C. § 1962(c) ............................................ 120
COUNT 6.        VIOLATION OF RICO 18 U.S.C § 1962 (d) BY CONSPIRING TO
                VIOLATE 18 U.S.C § 1962 (a).......................................................... 122
COUNT 7.        VIOLATION OF RICO 18 U.S.C. § 1962(d) BY CONSPIRING TO
                VIOLATE 18 U.S.C. § 1962 (c).......................................................... 128
COUNT 8.        RICO CONSPIRACY ...................................................................... 130
COUNT 9.        RICO EXTORTION ......................................................................... 132
COUNT 10.       TILA VIOLATIONS ........................................................................ 134
COUNT 11.       BREACH OF CONTRACT ............................................................... 137
COUNT 12.       NEGLIGENCE ............................................................................... 140
COUNT 13.       NEGLIGENT SUPERVISION ........................................................... 144
COUNT 14.       COMMON LAW FRAUD — CONCEALMENT ..................................... 145
COUNT 15.       DECLARATORY ACTION - THE CONTRACT IS VOID ...................... 148
                ILLEGAL "PYRAMID SCHEMES" ..................................................... 148
COUNT 16.       DECLARATORY ACTION -- THE CONTRACT IS VOID .................... 151
                "UNTRUE AND DECEPTIVE PRACTICES" ........................................ 151
COUNT 17.       DECLARATORY ACTION - THE CONTRACT IS VOID ...................... 153
                "PROHIBITED REFERRAL TRANSACTIONS" ..................................... 153
COUNT 18.       DECLARATORY ACTION - THE CONTRACT IS VOID ...................... 158
                "ILLEGAL MONEY LAUNDERING" ................................................... 158
COUNT 19.       DECLARATORY ACTION - THE CONTRACT IS VOID ...................... 161
                "VIRGINIA STATE RICO STATUTE"................................................. 161
                (VIOLATIONS OF THE VIRGINIA RACKETEER INFLUENCED AND
                CORRUPT ORGANIZATIONS ACT, VIRGINIA CODE § 18.2-512...... 161
COUNT 20.       DECLARATORY JUDGMENT - VIRGINIA CODE ANN. §8.01-184 ... 164
COUNT 21.       UNJUST ENRICHMENT .................................................................. 165
COUNT 22.       DECLARATORY ACTION – THE CONTRACT IS VOID .................... 166
                "ILLEGAL GAMBLING" ................................................................... 166
COUNT 23.       DECLARATORY ACTION - THE CONTRACT IS VOID ...................... 168
                "ACCESSORIES TO ILLEGAL GAMBLING" ....................................... 168
COUNT 24.       BAD FAITH AND WANTONNESS ..................................................... 170
COUNT 25.       QUIET TITLE ............................................................................... 171
COUNT 26.       FORECLOSURE PROCEEDINGS FRAUD............................................ 172
COUNT 27.       SPECIFIC PERFORMANCE.............................................................. 174
XVIII.          DEMAND FOR JURY TRIAL ........................................................... 176
XIX.            PRAYER FOR RELIEF .................................................................... 176

## TABLE OF AUTHORITIES

**Cases**

Carpenter v. Longan, 83 U.S. 271, 21 L.Ed. 313, 16 Wall 271 (1872) ........................ 62

Dunmore v. United States, 358 F.3d 1107 (9th Cir. 2004)............................................................. 60
In RE Countrywide Financial Corporation Mortgage Marketing and Sales Practices Litigation,
   USDC, SDCA, Lead Case No. 3:08-md01888-DMS-LSP (March 6, 2009)............................. 35
In Re JOSHUA & STEPHANIE MITCHELL, Case No. BK-S-07-16226-LBR (Bankr. Nevada
   3/31/2009)..................................................................................................................... 48, 59, 61
Powell v. Adams 179 VA 170 (VA Sup Ct 1942)........................................................................ 25
SEC v. Mozilo, et.al., USDC, Central District of California, CV09-03994 (6/04/2009)............. 63
U.S. Bank National Association, as trustee for the Structured Asset Securities Corporation
   Mortgage Pass Through Certificates, Series 2006-Z v. Antonio Ibanez, Misc. Case No. 08-
   384283 (KCL)  and Wells Fargo Bank, N.A., as trustee for ABFC 2005-OPT1 Trust, ABFC
   Asset Backed Certificates Series 2005-OPT1 v. Mark Larace and Tammy Larace,  Misc. Case
   No. 08-386755 (KCL).............................................................................................................. 75
Warth v. Seldin, 422 U.S. 490 (1975).................................................................................. 11, 60

**Statutes**

12 U.S.C. § 2607(b) ............................................................................................................ 96, 119
12 U.S.C. § 2607(d)(5) ............................................................................................................. 118
12 U.S.C. §§ 2607(c)(1)(c) and 2607(c)(2) ............................................................................... 96
15 U.S.C. § 1605...................................................................................................................... 135
15 U.S.C. § 1606...................................................................................................................... 136
15 U.S.C. § 1632(a) ................................................................................................................. 135
15 U.S.C. § 1635...................................................................................................................... 137
15 U.S.C. § 1638(a)(2).............................................................................................................. 136
15 U.S.C. § 1638(a)(3).............................................................................................................. 135
15 U.S.C. § 1638(a)(4).............................................................................................................. 136
15 U.S.C. § 1638(a)(9).............................................................................................................. 135
15 U.S.C. § 1638(b) ................................................................................................................. 134
15 U.S.C. § 1640...................................................................................................................... 137
18 U.S.C §1344......................................................................................................................... 124
18 U.S.C. § 1341....................................................................................................................... 123
18 U.S.C. § 1343....................................................................................................................... 124
18 U.S.C. § 1961(4).................................................................................................................. 132
18 U.S.C. § 1961(5).................................................................................................................. 127
18 U.S.C. § 1962(b)(c)............................................................................................................. 134
18 U.S.C. § 1962(c) ................................................................................................................. 102
18 U.S.C. §§ 1961(3) and 1964(c)............................................................................................ 132
18 U.S.C. §1951 ................................................................................................................ 125, 126
18 U.S.C. §1955........................................................................................................................ 126
18 U.S.C. §1956........................................................................................................................ 126
18 U.S.C. §1957........................................................................................................................ 127
28 U.S.C. § 1331......................................................................................................................... 67
28 U.S.C. § 1367(a) ................................................................................................................... 67
28 U.S.C. § 1391(a) and (b)....................................................................................................... 68
Bank Fraud Laws 18 U.S.C. §§ 1010, 1014, 1344 ("Bank Fraud") ............................................ 9
Code § 8.01-389(C) .................................................................................................................... 25
Commodity Futures Modernization Act of 2000........................................................................ 24

**DECLARATORY JUDGMENT)**
  **Virginia Code Ann. §8.01-184**................................................................ 164
Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. § 1692 et seq. (2000).......................... 9
Federal Mail Fraud Act, 18 U.S.C § 1341 (the "Mail Fraud Act") ............................................... 9
Federal Wire Act, 18 U.S.C. § 1343 (the "Wire Act") ................................................................ 9
Homeowners Equity Protection Act, 15 U.S.C. § 1639 et. seq. ("HOEPA")............................... 9
Internal Revenue Code of 1986, as amended................................................................................ 15
Internal Revenue Code of 1986, as amended (the "IRS Code")................................................... 73
of RICO, 18 U.S.C. §§ 1961(3) and 1962(d)............................................................................. 130
Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et. seq. ....... 9
Racketeer Influenced and Corrupt Organizations Act, U.S.C. 18 § 1961, et. seq. ("RICO") ..... 84
Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607 et. seq. and its
  implementing Regulation X ("Reg. X") ................................................................................. 9
RESPA 12 U.S.C. § 2607(d)(2) ............................................................................................... 118
RICO, 18 U.S.C § 1961(4)............................................................................................... 123, 131
RICO, 18 U.S.C. § 1961(5).................................................................................................... 123
RICO, 18 U.S.C. § 1962(c).................................................................................................... 123
RICO, 18 U.S.C. §§ 1961(3) and 1962(c)............................................................................. 123
RICO, 18 U.S.C. §§ 1961(3) and 1964(c). ................................................................... 122, 130
Securities Act of 1933, 15 U.S.C §§ 77a et. seq. (the "33 Act")), and Rules promulgated
  thereunder by the Securities and Exchange Commission ("SEC") ........................................ 10
TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17)...................................................... 41
Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. and its implementing Regulation Z
  ("Reg. Z"); ............................................................................................................................... 9
Virginia Accessories to Gambling Activity Act, VA Code § 18.2-330............................... 10, 168
Virginia Code § 18.2-325(1) - Illegal Gambling ......................................................................... 167
Virginia Code § 8.3A-305........................................................................................................... 75
Virginia Code §18.2-216 .......................................................................................................... 152
Virginia Code §8.3A-203(c)....................................................................................................... 75
Virginia Code Sec. 18.2-246.1 Title, the "Virginia Comprehensive Money Laundering Act".. 159
Virginia Comprehensive Money Laundering Act, VA Code §§ 18.2-246.3, et. seq.................... 10
Virginia Conspiracy Act, VA Code § 18.2-499........................................................................... 10
Virginia Consumer Protection Act of 1977, VA Code §§ 59.1-204, et. seq. .............................. 10
Virginia Illegal Gambling Act, VA Code § 18.2-326.................................................................. 10
Virginia Pyramid Schemes Act, VA Code §§ 18.2-239, et. seq.......................................... 10, 149
Virginia Racketeer Influenced and Corrupt Organization (RICO) Act, VA Code § 18.2-512 ... 10,
  161
Virginia Unlawful Referral Transactions law, VA Code Sec. 18.2-242.1 .......................... 10, 155

**Other Authorities**
Christopher L. Peterson, Predatory Structured Finance, 28 Cardozo L. Rev. 2185 (2007) ......... 50
*Derivatives Just "A Sophisticated Form Of Gambling," U.S. Senators Say; Propose Bill Allowing
  State Gambling Laws To Apply*, http://www.huffingtonpost.com/2009/11/10/derivatives-just-
  a-sophis_n_352994.html ...................................................................................................... 21
http://www.mersinc.org/about/shareholders.aspx......................................................................... 58
http://mersinc.com ...................................................................................................................... 61
http://mersinc.com/news/details.aspx?id=228 ............................................................................. 59

http://www.fbi.gov/hq/cid/orgcrime/lcnindex.htm ......................................................... 57
http://www.nclc.org/issues/mortgage_servicing/content/Servicer-Report1009.pdf.................... 27
http://www.sec.gov/litigation/litreleases/2006/lr19710.htm (U.S. SECURITIES AND
    EXCHANGE COMMISSION, Litigation Release No. 19710 / Accounting and Auditing
    Enforcement Release No. 2433 / May 23, 2006, *SEC v. Federal National Mortgage
    Association*, Case No. 06-00959 (RBW) (U.S.D.C., D.D.C) ................................................ 63
http://www.xe.com/news/2009-11-02%2013:36:00.0/774761.htm?c=2&t=103 ....................... 58
Loss Widens at GMAC, a Lender in Transition,
    http://www.nytimes.com/2009/08/05/business/05gmac.html................................................ 58
October 20, 2009 PBS documentary *FRONTLINE: The Warning*,
    www.pbs.org/wgbh/pages/frontline/warning/view.................................................. 19
Pratt's Journal of Bankruptcy Law, September 2008 Issue, Credit Default Swaps: From
    Protection To Speculation, http://www.rkmc.com/Credit-Default-Swaps-From-Protection-To-
    Speculation.htm. .................................................................................................. 19
RALI Series 2006-QO1 Trust.......................................................................................... 43
Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior,
    Servicer Compensation and its Consequences, NCLC, Inc. Report (October 2009) .............. 27

**Rules**
Fed. R. Civ. P. 17.............................................................................................. 41, 67, 115
Fed. R. Civ. P. 18(a)(b)................................................................................................... 68
Fed. R. Civ. P. 23(a) and (b)(3). ................................................................................... 97
Fed. R. Civ. P. 38(b) ...................................................................................................... 175
Fed. R. Civ. P. 41 ........................................................................................................... 48
IRS Code Section 860D .................................................................................................. 73
Securities and Exchange Commission Rule 424(b)(5) ...................................................... 17

**Treatises**
BLACK'S LAW DICTIONARY 165 (8th ed. 2004)............................................................... 61

**Regulations**
24 C.F.R. § 3500.14(c) and (g). .................................................................................... 96
24 C.F.R. § 3500.7(b) .................................................................................................... 86
IRS Form 4506-T............................................................................................................ 73
Reg. Z § 226.23.............................................................................................................. 137
Regulation X, 24 C.F.R. § 3500.7(a) (c)........................................................................ 96
Regulation Z § 226.17(a)................................................................................................ 135
Regulation Z § 226.17(b)................................................................................................ 134
Regulation Z § 226.18(b)................................................................................................ 136
Regulation Z § 226.18(c)................................................................................................ 136
Regulation Z § 226.18(d)................................................................................................ 135
Regulation Z § 226.18(m)............................................................................................... 135
Regulation Z § 226.22.................................................................................................... 136
Regulation Z § 226.4...................................................................................................... 135
SEC Rule 424(b)(5) ........................................................................................................ 16
Securities Act of 1933, § 10(d) ...................................................................................... 16

**COMPLAINT AND REQUEST FOR JURY TRIAL, CLASS CERTIFICATION, DECLARATORY INJUNCTION AND DECLARACTORY ACTIONS**

## I. INTRODUCTION AND PRELIMINARY STATEMENTS

I. A. <u>STATEMENT OF THE CASE</u>

Plaintiffs are LUIS G. LARA and OLGA M. GARCIA (where appropriate, this Husband and Wife couple are individually referred to by their respective name, otherwise hereinafter collectively they shall be referred to as the "Plaintiff"). Collectively, hereinafter the Plaintiff and other borrowers similarly situated shall be referred to as the "Plaintiffs." Plaintiff, on behalf of themselves and others similarly situated, by their undersigned counsel, sue the Defendants set forth above for the violations of several Federal and state laws including, but not limited to:

    a.   the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607 et. seq. and its implementing Regulation X ("Reg. X");

    b.   the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. and its implementing Regulation Z ("Reg. Z");

    c.   the Homeowners Equity Protection Act, 15 U.S.C. § 1639 et. seq. ("HOEPA");

    d.   the Federal Mail Fraud Act, 18 U.S.C § 1341 (the "Mail Fraud Act");

    e.   the Federal Wire Act, 18 U.S.C. § 1343 (the "Wire Act");

    f.   Bank Fraud Laws 18 U.S.C. §§ 1010, 1014, 1344 ("Bank Fraud");

    g.   the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. § 1692 et seq. (2000);

    h.   the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et. seq.;

i.   the Securities Act of 1933, 15 U.S.C §§ 77a et. seq. (the "33 Act")), and Rules

promulgated thereunder by the Securities and Exchange Commission ("SEC");

and for violations of several Commonwealth of Virginia statutes and laws

including:

j.   the Virginia Pyramid Schemes Act, VA Code §§ 18.2-239, et. seq.;

k.   the Virginia Comprehensive Money Laundering Act, VA Code §§ 18.2-246.3, et.

seq.;

l.   the Virginia Consumer Protection Act of 1977, VA Code §§ 59.1-204, et. seq.;

m.   the Virginia Conspiracy Act, VA Code § 18.2-499;

n.   the Virginia Illegal Gambling Act, VA Code § 18.2-326;

o.   the Virginia Accessories to Gambling Activity Act, VA Code § 18.2-330;

p.   the Virginia Racketeer Influenced & Corrupt Organization (RICO) Act, VA Code

§ 18.2-512;

q.   the Virginia Unlawful Referral Transactions law, VA Code Sec. 18.2-242.1; and

r.   other state common law causes of action for Fraud in the Inducement, Breach of

Contract, Negligence, Negligent Supervision and Training, and others.

Plaintiff is typically representative of other borrowers that fell prey to the violations

outlined and covered by this Complaint.

I. B. <u>MISCONCEPTION THAT ONLY BORROWERS ARE AT FAULT</u>

Some may consider this a simple issue of whether courts and laws should help

*"irresponsible,"* gullible people who got way over their heads in debt and into expensive home

purchases and mortgage loan transactions that they should never have considered when they

*knew* or *should have known* that they could not afford such luxuries and extravagances.  Thus,

since they *knew* that they could not really afford what they got into, they need only blame themselves for their dilemma. The issue may then be simply framed whether those directly involved in getting the Plaintiffs into impossible and implausible financial dilemmas that eventually lead to unaffordable situations and possible foreclosure of their homes, are entirely blameless and should be left alone to benefit from the "fruits of their fraud" without repercussions or accountings of any type. In the case of some class members, their foreclosures have already taken place.

I.  C. <u>BASIC ISSUES BEING CHALLENGED BY THIS LAW SUIT</u>

When viewed in the totality of the circumstances, this matter is not simply a case of innocent, hard working, honest, home purchasers and borrowers being duped and being taken advantage of by unscrupulous individuals, lending companies, and mortgage securitization entities. More poignantly, this case deals with arrogant, irresponsible and greedy individuals and companies that made predatory, toxic and ultimately unaffordable loans to these Borrowers, and preyed on gullible, unsophisticated consumers, and as such it is a class action challenging, among other things, the:

> a.  Standing[1], at the outset, of any putative person or entity that claims to have the power to enforce through foreclosure, the default rights under the applicable mortgage promissory notes (and the respective deeds of trust) in a securitized

---

[1] The issue of "Standing" is a basic issue of Constitutional Law either at the Federal level or at the state district court level. That is to say, if you are not the person directly injured or directly benefiting from a specific law or circumstance, you cannot go to court and try to enforce any rights that do not belong to you. The United States Supreme Court in several cases has stated that federal courts must satisfy for themselves that Standing exists and that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99 (1975) **Error! Reference source not found.** Thus, if no direct injury or direct harm to the claimant that wishes to pursue a claim in court, then there is no right to "standing" or right to be in court in the first place. In the case of mortgage default insurance and other credit enhancements, the very issue

11

mortgage, REMIC or securitization Special Purpose Vehicle ("SPV") or
Conduit Loan scheme in Virginia.

b.  Legality of so-called "Negative Amortization Loans"; [2]

c.  Legality of lenders' failure to disclose the *aggregate costs* involved in so-
called "Negative Amortization Loans";

d.  Legality of failure to disclose the *aggregate costs* of the transaction involved
in so-called "Negative Amortization Loans" *and* any accompanying
subordinate financing schemes to purchase or refinance a residential dwelling,
which, *but for* the subordinate financing, the transaction as a whole would not
have taken place. Simply put, if the only way you can afford to buy a house is
with a second loan, then the costs of that loan should be included in the
"costs" of the first loan so the buyer can make an informed decision.

e.  Legality of failure to completely account for the aggregate costs of a
transaction which purports to *disclose* a "yield spread premium" ("YSP"), but
yet entirely fails to include that YSP in the calculations applicable to the Truth
in Lending Act Disclosures ("TILA Disclosures").  For purposes of this
Complaint, there are at least four (4) YSP premiums that were not disclosed or
accounted for in the calculations:

    i.   The first YSP not accounted for or calculated in any way was the YSP
premium paid to the loan broker for origination of the first trust loan.

---

[2]  The term Negative Amortization loan or NegAm loan in this Complaint refers to mortgage loans that have a
"negative amortization" feature. Under the NegAm feature, any accrued interest on a mortgage loan is deferred and
added to the outstanding original Principal balance of that mortgage loan if the minimum monthly payment on such
mortgage loan on its interest payment date is less than the amount of accrued interest due on that mortgage loan on
that payment date. As a result, because the initial payments on these NegAm mortgage loans were "teaser rates" that
typically started at 1% or 2%, interest began accumulating from the day of settlement forward. This resulted in a re-
calculation of the interest rate each month as the principal balance increased each month.

ii.   The second YSP not accounted for or calculated in any way was the YSP premium paid to the loan broker for origination of the second trust loan.

iii.  The third YSP not accounted for or calculated in any way was the combined YSP premiums paid to the loan broker for origination of the first *and* the second trust loan.

iv.   The fourth, and by far the highest dollar value YSP not accounted for, calculated, or disclosed in any way or at any time by any of the Defendants are the YSP premiums received by the mortgage securitizing pool creators, pool sponsors, gamblers, and ponzi scheme entities that they obtained for themselves and for their mortgage pools for placing the borrowers in the type of loans which are the subject of this Complaint.

A.  In this fourth and last YSP, the securitizing entities never disclosed or accounted for all payments they received for structuring the transactions and placing the first and second trust loans in the applicable pools in the first place.

B.  This is even before accounting for any credit enhancements and pay-outs applicable to the securitized pool obtained on an event of default for a class of certificates or an alleged loss of value percentage pay-out triggering mechanism.

      C. This is a fact covered by the applicable securitized pooling and servicing agreement filed with the SEC. It is certifiable in an amount certain after discovery.

f. Legality of failure to disclose the applicable "par value" of a loan transaction before the transaction is made or completed.

g. Legality of the failure to properly account for, disclose, and calculate or list all the quantifiable reasons for the difference that exists between the YSP and the "par value" costs of a loan so as to properly and adequately inform Borrowers the reasons or guidelines as to why they obtained an "above par value" pricing for their particular loan; especially if, as stated in the loan applications which are the subject of the present Complaint, Plaintiffs had excellent credit and, in some cases, as stated by the Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC, in Plaintiffs' loan applications, Plaintiffs earned well over their real and unadjusted incomes.

h. Legality of whether a "pool" or "tranche" or "class of certificates" of securitized mortgage backed securities, whose associated pool or class of certificates has been paid by its "loss of value insurer," or various "credit enhancement policies" may still foreclose on homes belonging to that pool in a double payment, triple payment or even quadruple payment scheme. That is to say, if the investments have already been paid off or "bailed out" by their "securitized pool insurer or credit enhancement policy or guarantee" or "bail out federal government entity", are the putative investors still entitled to foreclose on consumers that have not been "bailed out." Further, if the

investors have already been paid once, do they continue to have the right to get paid out yet a second time if they already had required "loss reserves" insured against the possibility of default; and that is even before a foreclosure is consummated. To add insult to injury and add profits for the nefarious actors in these schemes, a foreclosure essentially effectuates a potential payment of yet a third time on the same notes, pools, tranches or class of certificates in the securitized mortgage backed securities they belong. And because of how the Internal Revenue Code is written (e.g. Internal Revenue Code of 1986, as amended, and applied to these securitized Conduit Loan activities), these profits are potentially tax free to the pool owners or investors, or class of certificates, giving them yet a fourth source of profit distribution to the securitized mortgage pool. Whether that fourth source of profit distribution ever trickles down to the securitized mortgage pool investors is a different issue yet to be determined. Considering the "bail out" payments and the totality of the circumstances, the Defendants' behavior is not just egregious, unconscionable, arrogant, irresponsible, and greedy; it is outright robbery and theft being perpetrated against innocent and unsuspecting victims: 1) the people who signed up for these loans and 2) the American taxpayer.

i.  Legality of whether the failure at settlement to disclose the identity of the Real Party in Interest or Certificate Holder(s) on a securitized loan transaction tolls the TILA statute of limitations.

j.  Legality of whether the failure at settlement to disclose the identity of the Real
    Party in Interest or Certificate Holder on a securitized loan transaction tolls
    the RESPA § 6 or § 8(a) statute of limitations.

k.  Legality of whether a mere putative "holder of the Note," or worse yet, a mere
    "nominee" of a noteholder, such as Defendant MERS in this Complaint, who
    is not a direct "legal or equitable beneficiary of payments of the Note", has the
    *standing* to enforce *any* provisions of the Note, including the power to enforce
    the Note by foreclosure; especially when the original Promissory Note is lost.
    For example, within the housing market itself, just because you are a
    "holder/tenant" of a house, do you have the right to sell the house?  More to
    the point, just because you are a Property Manager of a group of houses,
    responsible for collecting payments, paying insurance and taking care of
    maintenance fees and repairs, do you have the right to foreclose and or sell a
    house on behalf of the house owners you never met and you never contracted
    with?

l.  One sided practical application of the 33 Act §10[3] disclosures and SEC Rule
    424(b)(5). Specifically, when applied to the mortgage securitization industry,
    the prospective pool issuer or sponsor of the REMIC pool or Conduit Loan
    must comply with the disclosure requirements of the 33 Act by filing a

---

[3] Securities Act of 1933, § 10(d):  Classification of prospectuses: "In the exercise of its powers under subsections (a), (b), or (c), the Commission shall have authority to classify prospectuses according to the nature and circumstances of their use or the nature of the security, issue, issuer, or otherwise, and, by rules and regulations and subject to such terms and conditions as it shall specify therein, to prescribe as to each class the form and contents which it may find *appropriate and consistent with the public interest* and the protection of investors [emphasis added].

"424(b)(5)"[4] prospectus or private placement memorandum. That Rule 424

filing warns any prospective investors, before the prospective investor buys

securitized mortgage certificates, that certain loans in the proposed securitized

mortgages pool possessing Negative Amortization or interest only loan

characteristics present a "...*likelihood of default, especially in the early*

*years*...." Yet, in violation of the 33 Act §10 itself, potential borrowers are

*never* warned or told that their loan type is likely to fail or likely to default

regardless of the borrower's high credit score, intention, and valiant effort to

pay the mortgage loan. This failure to "trickle down" and "enforce the

warnings and disclosures" as against mortgage loan borrowers is in direct

contravention of the 33 Act §10 itself which states:

> In the exercise of its powers ..., the Commission shall have
> authority to ...prescribe ... the form and contents which it may
> find *appropriate* and *consistent* with the *public interest and* the
> protection of investors [emphasis added].

Warning borrowers that their loans are likely to default because of the nature

and characteristics of their loan itself is appropriate and consistent with the

public interest. [5]

---

[4] Securities and Exchange Commission Rule 424(b)(5) requires that: "A form of prospectus that discloses information, facts or events covered ... shall be filed with the Commission no later than the second business day following the earlier of the date of the determination of the offering price or the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date."

[5] This failure to require and enforce appropriate borrower disclosures at the time the securitized loan is made or applied for renders the SEC potentially culpable if not complicit in the predatory lending schemes which are the subject of this First Amended Complaint. Basically, what is good for the goose is good for the gander. These Negative Amortization loans actually create a galling and perplexing dichotomy in the respective prospectus filed with the SEC: always protect the investors and disclose all potential default risks in a certain securitized investment pool, but drown the borrowers themselves and never warn the borrowers; regardless of whether it is in the public interest to warn the borrowers of the default risks inherent in the loans themselves.  The effects of these failures are being felt all over the country.

These securitized mortgage pools were set up in a manner which allows them to function as racketeering activities in glorified pyramid and ponzi[6] schemes operating under the color of law. Further, these deceiving, underhanded, and egregious activities generated (and continue to generate) payments that had the effect of artificially inflating the cost of the consumers' loans, and reap for the Defendants quite substantial, illegal, unconscionable, on-going, and improper profits at the expense of the Plaintiffs and other similarly situated class members. Most disconcerting, all these violations had the immediate and incurable effect of ruining innocent peoples' lives; ruining Plaintiffs' American dream of owning a home they could afford; ruining Plaintiffs' credit, credit histories, and credit scores; exhausting any family savings and retirement funds; and created extraordinary emotional distress on borrowers and ruined Plaintiffs' health given the enormous stress as Plaintiffs may likely be rendered homeless due to foreclosure of their homes at any given moment because of their inability to pay the mortgage loans that Defendants set up for them.

Even after the loans were declared to be in default, these insatiable scavengers continue to feed on their victims' bodies and souls by re-securitizing, re-collateralizing, and re-selling these loans in "tranched investment pools", "securitized investment pools", "non-agency mortgage backed security pools", and other "securitized debt derivatives" that get insured by credit derivatives and credit default swaps, get cross-defaulted and/or cross-swapped, insured, re-insured, and ultimately paid-off (perhaps multiple times) before even reaching the unsuspecting taxpayers and guaranteed government bail-outs. Further, a lot of this activity is done, of course,

---

[6] MSNBC's Dylan Ratigan discusses these bank ponzi schemes in a November 2, 2009, article at http://www.huffingtonpost.com/dylan-ratigan/why-keep-geithner_b_341908.html.

in what is considered a "black box,"[7] where only the parties to the deal know what is being done. These unregulated credit derivative purchases and black box schemes further result in a web of "transactions" between parties and counter-parties that is impossible to track, unwind, explain, or verify. This is exactly what occurred to an entity known as Lehman Brothers that was allowed to file for bankruptcy because it could not cover the financial amounts and could not ascertain the identity of all of its credit derivative entities / counter-parties. This problem is not unique to Lehman. Rather, it applies to <u>all</u> financial entities selling securitized mortgage loans on the secondary market, including Defendants GREENPOINT, MERS and GMAC.

Specific allegations regarding the Defendants' ponzi scheme and *modus operandi* are more fully set forth below.

## I.  D. DROWNING IN THE POOL - SIMPLIFYING THE ISSUES OF A VERY COMPLICATED MESS

Plaintiffs recognize that the issues outlined and challenged by this Complaint are perceived as very complicated, as are the seemingly unrelated but inexorably intertwined issues involved in the secondary derivatives market. In an effort to simplify the issues, this Complaint may possibly be better understood by following the example of the makers, sponsors and the owners of swimming pools that are benefiting from the pool fees and payments or redemptions of life insurance policies obtained on their unsuspecting drowning victims.

---

[7] For a brief overview of the unregulated aspects of the credit default swaps, credit derivatives, and black box practices see Pratt's Journal of Bankruptcy Law, September 2008 Issue, Credit Default Swaps: From Protection To Speculation, http://www.rkmc.com/Credit-Default-Swaps-From-Protection-To-Speculation.htm.  See also information from Brooksley Born, former Chairwoman of the Commodities Futures Trading Commission who attempted to regulate the unregulated credit derivatives market and her efforts were shunned by then Federal Reserve Bank Chairman Alan Greenspan, Secretary of the Treasury under President William F. Clinton, Robert Rubin, and Larry Summer.  Ms. Born specifically warned about the systemic fraud on the markets that the credit derivatives posed.  An excellent overview of the credit derivatives discussion and black box issues can be seen at the October 20, 2009 PBS documentary *FRONTLINE: The Warning*, www.pbs.org/wgbh/pages/frontline/warning/view.

a. At the beginning, the swimming pool makers, sponsors, managers and owners advertise the opening of their brand new pools, one pool at a time; just like in typical ponzi or pyramid promotional scheme that attracts new innocent participants all the time.

b. Only good swimmers need apply to become members of the pools; just like our Plaintiff who had good credit at the time that their loans were originated. In fact, if you are not a good swimmer, you will not be accepted in the swimming pools.

c. Naturally, the better the quality of swimmers in the pools, the better the perceived quality of the pool. Thus, the better the perceived credit quality of mortgage notes signers or borrowers, regardless of their ability to swim (pay their mortgage), the better credit rating designation ultimately assigned to the notes or "commercial grade/investment grade paper" placed in real estate investment conduits ("REMICS") or Special Purpose Vehicles ("SPVs").

d. The higher the quality of swimmers, the higher the credit rating agencies like Standard & Poors', Moody's or Fitch's designate the characteristics of a particular REMIC pool. For instance, a triple AAA rating in a given securitized mortgage pool implies that the investment is sound, is likely to get paid out, has virtually no risk of loss, and the potential investors can feel more comfortable investing their money in the designated securitized pool certificates.

e. Once the first pool of "investment grade paper or negotiable instruments" is full, the entire pool gets sold on Wall Street's securities, secondary markets, or private placements as "good investments."

f. To make it attractive to potential pool investors, or to protect the interests of the pool creators themselves, the pool sponsors and creators make sure that life insurance policies are put in place to protect against the risk that the chosen swimmers will drown (default on their

mortgages). Further, knowing that the swimmers are likely to fail, the pool sponsors, creators and managers place bets, indeed gamble, on the likelihood that the swimmers will actually drown. These sophisticated bets and gambling schemes[8], otherwise known as trading in commodities of credit default derivatives and credit default swaps, are procured for the benefit of all pool members and participants; except of course the swimmers themselves.  These credit enhancements and credit derivatives are typically cashed and administered by the master servicer and pool trustee representatives who often are also investors in the senior certificate classes of the designated pool.

g.  As soon as the first pool of "excellent credit borrowers" is full it is sold; then it is time to fill the next pool. The racketeering activity and ponzi scheme continues.  Any pools already built but empty are just waiting to get filled by what is called "shelf registrations" with the Securities and Exchange Commission.

h.  The clearing house for all this spa and pool activity is an entity that, in exchange for a fee, allegedly keeps electronic track of the swimmers and their pool memberships; as for instance the role played by Defendants MERS1 and Defendant MERS2 in furtherance of this scheme and enterprise.

i.  Once the second pool gets full, that pool gets sold as well, and so on; just like in a typical ponzi or pyramid promotional scheme which attracts new innocent participants all the time, and allows for several avenues of money laundering.  Again, as is the case with each drafted swimmer, the swimmer's particulars are putatively maintained electronically by the

---

[8] Even US Senate has taken notice of these gambling schemes. See the November 11, 2009 article discussing the proposed legislation at *Derivatives Just "A Sophisticated Form Of Gambling," U.S. Senators Say; Propose Bill Allowing State Gambling Laws To Apply*, http://www.huffingtonpost.com/2009/11/10/derivatives-just-a-sophis_n_352994.html

electronic shell or clearinghouse represented by Defendant MERS1 and Defendant MERS2, throughout the swimmers' lifetime.

j.   This scheme of selling pools full of apparently good or excellent credit borrowers is nicely packaged by the pool sponsor, issuer, gambler or ponzi scheme creator. It creates the appearance that only good, responsible and strong swimmers are members of the pool, and therefore only good quality pools are allegedly offered in the securities markets.

k.   In fact, the better the credit score, the better the perceived quality of the securitized pool.

l.   Unbeknownst to all eligible swimmers put into these securitized mortgage pools, is that the pool makers, sponsors, gamblers, participants, associates, co-conspirators and ponzi scheme creators know that these borrowers are likely to default on their particular loans especially in the early years, and that the pool conspirators, gamblers and creators have made provisions for that dire eventuality.

m. In order to maximize profits for the pool builders, the pool sponsors, the pool managers, the pool servicers, the swimmer drowning gambler, and the pool owners (investors or purchasers of "certificates"), it is not disclosed by the conspirators, co-conspirators and ponzi scheme creators in the offerings to the potential swimmers that these swimming pools are specifically designed to drown all swimmers.

n.   From the beginning, these participants and malfeasants fraudulently conceal their activities and, in the securitized pool environment, more often than not they even conceal their identity. By concealing their activities and using loan originators they attempt to shield themselves from claims against them for violations of consumer protection and other laws. Indeed, proper disclosure of their nefarious activities may actually discourage potential

swimmers from being drafted, or may discourage potential ultimate investors from investing in the created pools.

      o.   When the swimmers begin to drown the pools' insurance policies or credit enhancement provisions of the particular pools pay-out. Although the insurance policies have paid out, the swimmers' homes are still foreclosed on to augment the pool creators' profits. One of the beauties of this nefarious racketeering activity and ponzi scheme is that because of the applicable REMIC provisions in the IRS Code, all these eventual pay-outs are tax free.

      p.   In reality, precisely because you were a good/excellent swimmer, you were drafted and put in the pool; in the pool of swimmers that would eventually drown no matter how strong or how much energy (money, savings, stocks) the drafted swimmer had.

      q.   Only a few lucky swimmers eventually survived if they managed to get out of the pool at the beginning of a pool's opening. They either managed to sell their house early or were able to refinance their loans before their credit scores were damaged.

      r.   Also disconcerting is the fact that if the borrower is a good swimmer and survives the drowning pool, that is good for the borrowers but not necessarily good for the pool makers, servicers, pool owners, gamblers, and ponzi scheme creators.

      s.   Knowing that the borrowers are destined to drown because of their good credit, good credit scores and their relatively low income in comparison to the loan principal amounts, the swimming pool sponsors, issuers, servicers, trustees, owners, gamblers, and ponzi scheme creators take out default/disaster insurance (for example through insurers like AIG, MGIC or their affiliates) against the likelihood that most or all the swimmers will drown. As noted previously, since these individuals and/or entities actually gambled on the likelihood that the types of loans given to Plaintiff and others similarly situated would default, they proceeded to

place bets and gambled on those defaults and obtained credit derivatives and credit default swaps for the benefit of all pool participants; except those most affected: the swimmers themselves. The activities in betting, trading, dealing in/or purchasing of credit derivatives and other credit default swaps are considered trading in commodities under the Commodity Futures Modernization Act of 2000. Due to the betting and gambling nature of these credit derivatives activities, these activities are considered gambling activities.

   t. Once the previously strong swimmers are drowning, or dead, or holding on to their last breath of life, the pool managers, sponsors, issuers, trustees, owners, gamblers and ponzi scheme creators make demand on the appropriate pool insurer to start paying on the insurance policies the pool owners purchased, and also demand that the loan loss reserve accounts be activated and pay out.

   u. Unfortunately for the drowning swimmers and their estates, at that point their houses are still in the swimmer's name. The pool managers, sponsors, owners, gamblers and ponzi scheme creators can get title to the drowned swimmers' homes through foreclosure, so they use the legal process to take the drowned victims' houses away and either put the houses in the pool owner's name (through foreclosure or deeds-in-lieu of foreclosure), or sell the houses to other swimmers in new pools of securitized mortgage loans (placing their REO – "real-estate owned" – properties on the market).

   v. Thus, like an orchestra that has been perfectly choreographed and through the help of their aiding and abetting associates at foreclosure law firms, the pool managers, servicers, issuers, owners, gamblers or ponzi scheme creators start taking the houses away from the swimmers' estate one at a time to increase the pool owners' and gamblers' profits.

w.  Although foreclosing law firms and trustees (i.e. Defendant SIW) have a fiduciary duty[9] to both a Lender and a Borrower to make sure that the foreclosing entity actually is a "lender" as required by the applicable deed of trust and security instrument, or is otherwise able to establish its authority to enforce the default provisions of the note, or actually has the power or authority to commence or order that foreclosure proceedings be started, these collaborating associates in the securitized mortgage pool or mortgage loan ponzi scheme environment rarely comply with and most times even ignore their fiduciary duty to the affected borrowers. Further, in the Virginia non-judicial foreclosure process that is conducted without any documentary review whatsoever, it is not helpful that their unchallenged participation in the foreclosure process actually generates substantial profits for their participation in the completion of the scheme.

x.  Specifically, the participation of the law firms and trustees provides these co-conspirators and aiders and abettors with hefty legal fee revenues and, at times, commissions of 5% or more of the sales price of a given foreclosed property. Since their activities are "presumptively valid" by statute in Virginia's non-judicial foreclosure process (see e.g. Virginia Annotated Code § 8.01-389(C)), these participating foreclosure law firms/Substitute Trustees and foreclosing representative entities are hardly ever challenged or questioned in court; regardless of their lack of documentation, their inaccurate documentation, or even worse, their fraudulent documentation indicating that a loan is actually owned by the foreclosing entity.

y.  Before they all drown, the swimmers' survival instinct pushes them to struggle and to want to come out of the pool.

---

[9] See Powell v. Adams 179 VA 170 (VA Sup Ct 1942)( Deed of Trust Trustee has a fiduciary obligation to all parties of the Deed of Trust; not just the Lender).

z.   Unfortunately, by the time the chosen swimmers want to come out of the pool and realize that they must get out as quickly as possible, it is too late. The borrowers' once stellar and excellent credit and ability to swim in the pool is vastly diminished. In fact, the great credit and credit scores that got them in trouble to begin with have by now been destroyed and they cannot even attempt to refinance their homes. Under these unfortunate conditions, even feeding their families in order to keep swimming becomes a struggle.

aa.   Unable to refinance their homes, the once strong but now failing swimmers wish for a life jacket or boat to help them get out of the pool. Family members are called in to help them by asking them to throw life lines. At times, even the occasional life line providers are forced into the pool of swimmers to help save the father, mother, sibling, or friend who is drowning in the pool and can no longer swim.

bb.   Then the swimmers ask the pool makers, owners, operators, conspirators, gamblers and ponzi scheme creators to help as well in order to survive and not drown in the pool. When help is given, which it rarely is, the life boat or life jacket in the form of a proposed loan modification or forbearance period may also be full of holes and, in most cases, only delays their inevitable drowning, but allows the pool creators to profit a bit more from the swimmers before allowing them to drown.

cc.   Little do the drowning swimmers know that default is preferable to the pool makers, owners, operators, conspirators, gamblers and ponzi scheme creators.  Unfortunately for the drowning swimmers, each pool owner/conspirator/sponsor/gambler and ponzi scheme creator may actually make more profit foreclosing on a property, even lower valued property because then the pool owners can start filling up other new and attractive pools for any remaining good swimmers out there.

dd. In case of a loss on a residential mortgage pool, upon information and belief, these creative scheming conspirators may even start selling tax credits on lower valued foreclosed properties to other interested investors that are newly attracted by their desire to mitigate or minimize their tax liabilities with the new tax credit pools.

ee. Thus, since the process can start up again when houses begin getting foreclosed and re-sold, the pool owners, gamblers and ponzi scheme creators have no real incentive to modify the situation at all.

ff. Sadly, it is plain to see that swimming pool owners, sponsors, operators, conspirators, gamblers and ponzi scheme creators servicing or owning pools that are full of drowning victims have no real incentive to fix the drowning pool situation because there is more profit and more gambling winnings in a foreclosed home loan than in a modified one. See the mid-October 2009, National Consumer Law Center, Inc., Report, <u>Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior, Servicer Compensation and its Consequences,</u> NCLC, Inc. Report (October 2009), for a brief analysis and overview of mortgage loan Servicers' incentives (or more appropriately, lack thereof) for either modifying or preferably foreclosing on borrowers' homes in the event of a mortgage delinquency. http://www.nclc.org/issues/mortgage_servicing/content/Servicer-Report1009.pdf.

gg. The pool owners, pool sponsors, pool operators, conspirators, scheme creators, when faced with a request from a swimmer/borrower to modify his/her loan, they must decide whether to 1) modify the loan, take a loss, and wait thirty (30) years to recover the now *reduced* income stream; or 2) deny the modification, default the borrower, and collect on insurance from AIG, MGIC or other similar counter-parties.   This is not a difficult decision from their perspective.

hh.  Bantu Stephen (Steve) Biko, one of South Africa's most significantly influential political activists and considered a martyr of the anti-Apartheid struggle once said "…if you show people how to look at things differently, things change." Mr. Biko's perspective helped other people question the legality of apartheid, until that unquestioned "legal policy" was ultimately eliminated.

ii.  If you observe the present securitized mortgage pools from afar and with a bird's eye view, is it right to blame the swimmers for drowning, or do you place the blame more properly on the pool makers, pool sponsors, pool managers, pool servicers, pool trustees, pool owners, conspirators, gamblers and ponzi scheme creators for building the drowning pools in the first place.

jj.  To put it more simply and to keep things in perspective, we can look to case law that has developed from the product liability cases. For instance, just because a child plays with a defective toy and loses an eye, the fact the toy maker did not know that the product was defective does not mean it is not liable for making a defective product. Similarly, just because car company executives do not know that their New Model car gas tank would explode on contact in a car accident does not mean the car manufacturers are not liable for the resulting damages. These are not "conclusory assertions" or assertions that are not "plausible." These assertions of product liability happened, the violations occurred, and the injuries were eventually allowed to be proved in the once supposedly "not defective" toy or vehicle. The same defective financial product liability analogy works and is provable with respect to each and every one of Plaintiffs' assertions.

kk.  If the pool makers, pool preparers, pool sponsors, pool managers, pool trustees, SPV gamblers, ponzi scheme creators and other interested pool entities knew or suspected that their

swimmers had a higher likelihood that the pool members in a Negative Amortization securitized pool would drown, especially in the early years as disclosed in their own securitization prospecti filed with the SEC, those individuals and/or entities cannot claim to be faultless just because they were not present when the swimmers were first drafted to join the pool.

ll. Furthermore, these gamblers, schemers and pool sponsors readily acknowledged in their filed prospectus that the potential losses in their negative amortization loans could be higher than the losses on loans that did not have negative amortization characteristics.

mm. In anticipation of the eventual expected "higher loss on a negative amortization loans," unbeknownst to the Plaintiffs, these savvy individuals and entities bought insurance policies such as credit default swaps, interest rate swaps, and other credit derivatives. Once the swimmers start to drown, these entities cash in on their insurance and credit enhancement policies; getting paid 100% on the dollar, or more.

nn. As such, if the pool maker, sponsor, issuer, conspirator, gambler or ponzi scheme creator knew that the borrowers may drown, or had a greater likelihood of drowning in these pools, and in fact, intended that these borrowers would drown, these Defendants may not now shield themselves behind loan brokers and other loan origination entities that may no longer exist.

oo. Quite clearly, this is really a simple case of arrogance, irresponsibility and greed ("aig") by each and every one of the named Defendants. Specifically, the Defendants' "aig" incentivized and encouraged them to create, develop, sell and profit from their predatory and sub-prime toxic loans and defective financial lending products, regardless of the harmful financial and emotional repercussions to the affected borrowers.

pp. Further, these Defendants conducted their schemes and enterprises under the arrogant assumptions that they are blameless for 1.) creating, marketing and selling defective financial products, 2.) for creating a mortgage mess, and 3.) that they have shielded themselves from liability by several layers of corporate entities and affiliations.  In the case of Defendant MERS, and the services that it provides to its members, it specifically has marketed its capabilities and activities as being "bankruptcy remote."

qq. Once Defendants successfully created one illegal ponzi scheme and generated obscene profits from that activity, Defendants began using their ill gotten gains in other securitized mortgage pools, thereby essentially using their illegal profits in money laundering activities.  The higher the profits, the more pools created, and the more money laundered.

Considering what has transpired with Plaintiffs' applicable mortgage loans, Plaintiffs institute this action against all of the named Defendants in this Complaint. With the institution of this Complaint, the Plaintiffs and other class members seek: actual damages; statutory penalties and damages; the costs of this action; compensatory and punitive damages; injunctive relief to stop foreclosures of Negative Amortization loans covered by this Complaint pending resolutions of the issues being raised herein; attorneys' fees; and other legal, equitable and remedial damages that this Honorable Court may deem necessary or appropriate in its discretion to address the wrongs herein highlighted and perpetrated by Defendants .

## II.    PARTIES

1.     Plaintiffs Luis G. Lara and Olga M. Garcia, Husband and Wife (the "Lara/Garcias") are individuals residing at 12777 Crossman Creek Way, Bristow, Virginia 20136 (the "Property").

2.       Mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, gambler, ponzi scheme creator, mortgage pool sponsor, securitizing agent, and conduit and beneficiary GMAC MORTGAGE, LLC (hereinafter "GMAC") services the Plaintiff's first and second trust home purchase loans on the Plaintiff's primary residence. It is not yet determined which other REMIC, SPV or Structured Asset Mortgage Investment pool/tranche or certificates holders Defendant GMAC represents in connection with Plaintiffs' loans.

3.       Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS1"), is a Delaware corporation incorporated in October 16, 1995, bearing Delaware File Registration Number 2543543 (MERS1) which also owns MERS2, an entity having the same name, below. MERS1's principal place of business is located in Reston, VA, as is the principal place of business for MERS2. Defendant MERS1 is licensed to and regularly does transact business in the Commonwealth of Virginia, including the *electronic* registration and *electronic* tracking of mortgage transfers. Defendant MERS1 acts as an electronic clearinghouse and conduit, facilitator and non-government mortgage or security instrument document tracking entity, specifically including the loans subject to this Complaint.

4.       Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS2"), is a Delaware corporation incorporated in January 1, 1999, bearing Delaware File Registration Number 2990193 which is owned by MERS1, an entity having the same name as above. MERS2's principal place of business is located in Reston, VA, in the same offices as MERS1. Defendant MERS2 regularly transacts business in the Commonwealth of Virginia, including the electronic registration and transfer of mortgages, specifically including the Property. MERS2 was allegedly set up by MERS1 as a bankruptcy and judgment remote subsidiary. The issue as to which MERS (1 or 2), when, how, why, and under what capacity

MERS1 or MERS2, or both, is/are involved in the transactions involved herein can only be determined through discovery. Upon information and belief, the use of either MERS1 or MERS2 depends on the circumstances present in each case and is a practice conducted by both Defendants MERS to a) create confusion; b) allow for plausible deniability for wrongful acts; c) conducted in such a way as to obfuscate legal process and; d) to abrogate legal and contractual responsibilities. Clearly, the activities and *modus operandi* of Defendant MERS1 and Defendant MERS2 are anything but pellucid. For purposes of this Complaint, both MERS1 and MERS2 have been present and acted in different capacities with respect to the allegations herein asserted since inception of the loan(s). For purposes of this Complaint, both MERS1 and MERS2 shall be hereafter solely referred to as "Defendant MERS." Upon information and belief, only *one* MERS is authorized and registered to do business in the Commonwealth of Virginia. Whether the licensed entity is MERS1 or MERS2, only Defendant MERS can tell. See the Commonwealth of Virginia State Corporation Commission entity and registration site http://s0302.vita.virginia.gov/servlet/resqportal/resqportal(last visited on November 10, 2009).

5.  Defendant Real Estate Agent JOSE (TONY) A. BONILLA (hereinafter "R/E Agent BONILLA or BONILLA"), was the real estate agent involved in all house purchases regarding Plaintiffs. Upon information and belief, Defendant R/E AGENT BONILLA is a Virginia resident. Further, at all times applicable to the Transactions in this Complaint, Defendant BONILLA was an employee, agent, and representative, of Defendants ANGELMAR REALTORS, LLC, and other named Defendants. Upon information and belief, Defendant R/E BONILLA is currently working for LOPEZ REALTORS in Manassas, Virginia.

6.  Defendant Real Estate Broker Agency ANGELMAR REALTORS, LLC (hereinafter "ANGELMAR R/E BROKER") was the original real estate broker associated or

employing Defendant R/E AGENT BONILLA in the course of the Transactions which are the subject of this Complaint.

7.     At all times relevant hereto, in the course of purchasing their homes, the Lara/Garcias, and other Plaintiffs, relied on Defendant R/E Agent BONILLA as a representative of Defendant ANGELMAR REALTORS, LLC, to prepare and present their house purchase contracts and effectuate their home purchases.

8.     Defendants Loan Officer and Senior Mortgage Consultant GUSTAVO H. OSSA (hereinafter, individually referred to as Sr. Loan Officer OSSA) and his wife ROSA MARIA OSSA, jointly and severally (hereinafter, individually referred to as "ROSA OSSA". Collectively, Sr. Loan Officer GUSTAVO H. OSSA and his wife, ROSA OSSA, are hereinafter referred to as the "OSSAS" when appropriate), are Virginia residents who worked for Defendant mortgage broker MORTGAGE UNLIMITED SERVICES, LLC at all times relevant to this Complaint as originating Loan Officers and mortgage consultants.

9.     Defendant mortgage broker MORTGAGE UNLIMITED SERVICES, LLC ("MORTGAGE UNLIMITED BROKER") at all times relevant hereto allegedly acted as a licensed mortgage broker in Virginia. Upon information and belief, however, Defendant MORTGAGE UNLIMITED BROKER was not licensed as a mortgage broker at all in Virginia. Further, Defendant MORTGAGE UNLIMITED BROKER at all times relevant hereto, acted as an agent of Defendants GREENPOINT, MERS and GMAC, and acted solely for the benefit of its/their officers, associates, partners, successors, assignees, assignors, and mortgage pool securitizing agents, gamblers, conspirators, co-conspirators, and ponzi scheme creators.

10.    Mortgage loan table funder, mortgage note buyer, assignor/assignee, servicer, ponzi scheme creator, mortgage pool sponsor, gambling entity, and securitizing agent and

conduit Defendant GREENPOINT MORTGAGE FUNDING, INC. (hereinafter

"GREENPOINT") allegedly provided the initial table funding of the first trust and second trust

notes for the ultimate purchase/refinancing of Plaintiffs' homes.

11.     Defendant Samuel I. White, PC (hereinafter "SIW"), is a Virginia law firm and

professional corporation with its principal offices located in Virginia Beach, VA. Defendant SIW

regularly conducts foreclosures on behalf of putative lien holders or allegedly authorized

foreclosing entities in the Commonwealth of Virginia which have not established their authority

or ownership of the promissory notes authorizing them to foreclose on peoples' homes.

12.     Defendants JOHN DOE AND JANE DOE (hereinafter "JOHN & JANE DOES")

represent an individual or individuals presently unknown, such as the real estate appraisers used

in the valuation of Plaintiffs homes and who conspired and otherwise participated with the

named Defendants in the wrongdoing described in this Complaint.  Since Plaintiffs are unaware at

this time of the true names and capacities of Defendants sued as JOHN & JANE DOES 1-100,

inclusive, Plaintiffs sue these Defendants by such fictitious names.  As such, Plaintiffs will amend this

Complaint to allege Defendants John & Jane Does' true names and capacities when ascertained to

name the additional wrongdoers as parties.

13.     Defendants corporations, partnerships, entities, yet to be determined, if any, also

involved in the real estate purchase, real estate loan transaction, unidentified real estate

appraisers, mortgage note purchasers, securitization entities, REMICs, Special Purpose Vehicles

("SPV"), collateralized mortgage pool insurer involved in this case ABC CORPORATIONS

(hereinafter "ABC CORPS"). Defendant ABC CORPS' identities are presently unknown, but

conspired and otherwise participated with the named Defendants in the wrongdoing described in

this Complaint.[10] Once the identity of these other corporations or business entities is established, this Complaint will be amended to name the additional wrongdoers as parties. Further, upon information and belief and at all times relevant hereto, in the course of purchasing (or refinancing) their home and after making contact with Defendants OSSAS and through Defendant R/E Agent BONILLA, the Lara/Garcias and other class members were provided real estate appraisals with inflated values for the properties, but the identity of the appraisers was not disclosed.

14.     Whenever reference is made in this Complaint to any act of any Defendants, that allegation shall mean that each defendant acted individually and jointly with the other Defendants.

15.     Based on information and belief, Plaintiffs allege that at all times mentioned in this Complaint, Defendants were agents, servants, partners and/or employees of their co-Defendants, and in doing the actions mentioned below were, unless otherwise alleged, within the course and scope of their authority as such agent, servant, partner, and/or employee with the permission and consent of co-Defendants.

16.     Any allegations about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority and/or within the scope of their agency if acting as an agent of another.

---

[10] Plaintiffs have documentation that an entity identified as Countrywide Home Loans was at one point connected with the loan origination process involved in Plaintiff's Lara/Garcia Complaint. How, which, when, and what specific role Countrywide played in Plaintiff's Transactions and its affiliation with Defendant GMAC is yet to be fully determined and ascertained. As such, Plaintiffs reserve their right to amend this Complaint when Countrywide's role is ascertained, and to perhaps determine and include the Plaintiffs in this Complaint in the national Countrywide Civil RICO proceedings currently underway in California which have survived dismissals and the first stages of federal civil RICO class certification. See In RE Countrywide Financial Corporation Mortgage Marketing and Sales Practices Litigation, USDC, SDCA, Lead Case No. 3:08-md01888-DMS-LSP (March 6, 2009). The Countrywide Civil RICO class action currently underway establishes the racketeering activities, practices and operations of a similar RICO enterprise in the securitization of pay option or negative amortization loans in which GMAC engaged.

17.     Plaintiffs believe and are informed and, on that basis, allege that each of the said

Defendants, including the DOE Defendants, were legally responsible for the unlawful actions, unlawful

policies, and unlawful practices contained in this Complaint. Further, each Defendant, unless

specifically excluded herein, committed, or was a co-conspirator/accomplice to, the acts alleged

in this Complaint.

18.     Additionally, each Defendant knew or realized that the other Defendants were engaging

in or planned to engage in the violations of laws alleged in this Complaint.  Knowing or realizing the

other Defendants were engaging or planning to engage in unlawful conduct, actions or practices, each

defendant nevertheless facilitated and even directed or assisted in the commission of the unlawful acts.

Each defendant intended and did encourage, facilitate, or assist in the commission of the unlawful acts,

and thereby aided and abetted the other Defendants in the unlawful conduct.  Plaintiffs will amend this

Complaint to set forth the true names and capacities of said Defendants, along with the

appropriate charging allegations when the same have been ascertained.

19.     At all relevant times, Defendants have engaged in a conspiracy, common

enterprise, and common course of conduct, the purpose of which is and was to engage in

violations of law alleged in this Complaint. This conspiracy, common enterprise, and common

course of conduct started more than four year ago and continues to the present.

### III. GENERAL BACKGROUND

III. A.     GENERAL ALLEGATIONS

20.     This action is brought against Defendants BONILLA, ANGELMAR R/E

BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC,

SIW and one or more of the fictitiously named Defendants and Co-Conspirators as described in the

caption of this Complaint who unlawfully committed: deceptive and unfair business practices;

fraud; fraud in the inducement; fraudulent concealment; illegal gambling; created illegal ponzi
schemes; negligence; negligent training and supervision; gross negligence; cloud/slander of title;
and violations of Federal and State consumer protection laws, warranting remedies and judgment
at law for damages as well as equitable injunctive relief.

21.     Plaintiff's are the legal and equitable owners and sole title holders of their
Property.

22.     Upon information, direct knowledge and belief, to purchase the home and primary
residence, despite the fact that Plaintiff indicated that they wanted to sell the house they were
then living in first, Plaintiff's were solicited, drafted and enticed by R/E Agent BONILLA, the
OSSAS, and MORTGAGE UNLIMITED BROKER to join several mortgage pools (i.e.
refinancing their original residence at 408 Patrick Lane, Herndon, VA 20170, with two loans
(one first trust loan with negative amortization and a teaser rate of 2%, and a second higher
interest rate second trust home equity line of credit loan (the "Plaintiff's Refinanced Property")).

23.     Specifically, once Plaintiff's Refinanced Property was completed and settled,
Defendants R/E Agent BONILLA, the OSSAS, and MORTGAGE UNLIMITED BROKER
stripped the equity of Plaintiff's Refinanced Property so that the Plaintiff would buy their new
primary residence in Gainesville, VA, which is the subject of this Complaint.

24.     These aiders, abettors, and conspirators (Defendants BONILLA, ANGELMAR
R/E BROKER, the OSSAS, and MORTGAGE UNLIMITED BROKER) are the first line of
swimmer drafting agents and Borrower recruitment associates specifically tasked to fill the
securitized mortgage pools which the pool sponsors, originators, gamblers and ponzi scheme
sponsors created, and to continuously fill the applicable mortgage pools, REMICs or SPVs.

25.     Starting approximately October 2005 and running through and including July 28, 2006, Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, and MORTGAGE UNLIMITED BROKER "helped" the Plaintiff, other members of the Lara and Garcia families, and others, find, identify and, ultimately complete the purchase of a home that would become their primary residence. Other Plaintiff family members were also solicited, drafted, and placed into similar securitized mortgage pools by Defendants either in an equity stripping or refinancing scheme, or home purchase.

26.     Based on information and belief, Defendants R/E Agent BONILLA and the OSSAS normally, readily and regularly communicated with each other via cellular phones, faxes, internet, and other forms of electronic communication and facilities of interstate commerce before sending and referring their victims to each other. In the event of a refinancing and/or selling transaction, the borrowers were sent to visit Defendants OSSAS and MORTGAGE UNLIMITED BROKER's office to start filling the securitized mortgage pools that Defendants OSSAS and MORTGAGE UNLIMITED BROKER's were tasked to fill by Defendants GREENPOINT and GMAC throughout the mortgage loan, gambling and ponzi schemes that created and filled the mortgage pools which are the subject of this Complaint.

27.     Once initial telephone contact was made with Defendants OSSAS, Defendant R/E Agent BONILLA sent the Lara/Garcias and numerous other Plaintiffs which are the subject of this action to: a) fill out loan applications; b) provide social security numbers to obtain credit reports and credit or FICO ratings; c) submit accurate and readily verifiable income and bank account documentation; d) and ultimately apply for a mortgage loan with Sr. Loan Officer and Defendants OSSA and ROSA OSSA, representatives of Defendant MORTGAGE UNLIMITED BROKER.

28.     On information and belief, Defendants GREENPOINT, MERS and GMAC knew before the settlement on Plaintiff's loans that the first and second trust loans were to be "securitized," but nonetheless fraudulently concealed and never disclosed such activity to the Plaintiff, thereby never actually complying with any applicable CRESPA, TILA, RESPA and HOEPA disclosures.

29.     Defendant MERS is identified on Plaintiff's First Deed of Trust as not a Trustee but "as a separate corporation that is acting solely as a nominee for Lender."

30.     At all times relevant hereto, in the course of purchasing their home and after making contact with them through Defendant R/E Agent BONILLA, the Plaintiff and other class members did obtain their mortgage loans through Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC.

31.     Defendant MORTGAGE UNLIMITED BROKER, and its employees, officers and agents performed its activities and duties as the first link of the chain in a convoluted, obfuscating, and yet extremely profitable gambling and ponzi scheme the other Defendants created and used to perpetrate the violations asserted in this Complaint against all unwitting Plaintiffs herein represented.

32.     Making use of instrumentalities of interstate commerce, and as a normal course of dealing and business practices, Defendants GREENPOINT, MERS and GMAC normally and regularly wired the loan proceeds on the loans that they table funded for the borrowers and swimmers recruited by Defendants R/E Agent BONILLA, ANGEMAR R/E BROKER, OSSAS and MORTGAGE UNLIMITED BROKER.  All the funding wires were sent to designated real estate settlement companies. In the instant case, GREENPOINT wired the first trust and second trust table funding for the Plaintiff's home purchase.

33.     The identity of the true party in interest and ultimate "Lender" for this

Transaction is unknown at this time.

34.     Upon information and belief, after the settlement of the Plaintiff's home took

place, GREENPOINT subsequently transferred the Plaintiff's first trust and second trust loan to

Defendant GMAC to be more properly placed in GMAC's applicable securitized mortgage

REMIC or SPV pools. On information and belief, this assignment of loans to Defendant GMAC

was known by Defendants GREENPOINT, MERS, and GMAC *a priori* of the loan settlement

and Defendants GREENPOINT, MERS and GMAC knew before the settlement that the first and

second trust loans were to be "securitized," but nonetheless fraudulently concealed and never

disclosed such activity to the Plaintiffs, thereby never actually complying with applicable TILA,

RESPA, HOEPA, and CRESPA disclosures; including never accounting for at least four (4)

YSPs as discussed *supra*.

35.     Upon information and belief and at all times relevant to these proceedings,

Defendants' residential lending business model consists of making as many residential loans

and/or loans made to unwitting borrowers with good to excellent credit scores.

36.     At times, as in the case of Defendant MORTGAGE UNLIMITED BROKER,

Defendants conducted their business as wholesale lenders/brokers. In its capacity as mortgage

broker, it worked pursuant to correspondent loan agreement relationships and/or lending contracts

with Defendants GREENPOINT and GMAC, and worked closely with Defendants

GREENPOINT and GMAC's sales representatives, followed their lending guidelines, and

originated loans that were ultimately supposedly underwritten and reviewed for borrower quality

control by Defendants GREENPOINT and GMAC. No borrower quality control was conducted.

37.     Sometime prior to 2008, Defendant GMAC informed Plaintiff that Defendant

GMAC would be servicing the Plaintiff's loan and that payments should be made to Defendant

GMAC.

38.     Plaintiff's did not receive any correspondence from Defendants GREENPOINT

or MERS, as required by contract and law, that Defendant GREENPOINT had assigned,

transferred, or sold Plaintiff's loan and Promissory Notes, and/or any of their interest in

Plaintiff's home, to Defendants GMAC.

39.     At all times relevant hereto, Defendants GREENPOINT, MERS and GMAC

regularly extended or offered to extend consumer credit for which a finance charge is or may be

imposed or which, by written agreement, is payable in more than four installments thereby

making them not exempt from coverage of federal and state consumer laws.

40.     Defendant GREENPOINT is the person/entity to whom some of the transactions

which are the subject of this action is initially payable, making this Defendant a creditor within

the meaning of TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17). Despite *a priori*

knowing that Plaintiff's loans formed part of a securitized mortgage loan transaction, Defendants

GREENPOINT, MERS and GMAC concealed and failed at all times relevant hereto to disclose

the identity of the true persons in interest or true lender of the applicable Plaintiff's promissory

notes. To this date the proper disclosures have not been made and disclosure of the identity of

the true party in interest, which would to comply with Rule 17 of the Federal Rules of Civil

Procedure, is still unknown.

41.     Further, with regard to the property values which supposedly served as the basis

for extending Plaintiff's the loans in the first place, the identity of the appraisers was not

disclosed. As of the filing of this Complaint, the identity(ies) of the real estate appraiser(s) is unknown.

42.     As such, having never identified and fraudulently concealed the identity of the appraisers and other referral entities, including the identity(ies) of the true parties in interest, Defendants R/E Agent BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC have never properly complied with the applicable TILA, RESPA, HOEPA, and CRESPA disclosures. To date the proper disclosures have not been made.

43.     Upon information and belief, Defendants GREENPOINT and GMAC either invested in the classes of certificates of the applicable securitized REMIC or SPV, or sold a majority of their residential loans to the secondary market, that is, to unidentified and innumerable third-party investors or qualifying SPV or REMIC entities that issue interest-bearing classes of certificates representing the mortgage pool notes and the hyped interest revenue stream. The YSPs and other consideration applicable to these notes and received by the securitizing entities has yet to be disclosed. Thus, as of the filing of this Complaint, the proper disclosures have not been made.

44.     After bundling or selling the mortgage notes to securitization entities or to third-party investors, some Defendants (like GREENPOINT and GMAC) typically were/are required to repurchase those loans in certain circumstances, for instance, in the event of documentation errors, underwriting errors, fraud, or early loan payment (defeasance) events. To date the proper Purchase and Sale Agreement ("PSA") as filed with the SEC has not been made available to Plaintiff to cite the exact SEC record number or PSA page number where those provisions are found on Plaintiff's loans.

45.     This assertion is based on information and belief obtained from other PSAs

Plaintiff's counsel has been able to uncover as filed by Defendant GMAC with regards to its

affiliate Residential Funding Corporation. Specifically, for example, one of the RALI Series

2006 PSAs states that:

> "...Residential Funding Corporation [a GMAC Affiliate], a Delaware corporation, buys
> residential mortgage loans under several loan purchase programs from mortgage
> loan originators or sellers nationwide, including affiliates, that meet its
> seller/servicer eligibility requirements and services mortgage loans for its own account
> and for others." See RALI Series 2006-QO1 Trust, SEC Accession Number
> 0000950117-06-000398.

46.     The applicable credit enhancement policies and amounts are addressed in the

relevant PSA.

47.     In the applicable PSA, the issue of any financial injury or harm actually sustained

by Defendant GMAC is more fully addressed. To date, Defendant GMAC has not disclosed the

securitized pool trusts holding Plaintiffs' notes.

48.     Another basic issue of federal court "standing" doctrine is that where a pay-out

has already taken place, even if it is from a third party payor, standing no longer exists since no

harm or injury can still be demonstrated by the supposedly injured party. As such, putting aside

any applicable federal government bail-outs already received by Defendant GMAC, the very

issue of whether Defendant GMAC can establish any financial injury or harm, or scintilla of

harm to establish standing is at issue in this Complaint.

49.     A proper accounting of the amount received from credit default swaps and other

credit enhancements, the identity of the counter parties, and the pay-out mechanisms already in

place in the applicable PSA will reveal double, triple, quadruple or more pay-outs on the

pertinent notes.

50.     The multiple payments on the applicable securitized mortgage trusts bring into question any Defendant's ability to establish "standing" in Plaintiff's alleged note default and its ability to enforce any note default provisions it may have.

51.     To avoid the IRS defeasance rules, the first trust loans typically have a three (3) year prepayment penalty which makes it virtually impossible for swimmers (borrowers) to get out of the pool within the first three (3) years. Plaintiff has such a pre-payment penalty in their first trust loan documents.

52.     While Defendants (BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) claimed to maintain underwriting guidelines that properly assessed the ability of the Plaintiff to repay their debt, Defendants purposefully relaxed their underwriting guidelines and provided and sold risky loan products to Plaintiff to increase their loan origination volume and Defendants' profits.

53.     Since the emphasis was placed on volume, regardless of the quality of the borrower population or borrowers' ability to pay, much less re-pay mortgage loans, Defendants' (BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT and GMAC) underwriting standards eventually became so lax that in many instances, their own underwriters took no steps or no meaningful steps to determine whether borrowers like Plaintiff could actually pay, much less repay, a loan for the purpose of filling the securitized pools as quickly as possible.

54.     Further, Defendants' (BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) activities sought to fund higher loan volumes with higher loan limits, obtain higher leveraged returns, and thereby obtain much higher profits for themselves and their REMIC investors and securitized pool

participants (again undisclosed or accounted for YSPs). The higher the appraised property value obtained from real estate appraisers that were also co-opted into the scheme, the higher the potential loan amounts given to drafted borrowers, and the higher the real estate commissions procured. The higher the loan volume generated, regardless of loan amount, the higher the amount of fees paid to or collected by Defendant MERS and the higher the amount of money lost by the County land records office.

55.    Defendants (BONILLA, ANGELMAR, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) violated and ignored the law by failing to clearly and conspicuously disclose to Plaintiff key provisions of Plaintiff's mortgage, including but not limited to such details as the fact that the interest rates would reset, the reset interest rate, specific loan terms, and the total *real dollar amount* the mortgages would cost Plaintiff over time.

56.    Defendants (BONILLA, ANGELMAR, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) violated and ignored the law by failing to clearly and conspicuously disclose to Plaintiff the identity of the real parties having an interest in Plaintiff's notes (TILA disclosure violations), or the identities of those individuals or entities that received commissions, referrals, kick-backs, fee-splits, and YSP payments without the proper disclosures required by RESPA.

57.    Defendants (BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) violated the law when they provided undisclosed financial incentives, fees, payments and other things of value to their agents, account executives, loan officers, and brokers marketing and selling their financial product; said payment and incentives constituting a RESPA and Virginia statute prohibited kickback, referral fee or other things of value.

58.     Defendants' (MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) business model of making loans for quick resale or already previously determined securitized mortgage pools (SEC shelf registrations prior to loan settlement(s)), rendered Defendants indifferent to whether Plaintiff, and any other class members, could afford the loan beyond Defendants' initial, limited, and short-lived time exposure to risk with the loans. This risk period was in effect only as long as it took to sell the loan to the secondary market or to fill the applicable securitized mortgage pool that was just waiting to reach its targeted amount level or pool "closing date" target.

59.     This indifference translated into Defendants' (BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) maximizing loan resale profits through funding unfair and exceedingly risky loan products, engaging in unfair and negligent underwriting practices, and conducting deceptive loan sales practices through their own conduct and the conduct of mortgage brokers and independent loan officers, and real estate agents in order to sell an illegal and fraudulent loan to the unsuspecting Plaintiffs.

60.     Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT and GMAC focused on creating unduly risky loans for their own profitability.

61.     Due to Defendants' compensation structure and policies, employees, brokers, loan officers, and related Defendants were encouraged to steer Plaintiffs into costly mortgages and for a larger amount in order to maximize Defendants' (BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) profits, regardless of borrowers' ability to pay, or much less re-pay the applicable loans.

62.     Upon information and belief, instead of focusing on Plaintiffs' ability to pay based on their earnings, Defendants sold their bundled securities in the secondary market only focusing on borrowers' credit scores; regardless of whether verifiable income statements and tax returns were available to certify the borrowers' ability to pay or, much less, repay the applicable loans.

63.     With that approach of focusing primarily on the borrowers' credit scores as opposed to the borrowers' salary, it does not matter if a borrower has a perfect 800 credit score, earns $1,500 per month, and can pay $1,000 per month for mortgage payments. When the mortgage payments reset to make the payments $3,000 per month because the interest rates have finally adjusted as fully expected in a negative amortization loan program, the high credit score and evidence of the borrowers' high level of responsibility are irrelevant to the borrowers' desire or ability to continue making the payments; the funds are simply not there.

64.     Being guaranteed fees and commissions, employees, associates, officers, affiliates, brokers and related Defendants ANGELMAR R/E BROKER, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC had no real incentive to conduct any type of quality control.

65.     In completing the loop and commencing/completing the foreclosure process, the same issues arise as Defendants' foreclosing law firms and Substitute Trustee are guaranteed substantial legal fees and sales commissions.

66.     Being guaranteed a fee or commission, there is no real incentive for the law firms or substitute trustees consummating these foreclosure proceedings to conduct a scintilla of quality control and ensure that the proper party in interest, and the rightful party has the standing and is duly authorized to request and enforce a home foreclosure or enforce the default provisions under the applicable promissory notes/security instrument.

67.    In fact, on or about September 11, 2008, Defendant SIW was first appointed as Substitute Trustee by Defendant MERS.

68.    Having no legal or equitable ownership in the promissory notes, and acting as a shell entity and fraud facilitator, Defendant MERS is acting out of the scope of its authority in appointing or attempting to appoint Defendants SIW as Substitute Trustee with the authority to foreclose on Plaintiffs' home. Courts are beginning to see through the façade of MERS' shell. See In Re JOSHUA & STEPHANIE MITCHELL, Case No. BK-S-07-16226-LBR (Bankr. Nevada 3/31/2009)(MERS' standing and authority in any capacity in the mortgage securitization process, in particular its right to represent putative "lenders" in the foreclosure process, does not exist).

69.    In this Complaint, Defendant MERS is/are an entity(ies) that can prove no legal, equitable or beneficial interest whatsoever in Plaintiff's loans. Putting minor details aside for the moment with reference to Defendant MERS' lack of authority or lack of standing, these two Defendants (MERS and SIW) are the parties purporting to have had, and to continuously retain, the authority to offer Plaintiff's home for sale at foreclosure for an alleged note default. But for the institution of the previously filed Complaint (1:09CV707), the Plaintiff's home would have been sold at foreclosure on June 29, 2009, by these entities that can establish no right or ownership to Plaintiff's promissory notes.

70.    Since then, the Plaintiffs used the time to locate Defendant R/E Agent BONILLA. The first action (1:09CV707) was voluntarily dismissed by Plaintiffs pursuant to Rule 41 of the Federal Rules of Civil Procedure on November 9, 2009.

71.    New foreclosure proceedings regarding the Plaintiff's home have been scheduled for November 16, 2009, at 1:30PM. This time, the foreclosure is scheduled by Defendants

GMAC and SIW. How, when, what, why the change from Defendant MERS to Defendant

GMAC is taking place, it is not yet known. We can speculate that, having reviewed Plaintiffs'

initial filings of June 26, 2009, Defendant GMAC has attempted to cure the documentary

deficiencies then present, to renew its foreclosure attempts for November 16, 2009.

72.     This time the new signer of the Substitution of Trustee Document is an individual

identified as Jeffrey Stephan, who is executing the document as "Limited Signing Officer." How

and in what manner is Jeffrey Stephan's signature "limited" or "authorized" is yet to be

determined as no evidence of authority or limitation of authority has been placed in the land

records of Prince William County, VA, as of October 2, 2009.

73.     Jeffrey Stephan is supposedly acting on a "limited capacity" on behalf of GMAC

MORTGAGE, LLC, as the "Lender," thereby replacing Defendant MERS' prior allegedly "valid

appointment" of Defendant SIW.

74.     Defendant GMAC fails to acknowledge that its designation of its status as

"lender" is no longer appropriate as GMAC lost the "lender" designation when it got paid off on

the applicable notes as it securitized the mortgage notes and sold its interests to other investors.

75.     Defendants ANGELMAR R/E BROKER, MORTGAGE UNLIMITED

BROKER, GREENPOINT, MERS and GMAC intentionally or recklessly, failed to verify or

audit the information prepared, submitted or otherwise created by their employees, subordinates,

agents or principals and avoided implementing reasonable measures that would have prevented or

limited these fraudulent practices as those practices were being conducted.

76.     Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE

UNLIMITED BROKER, GREENPOINT, MERS and GMAC also attempted to increase their

profit margins and the amount of loans generated by creating defective financial loan products in

the form of residential mortgage loans ("RML") and other loans in the form of adjustable rate mortgages ("ARMs") that Defendants sold to Plaintiff.

77.     The ARM was a mortgage that contained an introductory low teaser rate for an initial brief period of time of the loans existence. After the supposedly fixed period, the interest rate of the ARM would adjust, generally substantially upwards, and would increase monthly payments that the Defendants knew Plaintiffs could not likely pay, eventually causing the Plaintiff to default and/or to have their home foreclosed upon.

78.     In the instant case, Defendants offered Plaintiff only risky options, payment-option loans, and negative amortization loans with interest payment only feature and balloon payment; this was so even when Plaintiffs could have qualified for other loan options that were safer and more reasonable considering their financial situation.

79.     Defendants offered and aggressively marketed ARMs with interest payment only features, or "payment options" features and balloon payment as "prime" products when in reality those products actually are considered "sub-prime" products. See CNNMoney.com Staff Writer Les Christie's, Special Report: Mortgage Meltdown "Pick-a-payment loans turn poisonous", money.cnn.com/2008/09/02/real_estate/pick_a_poison/index.htm?postversion=2008090311. Site last visited on November 9, 2009.  See also Christopher L. Peterson, Predatory Structured Finance, 28 Cardozo L. Rev. 2185 (2007).

80.     Further, these products that supposedly made it possible for borrowers to accomplish the American dream of owning their own home, enticed consumers like Plaintiff by offering a teaser low rate for a short period time, at the end of which the interest rates would be reset and change at a minimum every year; if not monthly at much higher interest rates and mortgage payments.

81.     Defendants knew that their financial products were defective.

82.     At all times applicable to this Complaint, Defendants BONILLAS, ANGELMAR, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC continued their deceptive and unfair practices and set up borrowers with those defective mortgage loans.

83.     During the underwriting and selling of these defective mortgage loan products with interest payment only features, or worse yet negative amortization features, and balloon payment for borrowers, including the Plaintiff, Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC never explained the inevitable payment shock and/or significant increase borrowers would subsequently confront with their mortgage payments.

84.     To insure an abundant stream of such highly profitable loans, Defendants GREENPOINT, MERS, and GMAC, pushed their affiliates, loan officers and mortgage brokers to aggressively steer borrowers to those defective loan products, especially those with negative amortization features and balloon payment and provided greater compensation for these types of loans.

85.     Plaintiff was never warned that they would be unable to refinance their loans to a fixed and amortizing reasonable mortgage interest rate.

86.     Most often than not, borrowers were also not warned that a hefty pre-payment penalty existed for the first three (3) years of the loans' existence; typically 2% of the outstanding loan amounts. Due to the costs associated with the pre-payment penalties, it became cost prohibitive and virtually impossible for borrowers to get out of the mortgage pools.

87.     Through Defendants' policies of choosing the appraiser and hiring only appraisers that would appraise the value of the property using their "guidelines," Defendants could increase the property value and therefore increase the loan amount. This *modus operandi* also resulted in increasing their commissions, fees and revenues.

88. Defendants GREENPOINT, MERS and GMAC knew, as disclosed in applicable SEC filings, that Plaintiff's loans would likely result in default and foreclosure.

89. This is so particularly in light of the manner in which Plaintiff got "qualified" for their applicable loans, and how Plaintiffs loans were "underwritten."

90. At times, Defendants even informed Plaintiff that they would be able to refinance their Property "within a year," or when the interest rates re-adjusted upwardly; presumably within less than 30 days in a negative amortization loan.

91. This serial refinancing in turn relied on a mistaken and borrow-enticing assumption that Plaintiff's ignorance and Defendants' lack of quality control and lax underwriting standards would last in perpetuity and would be accepted by all subsequent and interested mortgage lenders.

92. Defendants' lack of underwriting standards or quality control also contributed to the inability of some borrowers to pay the initially "affordable" loans following the initial and deceptive teaser interest rate period, by neglecting or intentionally failing to adequately review borrowers' financial and employment documentation submitted by the loan originators.

III. B. DEFENDANTS' LOANS ARE STRUCTURALLY UNFAIR AND DIFFICULT TO UNDERSTAND DUE TO THEIR MULTIPLE LAYERS OF RISK

93. Defendants' deceptive "aig" business model generated a variety of aggressive, exceedingly risky, unfair, and defective financial loan products. This in turns reflects Defendants' indifference to whether Plaintiffs would or actually could afford their loans.

94. Specifically, Defendants, through their employees, agents, sales representatives, and different real estate brokers, and different the mortgage brokers Defendant recruited and contracted with, induced Plaintiffs into purchasing a deceptive residential loan product that Defendants knew was likely to result in default and foreclosure. These higher default risk disclosures were put into the SEC filings but the borrowers were never warned of anything to that effect.

95.     Defendants and the mortgage brokers selling their products approved Plaintiffs for the loans based only on the initial minimum interest rate without regard to Plaintiffs' ability to pay not one but, at times as in the case of the Plaintiff, two separate mortgage loans for the same property.

96.     These risky loans were the only option offered and recommended to Plaintiffs even when Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC knew that a substantial and likely unaffordable monthly payment increase would occur at the end of the initial teaser interest rate period.

97.     Defendants ANGELMAR R/E BROKER, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC through their employees, agents, sales representatives and the real estate and mortgage brokers selling these loans to Plaintiffs failed to meaningfully account for those payment adjustments in approving and selling loans and thereby failed to meaningfully account for Plaintiffs ability to repay the Defendants' loans.

98.     Any statements made by Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, in connection with these costs were untruthful about how the borrowers' low interest rates were "fixed for the life of the loans," and the ease with which repeated refinancings would be available, the increase in property value, and other fraudulent claims designed to fraudulently induce borrowers like Plaintiffs to obtain the loans and execute the loan documents.

99.     Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT and GMAC failed to explain and/or disclose in a meaningful manner the terms and conditions of their defective mortgage loan products and

instead provided borrowers like Plaintiffs with incomplete or confusing information relative to product features, and material loan terms and product risks.

100.    No proper disclosure or accounting of a first, second, third, or fourth YSP was ever made.

### III. C.  DEFENDANTS ENCOURAGED MORTGAGE BROKERS' UNFAIR AND DECEPTIVE CONDUCT

101.    Defendants GREENPOINT, MERS and GMAC exacerbated the unfair and deceptive loans described above by relying on third party mortgage brokers to sell their loans.

102.    Defendants GREENPOINT, MERS and GMAC induced and rewarded their mortgage brokers to originate unduly risky, inappropriate, and in some cases, fraudulent, loans while failing to monitor these brokers' sales and underwriting conduct in any meaningful way.

103.    Driven by their push for market share and profits, Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC did whatever it took to sell more houses and loans, faster - including easing their underwriting criteria and disregarding minimal oversight of mortgage brokers.

104.    By easing and disregarding their underwriting criteria, Defendants GREENPOINT, MERS and GMAC increased the risk that borrowers like Plaintiffs would default and potentially lose their home.

105.    Defendants GREENPOINT, MERS and GMAC and their brokers also relaxed traditional underwriting standards used to separate *acceptable* from *unacceptable* risk in order to produce more undisclosed YSPs and loans for the secondary market, and more money laundering venues.

106. In the pre mortgage securitization days, the depth of credit and thereby credit worthiness of borrowers played a crucial role in determining whether borrowers could indeed obtain a loan.

107. In the mortgage securitization environment that was prevalent at all times relevant to this Complaint, however, as the pursuit of profits became the primary goal of Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC, the borrowers' credit score itself became most important - the threshold number becoming lower and lower - with disregard for the borrowers' future ability to pay based on previous payment habits or indeed available monthly income.

108. Further, Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC disregarded the importance of loan-to-value ratios, debt-to-income ratios, income-to-expense ratio, reset payment-to-income ratio, and other factors that are designed to protect 1.) the borrowers, 2) the borrowers' ability to pay within their means for the entire lifetime of their loan, and 3.) to protect the quality of the securitized mortgage pool participants on behalf of the ultimate investors.

109. Due to the fact that riskier and higher loan amounts would produce a greater financial reward for Defendants, they encouraged and incentivized their representatives Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, and MORTGAGE UNLIMITED BROKER to focus on producing only those loans.

110. Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC realized even greater profits by way of increased real estate commissions, origination fees, higher "yield spread premiums" for the originating loan officers and loan brokers, higher interest rates for their securitized mortgage pools,

higher yield spread premiums (the amounts of which, and the entities to/from whom those much higher YSPs were obtained have never been disclosed), and larger credit spreads above the index or par value applicable to the particular loans.

111.    To further encourage real estate and mortgage brokers and agents to bring in more swimmers to the applicable securitized pools, Defendants GREENPOINT, MERS and GMAC provided little to no oversight of their conduct.

112.    As long as their broker representatives provided home purchasers and loan borrowers with the "good" credit scores that Defendants could subsequently sell to the secondary market, Defendants ANGELMAR R/E BROKER, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC had the financial incentive to continue receiving loans regardless of the available and verifiable documentation, or the fraudulently created documentation.

113.    Upon information and belief, to further the deceptive scheme and their racketeering enterprise, Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC created a loan sales environment that propelled their mortgage brokers to meet high production goals and close as many loans as they could without regard to a borrower's ability to repay.

114.    Defendants' sales environment also propelled mortgage brokers to sell the risky types of loans, such as negative amortization loans because mortgage brokers could easily sell them to potential borrowers by deceptively focusing borrowers' attention on the low initial teaser monthly payments or interest rates. Of course, this resulted in Defendants' fraudulent concealment of the true effects of the loans or true disclosure of the financing cost of the loans.

115.    This system of compensation aided and abetted brokers in breaching their fiduciary duties to borrowers by inducing borrowers like Plaintiffs to accept unfavorable loan

terms without full disclosure of the borrowers' options, and also compensated brokers beyond the

reasonable value of the brokerage services rendered. It also compensated the pools sponsors and

ponzi scheme creators quite handsomely.

### III. D. THE ROLE OF *MERS* IN THE SUB-PRIME MARKET & THIS CASE

116. The Cosa Nostra[11] and electronic clearinghouse of the mortgage securitization

enterprises is represented by Defendant MERS.

117. MERS operates a computer database designed to electronically track the

"servicing," "assignments," and "ownership rights" of mortgage loans anywhere in the United

States.

118. Upon information and belief, mortgage loan originators and securitizing entities

and secondary market players pay membership dues and per-transaction fees to MERS in

exchange for the right to use and access MERS' electronic records.

119. None of these membership dues or transaction fees applicable to Plaintiffs' loans have

ever been disclosed to Plaintiffs on any applicable disclosure or documentation. As such, this practice

is a clear case of fraudulently concealed "fee splits" in violation of RESPA. This practice is on-going.

120. Further, while Defendant MERS is always listed on the deeds of trust as a party, its

involvement and fees are never accounted for or disclosed on the settlement statements of Plaintiffs'

loans.

121. Upon information and belief obtained directly from MERS' website, Countrywide

Home Loans, Inc., Fannie Mae, Freddie Mac, AIG United Guaranty, Merrill Lynch, Washington

Mutual Bank, and Defendant GMAC, LLC, d/b/a GMAC Residential Funding Corporation,

---

[11] A brief outline and history of La Cosa Nostra, Italian for "Our Thing", "This Thing of Ours", "La Camorra", "La Famiglia" and other similar descriptions for the enterprise that encouraged the drafting, creation, and execution of the RICO Statute can be found at http://www.fbi.gov/hq/cid/orgcrime/lcnindex.htm. It is uncanny how close the FBI website and description of the Mafia tracks the enterprises that MERS has participated in.

were/are among the 25 initial lead organizers, shareholders and "members" of MERS. See

MERS shareholder information at http:// www.mersinc.org/about/shareholders.aspx.

122.     It is worth noting that as of the filing of this Complaint, at least nine of the

original MERS shareholders have either a.) disappeared (Merrill Lynch); b) been outright

acquired by the federal government (Fannie Mae & Freddie Mac); c) been bailed out by the

federal government, in one way or another (most of MERS initial shareholders), or d.) been sold

off (to other healthier financial institutions) after their collapse and participation in the sub-prime

and predatory lending disaster they themselves created (Countrywide to Bank of America).

123.     In the case of Defendant GMAC, beginning on or about December 28, 2008, the

federal government provided it various forms of aid and, in fact, injected an initial $5.0 billion in

TARP assistance. As of August 5, 2009, more is expected. Loss Widens at GMAC, a Lender in

Transition, http://www.nytimes.com/2009/08/05/business/05gmac.html.

124.     As of November 2, Defendant GMAC has already received $12.5 billion in TARP

assistance, and Defendant GMAC is slated to receive an additional $5.6 billion soon. Such bail-

out assistance does not account for the billions in FDIC guaranteed debt that is not disclosed.

See  James Pethokoukis' November 2, 2009, Column-GMAC shows it's time to roll up TARP,

http://www.xe.com/news/2009-11-02%2013:36:00.0/774761.htm?c=2&t=103.

125.     Defendant GMAC originally claimed that being the "financing arm" of General

Motors, it needed assistance to help finance the automaker's operations.

126.     Upon information and belief, instead of most of the federal government bail-out

going to General Motors' operations, Defendant GMAC has diverted a majority of the federal

assistance it has received so far to fund alleged losses on its securitized mortgage pools.

127.     Upon information and belief, once the federal government issues the last expected

assistance to Defendant GMAC, the US federal government will be a majority owner of that entity as well.

128.   As of October 12, 2009, MERS boasted that it has over 62 million mortgages or deeds of trust registered in its electronic system since MERS2s' establishment nearly a decade ago in January 1, 1999.  http://mersinc.com/news/details.aspx?id=228.

129.   At the same time mortgage loan documentation has become more complex, the organizational technology of securitization has displaced older, more transparent, public systems for maintaining records. Nowhere is this more apparent than the use of Defendant MERS to circumvent county recording offices or to directly and indirectly usurp the reliability of the land recording systems throughout the United States.

130.   Upon information and belief, MERS' primary function is to act as a purported document custodian and deed of trust beneficiary, *without* actually holding the "note." In relevant court filings MERS indicates that it *never* holds the mortgage notes and has no interest in them. In the Nevada In Re Mitchell court decision cited above, Defendant MERS' standing is clearly questioned and, more importantly, is determined not to exist. Specifically, the Nevada In Re Mitchell decision studiously determined that with regard to MERS:

... *STANDING*

MERS must have both constitutional and prudential standing, and be the real party in interest under FED. R. CIV. P. 17, in order to be entitled to [have standing].

Further, ... Constitutional standing under Article III requires, at a minimum, that a party must have suffered some actual or threatened injury as a result of the defendant's conduct, that the injury be traced to the challenged action,

and that it is likely to be redressed by a favorable decision. *Valley Forge Christian Coll. v. Am. United for Separation of Church and State*, 454 U.S. 464, 472 (1982)(citations and internal quotations omitted)…

Beyond the Article III requirements of injury in fact, causation, and redressibility, MERS must also have prudential standing, which is judicially-created set of principles that places limits on the class of persons who may invoke the courts' powers. *See* Warth v. Seldin, 422 U.S. 490, 499 (1975). As a prudential matter, a plaintiff must assert "his own legal interests as the real party in interest," Dunmore v. United States, 358 F.3d 1107, 1112 (9th Cir. 2004), as found in FED. R. CIV. P. 17, which provides "[a]n action must be prosecuted in the name of *the real party in interest*."[emphasis added]…

### STANDING AS THE NAMED BENEFICIARY OR THE NOMINEE OF THE BENEFICIARY OR ITS ASSIGNEE

MERS does not have standing merely because it is the alleged beneficiary under the deed of trust. It is not a beneficiary and, in any event, the mere fact that an entity is a named beneficiary of a deed of trust is insufficient to enforce the obligation. The deed of trust attempts to name MERS as both a beneficiary and a nominee. The document [exactly the same language as the deed of trust used in the Lara/Garcias' case] first says this:

> MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. [at Lara/Gracias' document, page 2, first paragraph]

And later [at Lara/Garcias' document, page 3, 5th paragraph] it says this:

> The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lenders successors and assigns) and the successors and assigns of MERS.

MERS' [own] "Terms and Conditions" identifies MERS' interests. The Terms and Conditions say this:

> ***MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments***

*made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans.* MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law. (Emphasis in original, citations omitted.)

A "beneficiary" is defined as "one designated to benefit from an appointment, disposition, or assignment . . . or to receive something as a result of a legal arrangement or instrument." BLACK'S LAW DICTIONARY 165 (8th ed. 2004). But it is obvious from the MERS' "Terms and Conditions" that MERS is not a beneficiary as it has no rights whatsoever to any payments, to any servicing rights, or to any of the properties secured by the loans. To reverse an old adage, if it doesn't walk like a duck, talk like a duck, and quack like a duck, then it's not a duck.

But more importantly, even if MERS is the nominee of the beneficiary, or the motion was brought by the beneficiary, that mere allegation is not sufficient to confer standing [on MERS]. In Re Mitchell, at 5-7 (footnote citations omitted).

131.   Major players in the mortgage lending industry created MERS to allegedly simplify the process of transferring mortgages by avoiding the need to re-record liens - and to avoid the paying of county recorder filing fees - each time a loan is assigned.

132.   "... Instead [of paying the applicable recording fees and preserving the sanctity of the land recording system], servicers, [mortgage originators, securitization entities, securitized pool sponsors, ponzi scheme creators, loan and pool funders] record loans only once and MERS' electronic system monitors transfers and facilitates the trading of notes ..." Therefore, "...MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans." http://mersinc.com.

133.   In facilitating the assignment of mortgages or security instruments instead of the

assignment of the promissory notes through the use of Defendant MERS' "system," the mortgage loan securitizing entities' "aig" also discounted and put aside at least two basic issues of real property law. First, while a note must be followed by its security instrument, assignment of the security instrument or deed of trust does not make the applicable promissory note follow as that creates a "nullity." See Carpenter v. Longan, 83 U.S. 271, 274, 21 L.Ed. 313, 16 Wall 271 (1872). Second, since assignments of the security instrument creates a nullity and splits the security instrument from the deed of trust, the foreclosure mechanisms are no longer applicable to the promissory note because the promissory note has been rendered unsecured.

134.     The use of MERS in the security instruments has usurped the certainty and the inviolateness of the land recording systems around the country.

135.     More importantly, however, the use of MERS to obviate and bypass the sanctity of the land recording system has reduced transparency in the mortgage market in two ways. First, there no longer exists a public recording system to learn the true identity of the holder of the borrowers' promissory note or security interest, or to trace the unbroken chain of title applicable to a particular property. Second, all across the country, MERS now brings foreclosure proceedings in its own name or putatively is the "holder of the note" authorized to supposedly and putatively legally appoint Substitute Trustees to commence foreclosure proceedings when MERS indicates it i.) has no interest in the promissory notes, ii.) at best can only demonstrate assignments of security instruments in its "system" and, iii.) cannot establish or track assignments of promissory notes at all.

136.     In the instant case, Plaintiff has MIN (MERS Instrument Number) 100013800891555431 for the first deed of trust and MIN 100013800891555506 for the second

deed of trust.

137.    This is so even more poignant when in its own court disclosures, MERS is not the true party in interest concerning the Notes.

138.    This is what Defendant MERS did in the instant case when it caused an endorsement to be placed on the Lara/Garcias original promissory note.

139.    The abuses created by the use of MERS facilitated the very fraud that this Complaint addresses.  In fact, on a May 23, 2006, report to Congress, the Office of Federal Housing Enterprise Oversight detailed what it called:

"an arrogant and unethical corporate culture where Fannie Mae employees manipulated accounting and earnings to trigger bonuses for senior executives from 1998 to 2004". . . "The image of Fannie Mae as one of the lowest-risk and 'best in class' institutions was a facade," . . . "Senior management manipulated accounting; reaped maximum, undeserved bonuses; and prevented the rest of the world from knowing". . . "Our examination found an environment where the ends justified the means."

FannieMae was fined $400 million dollars for its deceptive and unethical conduct. See

http://www.sec.gov/litigation/litreleases/2006/lr19710.htm (U.S. SECURITIES AND EXCHANGE COMMISSION, Litigation Release No. 19710 / Accounting and Auditing Enforcement Release No. 2433 / May 23, 2006, SEC v. Federal National Mortgage Association, Case No. 06-00959 (RBW) (U.S.D.C., D.D.C)(Fannie Mae to Pay $400 Million Penalty for Accounting Fraud, SEC and OFHEO Settle Action Against Fannie Mae).

140.    The Ohio Attorney General recently sued another MERS founding member, Freddie Mac, and its top executives for engaging in fraudulent activities very similar to those found by OFHEO relating to Fannie Mae.

141.    As recently as June 4, 2009, Countrywide's Chief Executive Officer Angelo

Mozilo was charged by the SEC with "deliberately misleading investors about the significant credit risks being taken in efforts to build and maintain … [Countrywide]'s market share," See SEC v. Mozilo, et.al., USDC, Central District of California, CV09-03994 (6/04/2009). Mozilo and other executives are charged with over $140 million dollars in illegal compensation, insider trading, and fraud.

142.    MERS serves as a "nominee" of mortgages and deeds of trust recorded in all fifty states.

143.    In the instant case, Defendant MERS is the entity that was named "nominee" on Plaintiffs' deed of trust, and the entity that was allegedly authorized to appoint Defendant SIW as Substitute Trustee to commence foreclosure proceedings against the Lara/Garcias.

144.    As a result of the federal government's "bail-outs" and outright acquisitions of MERS shareholders, the US Federal Government has become, either directly or indirectly, the majority shareholder of Defendant MERS (1&2).

145.    It is instructive to recognize that MERS actually acts as a mere shell and upon information and belief:

     a.  MERS claims that it holds legal title to mortgages and deeds of trust as a nominee for the owner of the promissory note.
     b.  MERS claims that it immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur.
     c.  The lender or investor continues to own and hold the promissory note, but under the MERS® System, the servicing entity only holds contractual servicing rights and MERS holds legal title to the mortgage as nominee for the benefit of the investor (or owner and holder of the note) and not for itself.
     d.  MERS claims that one of the advantages of its paperless systems is that the mortgage lien becomes immobilized by MERS continuing to hold the mortgage lien when the note is sold from one investor to another via an endorsement and delivery of the note or the transfer of servicing rights from one MERS member to another MERS member via a purchase and sale agreement which is a non-recordable contract right.
     e.  MERS claims that the legal title to the mortgage or deed of trust remains in MERS after such transfers and is tracked by MERS in its electronic registry.

f. MERS claims to hold legal title to the mortgage for the benefit of the owner of the note.
g. MERS does not take applications for, underwrite or negotiate mortgage loans.
h. MERS does not make or originate mortgage loans to consumers.
i. MERS does not extend any credit to consumers.
j. MERS has no role in the origination or original funding of the mortgages or deeds of trust for which it serves as "nominee".
k. MERS does not service mortgage loans.
l. MERS does not sell mortgage loans.
m. MERS is not an investor who acquires mortgage loans on the secondary market.
n. MERS does not ever receive or process mortgage applications.
o. MERS is simply named as a "nominee," and its parent company MERS Corp Inc. maintains an electronic registry, tracks changes in the ownership of mortgage loans and servicing rights related thereto.
p. MERS© System is not a vehicle for creating or transferring beneficial interests in mortgage loans.
q. MERS is not named as a beneficiary of the alleged promissory note.
r. MERS is never the owner of the promissory note for which it seeks foreclosure.
s. MERS has no legal, equitable or beneficial interest in the promissory note underlying the security instrument for which it serves as "nominee".
t. MERS has no legal, equitable or beneficial interest in the loan instrument underlying the security instrument for which it serves as "nominee."
u. MERS has no legal, equitable or beneficial interest in the mortgage indebtedness underlying the security instrument for which it serves as "nominee".
v. MERS has no interest at all in the promissory note evidencing the mortgage indebtedness.
w. MERS is not a party to the alleged mortgage indebtedness underlying the security instrument for which it serves as "nominee".
x. MERS has no financial or other interest in whether or not a mortgage loan is repaid.
y. MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note.
z. MERS does not make or acquire promissory notes or debt instruments of any nature and therefore cannot be said to be acquiring mortgage loans.
aa. MERS has no interest in the notes secured by mortgages or the mortgage servicing rights related thereto.
bb. MERS does not acquire any interest (legal, equitable or beneficial) in the loan instrument (i.e., the promissory note or other debt instrument).
cc. MERS has no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans.
dd. The note owner appoints MERS to be its agent to only purportedly physically hold the mortgage lien interest, not to hold any interest in the note.
ee. MERS does not hold any interest (legal, equitable or beneficial) in the promissory notes that are secured by such mortgages or in any servicing rights associated with the mortgage loan.

65

ff.  The debtor on the note owes no obligation to MERS and does not pay MERS on the note.

gg. MERS is not entitled to receive any of the payments associated with the alleged mortgage indebtedness.

hh. MERS is not entitled to receive any of the interest revenue associated with mortgage indebtedness for which it serves as "nominee".

ii.  Interest revenue related to the mortgage indebtedness for which MERS serves as "nominee" is never reflected within MERS bookkeeping or accounting records nor does such interest influence MERS earnings.

jj.  Mortgage indebtedness for which MERS serves as "nominee" is not reflected as an asset on MERS' financial statements.

kk. Failure to collect the outstanding balance of a mortgage loan will not result in an accounting loss by MERS.

ll.  When a foreclosure is completed, MERS never actually retains or enjoys the use of any of the proceeds from a sale of the foreclosed property, but rather would remit such proceeds to the true party at interest.

mm.        MERS is not actually at risk as to the payment or nonpayment of the mortgages or deeds of trust for which it serves as "nominee".

nn. MERS has no pecuniary interest in the promissory notes or the mortgage indebtedness for which it serves as "nominee".

oo. MERS is not personally aggrieved by any alleged default of a promissory note for which it serves as "nominee".

pp. There exists no real controversy between MERS and any mortgagor alleged to be in default.

qq. MERS has never suffered any injury arising out of any alleged default of a promissory note for which it serves as "nominee".

rr.  MERS, in a nominee capacity for lenders, claims that it merely acquires legal title to the security instrument (i.e., the deed of trust or mortgage that secures the loan).

ss. The beneficial interest in the mortgage (or person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note and/or servicing rights thereunder.

tt.  MERS has no interest at all in the promissory note evidencing the mortgage loan.

uu. MERS does not acquire an interest in promissory notes or debt instruments of any nature.

vv. The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note (NOT MERS).

ww. MERS is never the holder of a promissory note in the ordinary course of business.

xx. MERS is not a custodian of promissory notes underlying the security instrument for which it serves as "nominee".

yy. MERS does not maintain copies of promissory notes underlying the security instrument for which it serves as "nominee".

zz. When an investor or servicer desires to foreclose, the servicer obtains the promissory note from the custodian holding the note on behalf of the mortgage

investor and places that note in the hands of a servicer employee who has been "appointed" as an officer (vice president and assistant secretary) of MERS by corporate resolution. This technique is used by attorneys who purport to be representing MERS to feign standing by MERS to foreclose the mortgage by claiming that MERS is the holder of the promissory note. When in fact MERS, by design is never the holder of the promissory note.

aaa. When a promissory note is placed in the hands of a servicer employee, that employee will then assume the position as a MERS *officer de jour* and pretend that this transfer of custody of the note into the hands of this nominal officer (without any transfer of ownership or beneficial interest) renders MERS the holder.

bbb. No consideration or compensation is exchanged between the owner of the promissory note and MERS in consideration of this transfer in custody.

ccc. MERS is a bankruptcy remote corporation, and does not have any assets.

ddd. Even when the promissory note is physically placed in the hands of the servicer's employee, who is at best, a nominal MERS officer, MERS has no actual authority to control the foreclosure or the legal actions undertaken in its name.

eee. Through its acquisition of FannieMae, FreddieMac, and the federal bail-out of at least half of the MERS initial shareholders, the United Stated States government has become a majority shareholder of MERS.

fff. Considering that the federal government is now either directly or indirectly the majority shareholder/owner of MERS, the constitutionality of MERS' activities foreclosing on peoples' homes without just compensation is equivalent to an unconstitutional federal taking of peoples' homes.

ggg. MERS is never the true party in interest to satisfy the requirements of Rule 17 of the Federal Rules of Civil Procedure**Error! Reference source not found.**

## IV. JURISDICTION

146.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, as well as the specific grants of federal court jurisdiction under the federal laws represented by TILA, RESPA, HOEPA, the Securities Act of 33, the Wire Act, the Mail Fraud Act, Bank Fraud, and RICO, as this is a civil action arising under the laws of the United States. This Court has supplemental jurisdiction of the state law causes of action asserted herein pursuant to 28 U.S.C. § 1367(a) as these claims are so related and so inexorable intertwined to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

147.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(a) and (b), among other subsections, because a substantial part of the events or omissions giving rise to the claims occurred in this District.

148.    Jurisdiction of this court for the pendent claims is authorized by Fed. R. Civ. P. 18(a)(b).

## V. FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS

149.    All Plaintiffs representing this action were represented by R/E Agent BONILLA who held himself out as a real estate agent using his own real estate agent license and the license of the real estate broker Defendant ANGELMAR REALTORS, LLC.

150.    All Plaintiffs representing this action were represented by and applied for mortgage loans with Defendants Sr. Loan Officer GUSTAVO H. OSSA and/or his wife, ROSA OSSA, both of whom held themselves out as mortgage loan officers and professionals in Virginia and worked under the licenses of the mortgage loan broker Defendant MORTGAGE UNLIMITED SERVICES, LLC.

151.    All Plaintiffs representing this action submitted accurate documentation regarding their monthly and yearly income to show their ability (or inability) to pay applicable loan obligations in the purchase of their homes to Defendants R/E Agent BONILLA, the OSSAS, and the companies they represented, or for whom they acted as recruiters for the securitized mortgage pools that were set up by their other co-conspirators and pool beneficiaries.

152.    All Plaintiffs representing this action have their Federal Form Loan Application 1003 showing monthly income far in excess of the truth. In the case of the Lara/Garcias, husband and wife made no more than $5,900.00 per month; combined. Yet, Form 1003 Loan Application applicable to the transactions at issue in this Complaint indicates that their combined income

exceeded $17,751.00 per month. This income inflation and exaggeration is/was unbeknownst to the Lara/Garcias prior to retaining counsel. In another related Garcia family case, the same Defendants indicated that the borrowers earned over $14,000 per month, when in reality the borrowers did not make more than $4,800.00 per month.

153. All Plaintiffs representing this action had their Form 1003 Loan Application listing cash or other liquid assets in their savings, checking, retirement accounts, and other bank statements and showed amounts far in excess of what Plaintiffs individually or collectively actually held in those accounts; at times their respective Form 1003 Loan Applications even have bank accounts that did not belong to them. This bank statement alteration and asset falsification and inflation is/was unbeknownst to the borrowers/Plaintiffs prior to retaining counsel.

154. All Plaintiffs representing this action at the time of the loan application had good to excellent credit ratings and credit scores. All Plaintiffs were good and excellent swimmers.

155. All Plaintiffs representing this action were given first trust Negative Amortization loans whose very validity is herein questioned. Although the arguments are similar for interest only loans or adjustable rate loans, which are not the subject of this immediate action, "payments" on these type of loans are just that; *payments*. Consequently, those payments by definition cannot be considered "repayments" of a loan or really be considered valid and legal loan instruments according to TILA provisions.

156. All Plaintiffs representing this action question the very validity of their Negative Amortization loans where, as opposed to interest only loans and/or adjustable rate loans, their validity under the applicable statutes is even more suspect since instead of loan principal balances being *repaid* as the language of the statutes require, the outstanding principal balances

in a Negative Amortization loan actually *increase* from day one, as soon as the Settlement takes place.

157.    All Plaintiffs representing this action were given first trust Negative Amortization loans at initial "teaser interest rates" ranging from One Per Cent (1.0%) per annum to Two Per Cent (2.0%) per annum to complete their mortgage loan transaction and their respective home refinancing and/or purchase.

158.    Such teaser interest rates cloaked the true value of the loan and, while putatively affordable at the time, in reality and over time the loans were predatory, ultimately unaffordable, and unconscionable. Simply put, like great swimmers eager to join a swimming pool of home owners, all Plaintiffs were attracted to the new comfortable and affordable loan pools not knowing that they would be ultimately unable to pay their debts and in fact were destined to drown in the securitized mortgage pools Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC set up for them.

159.    All Plaintiffs representing this action at the time of the transaction were given second trust loans to complete their mortgage loan transaction and their home purchase. Such second trust loans were designated as "Home Equity Line of Credit and Promissory Note (Secondary Lien)," or "Home Equity Credit Line Agreement and Disclosure Statement" or some other but similar subordinate financing loan/facility, at initial rates ranging from at least 4.0 % to 10.0% but indicating in the applicable promissory notes that the interest rates' "maximum ANNUAL PERCENTAGE RATE will be 18%."

160.    All Plaintiffs representing this action at the time of the transaction received the table funding for their respective homes *purchases,* and, if not immediately at settlement, within

3-6 months after purchasing their homes, their first and second trust loan was transferred to a securitized pool servicer, sponsor and/or mortgage securitizing trust.

161.    All Plaintiffs representing this action at the time of the transaction received the table funding for their first trust and second trust loans to *refinance* the respective refinanced properties from AMERICAN MORTGAGE EXPRESS AND/OR AMERICAN RESIDENTIAL MORTGAGE. Without this equity stripping scheme to refinance prior existing homes so that the targeted borrowers would subsequently purchase other primary home properties, the subsequent purchase money loans would not have been made. The refinancings involved in this initial but separate scheme are the subject of a different Complaint and class action being instituted by the Lara/Garcias.

162.    All Plaintiffs representing this action at the time of the transaction were given "above par value" loans.

163.    All Plaintiffs representing this action at the time of the transaction were given "above par value" loans but were never told nor was it ever disclosed to them the reasons as to why they received such "above par value" pricing. Further, Plaintiffs were never shown any appropriate guidelines for such "above par value" pricing.

164.    All Plaintiffs representing this action at the time of the transactions show, on their first trust RESPA Form HUD-1 Settlement Statement, thousands of dollars in "Yield Spread Premiums" being paid to Defendant MORTGAGE UNLIMITED BROKER by Defendants GREENPOINT and GMAC when there is a house purchase. On the Settlement Statement, Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC never disclosed the identity(ies) of the true party(ies) in interest regarding Plaintiffs' loans.

71

165.    All Plaintiffs representing this action at the time of the Transaction show, on their second trust RESPA Form HUD-1 Settlement Statement, hundreds of dollars in "Yield Spread Premiums" being paid to Defendant MORTGAGE UNLIMITED BROKER by Defendants GREENPOINT, MERS and GMAC.

166.    All Plaintiffs representing this action at the time of their home purchase transaction show, on their first and their second trust RESPA Form HUD-1 Settlement Statements thousands of Dollars in "Yield Spread Premiums," respectively, but yet, the respective "Yield Spread Premiums" are never included in any calculations of the applicable finance charge calculations to satisfy appropriate and required TILA Disclosures. This is so regardless of which conspirators, putative creditor, bank, lending entity, or ultimate table funder was represented at settlement for the loans.

167.    All Plaintiffs representing this action and at the time of the "Transaction" show, on their first trust RESPA Form HUD-1 Settlement Statement, hundreds of dollars in "Appraisal Fees" being paid to Defendant MORTGAGE UNLIMITED BROKER, a licensed mortgage broker which, based on information and belief, was not a licensed real estate appraiser in the Commonwealth of Virginia. As such, there is no way of knowing, except through discovery, if a proper real estate appraisal was conducted by a professional and independent real estate appraiser. This illegal fee splitting and kickback, and the identity of the recipients of those fees has never been made by any named Defendant in violation of TILA, RESPA, HOEPA, and CRESPA.

168.    Further, there is no way of knowing, except through discovery, whether, even assuming arguendo that such appraisals were created and exist, the real estate values contained therein and obtained for the applicable transactions were properly, accurately, independently and

honestly derived at, and whether or not there were any other undisclosed and improper "fee-splitting arrangements" in existence at the time of the transaction in violation of RESPA and CRESPA.

169.   There is also no way of knowing, except through appropriate discovery, the names of the individuals and companies that inflated Plaintiffs' house prices on the appraisals.

170.   All Plaintiffs representing this action and at all applicable times herein, have had their respective Promissory Notes (the "Notes") moved along the mortgage feeding chain to form part of a securitized mortgage loan pool or conduit loan, or as part of a real estate investment conduit ("REMIC") or Special Purpose Vehicle ("SPV") within the meaning of Internal Revenue Code of 1986, as amended (the "IRS Code"), or the Treasury Regulations promulgated thereunder and classified as such within the meaning of IRS Code Section 860D, or a similar type of real estate mortgage securities conduit vehicle.

171.   All funds to finance Plaintiffs' loans and that represent this action had those funds wired by the respective "funder" using the wires and other instrumentalities of interstate commerce.

172.   All Plaintiffs representing this action and at all applicable times herein executed IRS Form 4506-T "Request for Transcript of Tax Return" at settlement ("IRS Form 4506-T"). This form authorizes the "requestor" to verify the borrowers' accurate yearly earnings and verify borrowers' true ability to pay their mortgage loan obligations.

173.   Upon information and belief, although all Plaintiffs representing this action and at all applicable times herein executed IRS Form 4506-T at settlement, no IRS Form 4506-T to verify Plaintiffs' purported earnings were ever filed with or requested from the IRS by any Defendants.

174.    For all Plaintiffs whose promissory Notes are being represented by this
Complaint, these Defendants and/or their counter-parties are getting paid numerous times for the
same "Promissory Notes" or "mortgage-backed securities", or REMICS in the securitization
pools they belong to through one or more credit enhancement policies or provisions and/or
collateralized debt obligations or credit default swaps, or credit derivatives.

175.    All Plaintiffs representing this action have Defendant MERS as the "nominee" or
"beneficiary … (solely as nominee for Lender…)."

176.    All Plaintiffs representing this action have had their loans sold, re-sold,
transferred, securitized, pooled and placed in investment tranches, or have been otherwise
assigned in the mortgage derivatives financial markets. As such, the true "holder in due course",
if any, of those promissory Notes cannot be ascertained to see who, if anyone, is truly still owed
moneys on the Notes at this time.

177.    Among other things, all Plaintiffs representing this action also represent one basic
tenet in the law of "commercial and/or negotiable paper." That basic and unyielding tenet is
important to keep in mind throughout this Complaint:

          If you are not a "Holder in Due Course" of the Notes (sometimes promissory
     notes are also known as "negotiable financial instruments or negotiable papers"), you
     cannot enforce the rights incumbent to the Notes in the event of default under the Notes.
     That is to say, it is ONLY the "holder in due course" who is allowed in court to make
     claims or enforce any rights regarding the mortgage and Note. No sponsor, servicer,
     manager, conspirator, gambler, or ponzi scheme creator of the pool (e.g. GREENPOINT,
     GMAC), electronic mortgage registry (e.g. MERS), or trustee has any right to do a
     judicial or, as in Virginia, a non-judicial foreclosure because they are not the holder "in

due course" of a given promissory note, they are not the true party in interest, and can

establish no injury or indicia of injury to establish standing and enforce the default

provisions of the applicable promissory notes. In order to qualify as a holder in due

course, the first requirement is that you MUST have an economic interest, which means

that the money is owed to you and not someone else. The second and equally important

requirement is that to have any rights as a holder "in due course", you must have given

"consideration" (value) of some sort to step into the "holder in due course" shoes. Thus,

no consideration to "hold" the Note results in no "holder in due course" status or

designation.[12]

178.    Because of the nature of the "securitized mortgages" and REMICS market in

which these Plaintiffs' Notes currently exist, it is not enough to be just a "Holder of the Note."

179.    In order for the debt to be properly "owed" in this case, a proper Holder In Due

Course in Virginia must be a "Holder" who has no notice that the obligor executed the Note

under:

> (1) a defense of … (ii) duress, lack of legal capacity, or illegality of the transaction
> which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the
> obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn
> of its character or its essential terms, … (Virginia Code § 8.3A-305).

Only after a "holder in due course" has been ascertained in the Lara/Garcias Property

may a putative note holder have the right to appoint trustees and/or substitute trustees and have

---

[12] See Virginia Code § 8.3A-203(c); See also U.S. Bank National Association, as trustee for the Structured Asset Securities Corporation Mortgage Pass Through Certificates, Series 2006-Z v. Antonio Ibanez, Misc. Case No. 08-384283 (KCL) and Wells Fargo Bank, N.A., as trustee for ABFC 2005-OPT1 Trust, ABFC Asset Backed Certificates Series 2005-OPT1 v. Mark Larace and Tammy Larace, Misc. Case No. 08-386755 (KCL)(Notes endorsed in blank are not evidence of ownership for standing purposes or for preservation of sanctity of land records and other relevant issues).

the right to foreclose on a Plaintiffs' property in the event of default pursuant to a promissory note secured by a Deed of Trust or other security instrument.

180. All Plaintiffs representing this action cannot currently ascertain the identity of the true "beneficiary," proper "enforcer," or interested party of the rights claimed under the Notes.

181. All Plaintiffs representing this action do not have a taxpayer sponsored "bail-out" plan for themselves in case of default under the Notes.

182. All Plaintiffs representing this action and in the event of a foreclosure where the foreclosed price of the property is lower than the amount the Plaintiffs owe on the loan, may be subject to taxation on the amount of any "default balance" that may exist.

183. Thus, not only are the Plaintiffs possibly subject and liable to losing their homes, but they are also possibly liable for any loan deficiency judgments that may be instituted against them by putative Note holders or note holder representatives.

184. Upon information and belief, all putative "Holders" AND/OR "Beneficiaries" of the Notes have currently already been either: i.) paid out in the event of default under the Notes, or ii) have had their respective investment pools or tranches paid out at least once because the lower "values" of the applicable investment tranches have triggered an insured payment plan by "unidentified persons or entities" (the "AIG's of this world"), or a "federal government bailout entity."

185. Specific pay-out rates, pay-out percentages, amounts, individuals, or entities paid out from the applicable tranche insurance policies pertaining to each investment pool which is the subject of this Complaint will be determined and named through discovery.

186. Upon information and belief, all putative "Holders" AND/OR "Beneficiaries" of the Notes have currently already been either: i.) paid out in the event of default under the Notes,

or ii.) have had their respective investment pools, tranches, or class of certificates paid out perhaps a second time because the applicable investment tranches or class of certificates have already triggered their "default rate" levels and been paid out.

187.    Thus, the respective funds available in applicable "tax free loan loss reserve" accounts have paid out to the respective pool managers, pool servicers, pool administrators, owners, conspirators, gamblers, ponzi scheme creators and other syndicate members. Specific pay-out rates, percentages, amounts, individuals, or entities paid out from the applicable "tranche loan loss reserve accounts" which are the subject of this Complaint will be determined and named through discovery.

188.    All Plaintiffs representing this action, whether still swimming and in their homes, or already drowned in the pool through foreclosure, have been irreparably and permanently harmed emotionally and financially.

## VI.    FACTUAL ALLEGATIONS FOR THE LARA/GARCIAS

189.    The Lara/Garcias were duped by Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, and MORTGAGE UNLIMITED BROKER, against Plaintiffs' best interests and wishes, to refinance a prior primary residence so that Plaintiffs would be able to purchase the new home which is the subject of this Complaint. A separate action is pending on that refinancing transaction by the Lara/Garcias and is not part of this Complaint at this point.

190.    On or about February 28, 2006, the Lara/Garcias applied for a mortgage loan from Defendant MORTGAGE UNLIMITED BROKER with the OSSAS, its representatives.

191.    The Crossman Home and Primary Residence was purchased for $730,000.00 by the Lara/Garcias with the assistance, professionalism, and documents of Defendant R/E BONILLA and ANGELMAR R/E BROKER.

192.    To finance their new primary home purchase, Defendants OSSAS, MORTGAGE

UNLIMITED BROKER, GREENPOINT and GMAC gave the Lara/Garcias a first trust loan in

the amount of $584,000.00, and a second trust loan in the amount of $73,000.00 (hereinafter the

first and second trust loan scheme is referred to as the "Transaction").

193.    At Settlement, and in order to complete the Transaction, the Plaintiffs executed

two (2) Promissory Notes, a First Trust Note in the principal loan amount of $584,000.00 (the

"First Trust Note"), and a Second Trust Note in the principal loan amount of $73,000.00 (the

"Second Trust Note").

194.    Once Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, and

MORTGAGE UNLIMITED BROKER procured the loans, on or about March 10, 2006,

Plaintiffs Lara/Garcias entered into a consumer credit transaction in which Defendant

GREENPOINT was the table funder of the Transaction with Defendant GMAC as the designated

mortgage securitizing servicer and/or Trustee.

195.    Thus, at Settlement the consumer credit Transaction consisted of extending two

consumer credit loans subject to separate but yet, due to the nature of the Transaction, combined

finance charges initially payable to Defendant GREENPOINT. Without *both* loans, the

Transaction could not have been completed.

196.    While only the First Trust Note is the subject of foreclosure proceedings at the

moment (with a forestalled foreclosure originally scheduled for June 29, 2009, and now re-

scheduled for November 16, 2009), in the totality of the circumstances it is the combination and

scrutiny of the First Trust Note and the Second Trust Note Transaction that creates further doubt

as to the legality of the Transaction as a whole, and where the mandated disclosures and

requirements of TILA, RESPA, and CRESPA get further aggregated, violated, and seriously questioned as to their compliance by Defendants.

197.   To date, in fact, the identity of all original participants and parties of interest in the Transaction has been concealed and is unknown.

198.   To date, in fact, the amounts paid to each and every one of the participants with respect to Plaintiff's loans and the Transaction has been concealed and is unknown.

199.   As part of the consumer credit transaction in which Plaintiff was induced to participate, Defendant GREENPOINT claimed that it retained a security interest in 12777 Crossman Creek Way, Bristow, VA 20136, which is Plaintiff's primary home and residence.

200.   The loan application that Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT and GMAC filled out and completed, Fannie Mae Form 1003 (the "Federal Loan Application"), indicated that the Lara/Garcias earned a combined monthly salary of $17,751.00.

201.   The monthly earnings are broken down as $10,516.00 per month for Luis Lara, and $7,235.00 per month for his wife Olga Marina Garcia, respectively. Additionally, the Federal Loan Application indicates that the Lara/Garcias were not co-makers or endorsers on a note, and that Mr. Luis Lara is a U.S. Citizen.

202.   In reality, the Lara/Garcias income was substantially overstated by Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT and GMAC. In fact, the Lara/Garcias at no time made more than $5,833.33, per month, combined.

203.    The federal tax filings for fiscal 2004 and 2005 so that Plaintiffs' salaries would be readily verified, were given to Defendants OSSAS, MORTGAGE UNLIMITED BROKER and GREENPOINT during Plaintiffs' loan application process.

204.    At all times relevant hereto, both Lara/Garcias were endorsers on another property as co-signers on another mortgage loan for a relative that the Lara/Garcias had helped previously to purchase a home.

205.    Finally, Mr. Lara is not a US Citizen as indicated by Defendants OSSAS, MORTGAGE UNLIMITED BROKER and GREENPOINT on the Federal Loan Application, but rather a permanent legal resident of the United States.

206.    These material and untruthful disclosures on the Federal Loan Application were never disclosed to the Lara/Garcias, and the Lara/Garcias never saw exactly what Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC had filled out and completed in the preparation of their loan for their purchase of their home and primary residence.

207.    After their February 28, 2006 Federal Loan Application was completed, the Lara/Garcias were not given either a draft copy of the Federal Loan Application that Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, and GMAC filled out, or given a Good Faith Estimate of Closing Costs as required.

208.    As part of this consumer credit transaction, Defendant GREENPOINT claimed that it retained a security interest in 12777 Crossman Creek Way, Bristow, VA 20136, which is Plaintiffs' home, and Defendant MERS claimed that it was a "beneficiary" under the Dedd of Trust. The Transaction is a consumer credit transaction within the meaning of TILA, 15 U.S.C. § 1602 and Regulation Z § 226.2.6.

209.   The Lara/Garcias are the sole legal, equitable, and beneficial title holders of their Property.

210.   The Lara/Garcias bought their home and primary residence in March 2006, at a time when home mortgage interest rates were being offered to prospective borrowers at teaser rates sometimes starting at one percent (1%) per annum without Borrowers properly being advised or a proper disclosure being made to them that in fact the interest rates on their mortgage notes would quickly increase and would ultimately make their home mortgages unaffordable.

211.   As it turns out, due to the nature of their Negative Amortization Loan, and unbeknownst to the Borrowers, their principal loan balance actually increased starting on day one, regardless of whether mortgage interest rates decreased or even stayed the same. The failure to properly disclose the effective cost of the mortgage transaction is a strict liability matter in violation of TILA § 1640(a).

212.   Many people, including the Lara/Garcias, fell prey to what is now commonly known as predatory lending practices and toxic sub-prime loans.

213.   The identity of the true parties in interest with respect to the promissory notes was concealed from the beginnning, has never been made and has never been disclosed to the Plaintiffs.

214.   If a proper disclosure at time of settlement was never made, one outstanding and underlying issue remains: Do the applicable TILA or RESPA statute of limitations begin to run if no true disclosure exists or was ever made.

215.   The only disclosure of the financing charges was presented to the Lara/Garcias at time of settlement and, as expected, inaccurately states the obvious: The Truth in Lending Disclosure Statement (RESPA Transaction) (hereinafter the "RESPA Disclosure") given to the

Lara/Garcias to execute on the day of settlement is neither complete, nor accurate, nor truthful. In fact the only available Lara/Garcias RESPA Disclosure 1.) does not account for the complete nature of the Transaction as the RESPA Disclosure completely ignores the finance charges associated with the Second Trust Note; 2.) completely ignores the effects of the Negative Amortization Loan associated with the Transaction, and 3.) entirely fails to account for all the fee splits, and kickbacks, including those fees paid to Defendant MERS at settlement for the first and second trust loans' "electronic registration." As previously asserted, it also fails to identify the true parties in interest with respect to the notes.

216.    The RESPA Disclosure also fails to account for, and much less calculate all the YSPs present in the Transaction. In so doing, the disclosure: 1.) ignores the "Yield Spread Premium" that Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC were paid and "earned" as a direct and proximate result of the falsehoods that they completed on the Federal Loan Application b oth for loan origination and then for loan securitization. Not only did these activities violate TILA, and RESPA, but they also violated several federal and state statutes, including, but not limited to 18 USC § 1344 (relating to financial institution fraud) and 18 USC § 1957 (monetary transactions in unlawful activity).

217.    The RESPA Disclosure also fails to account for, and much less calculate all the YSPs present in the Transaction all the "Yield Spread Premiums" that Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT and GMAC were paid and "earned" as a direct and proximate result of the falsehoods that they completed on the Federal Loan Application at loan origination and loan securitization.

218.    Not only did these activities violate TILA, and RESPA, but they also violated federal and state statutes, including, but not limited to 18 U.S.C. §§ 1010, 1014 (relating to false

statement in connection with a mortgage loan), 18 USC § 1344 (relating to financial institution fraud) and 18 USC § 1957 (monetary transactions in unlawful activity).

219.    When the Transaction was completed, following the profitable scheme that Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC operated, the Lara/Garcias received a "Negative Amortization Loan" on their first trust note.

220.    The Lara/Garcias initial "teaser interest rate" with the Negative Amortization characteristics started at 1% per annum. On the date of settlement, however, the TILA Disclosure states that the Annual Percentage Rate ("APR") is **7.242%**.

221.    If given the opportunity and time to review, read, and understand the closing documents on the day of settlement, any reasonable person may immediately get confused with just the language of the First Trust Note as it indicates that despite its 1% per annum interest rate, the maximum interest rate on the First Trust Note shall not exceed **9.950%** during the term of the First Trust Note.

222.    Thus, while the applicable TILA Disclosure attempts to comply with TILA disclosure requirements, it completely fails to account for the Negative Amortization nature of the Transaction, entirely fails to account for the finance charges incurred with the Second Promissory Note, and entirely dismisses and fails to account for the Yield Spread Premium of $8,760.00 that Defendant GREENPOINT sent to Defendants OSSAS, MORTGAGE UNLIMITED BROKER on the First Trust Loan, or the YSP also paid to them for the second trust note.

223.    Quite conveniently and concealed from Plaintiffs is the lack of mention of the securitized nominal rate, promissory notes discount rate, or all YSPs involved in the securitized

notes applicable to the Transaction and received by Defendants GREENPOINT, MERS and
GMAC.

224.    By giving the Lara/Garcias a low "teaser" Negative amortization loan, Defendants
OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC, succeeded
in hiding the true nature of the Transaction. By making sure that a Borrower could afford to
make the low "teaser" payments, knowing full well that the Lara/Garcias did not make more than
$5,833.33 per month, Defendants OSSAS, MORTGAGE UNLIMITED BROKER,
GREENPOINT, MERS and GMAC successfully funded an "above par loan".

225.    By originating the type of loan and table funding the purchase money loans that
the Lara/Garcias obtained, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS,
MORTGAGE UNLIMITED BROKER, GREENPOINT, GMAC, MERS, and others have
engaged in a pattern of fraud and deception across the country and the Commonwealth of
Virginia in attempting to foreclose on residential properties where a plethora of violations are
evident on the face of the documents executed in connection with their consumer transaction,
including violations of RESPA, HOEPA, TILA, the Wire Act, the Mail Fraud Act, the Uniform
Commercial Code, and other federal and state laws.

226.    By regularly threatening foreclosure and actually scheduling foreclosure sales
dates, Defendants GREENPOINT, GMAC, MERS, and SIW have engaged in patterns of
racketeering activities including extortion and collection of unlawful debts which are considered
prohibited activities by the Racketeer Influenced and Corrupt Organizations Act, U.S.C. 18 § 1961,
et. seq. ("RICO").

227.    Making use of instrumentalities of interstate commerce and the wires, Defendants
GREENPOINT, MERS and GMAC wired the Settlement Agent on this Transaction the loan
proceeds for the purchase of the Lara/Garcias home and primary residence on March 10, 2006.

228.    At no time has a proper chain of custody of the First Trust Note, or even the
Second Trust Note, been demonstrated by Defendants GREENPOINT, GMAC, MERS, or SIW.
As part of the chain of custody of the Promissory Notes, Defendants (a) have not disclosed the
identity of the true parties in interest; (b) the identity of the true holder in due course of the First
and/or Second Trust Notes; (c) have not identified the parties in possession of endorsement (of
which there are several who potentially have an interest in the First Trust Note and the Second
Trust Note); and (d) have not made available for review the original signed and dated Notes.

229.    In fact, Defendants have not even disclosed if the First Trust Note or the Second
Trust Note are part of a mortgage backed security pool, a securitization agreement, or identified
a proper holder in due course person, entity, or group.

230.    On June 25, 2009, just four (4) days before the first foreclosure proceeding on the
Lara/Garcia Home was scheduled to take place, Defendant SIW complied with Plaintiffs'
Counsel request to show evidence that the Original Promissory Note was in its possession. A
copy of the back page of the First Trust Original Promissory Note shows an undated
endorsement executed by a Thomas K. Mitchell, Vice President of Defendant GREENPOINT
with the following legend: WITHOUT RECOURSE PAY TO THE ORDER OF
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC [the different font type and
size in original].

231.    It is quite revealing that nowhere on the original promissory note is any indication that GMAC is the "holder", the "holder in due course", or the entity authorized to enforce the default provisions of the first Promissory Note and the First Deed of Trust as of June 25, 2009.

232.    Further, there is no indication as to what consideration, if any, Defendant MERS or Defendant GMAC tendered to meet the requirements of a "holder in due course."

233.    As outlined above, numerous violations of RESPA and TILA were committed in the course of processing and settling the Lara/Garcias', and the other class members' loans. The more egregious violations began with the failure to timely provide the Lara/Garcias with a Good Faith Estimate of Closing Costs.

234.    RESPA requires, among other things, that the mortgage broker and/or the lender provide the borrower with a Good Faith Estimate of Closing Costs within three calendar days of the date the application is prepared or received. 24 C.F.R. § 3500.7(b).

235.    This Good Faith Estimate is essentially the method by which lenders and mortgage brokers satisfy their TILA disclosure requirements in the context of mortgage loans. Not only was the Good Faith Estimate not prepared and sent to the Lara/Garcias within the required period, but it was not presented to the Lara/Garcias at all.

236.    The Defendants purposefully failed to provide the Lara/Garcias with the required Good Faith Estimate within the required period of time in an effort to conceal their fraudulent activities. The reason for the concealment was that the Good Faith Estimate, if and when ultimately provided, would disclose the serious, inaccurate and misleading nature of their activities in a number of material respects.

237.    By delaying, concealing and/or not providing the Good Faith Estimate, the Defendants ensured that any applicable disclosures or loan documents would be essentially

unquestioned or lost in the avalanche of documents typically involved in a real estate settlement, and lessened the chance that the borrowers would discover and challenge the inaccuracies that Defendants had perpetrated on the loan application and other documents.

238.   If the manner in which the Defendants had misstated the Lara/Garcias monthly salary in the Federal Loan Application remained concealed and unchallenged, then the Defendants (BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) would all reap a substantial pecuniary and financial benefit, at the expense of the Lara/Garcias, and other class member plaintiffs.

239.   In fact, the Defendants' scheme to conceal and misrepresent the true nature of the Lara/Garcias' loan transactions worked. The Lara/Garcias were unaware of the Defendants' wrongdoing until very recently. There was simply no reasonable way that the Lara/Garcias could tell from the documentation that was provided Plaintiffs that the Defendants had seriously misrepresented the Transaction.

240.   Indeed, this result of concealment was exactly as the Defendants intended. As a direct result of the Defendants' numerous violations of federal statutory and state common law, and of their misrepresentation and concealment of the true facts from the Lara/Garcias and other class members, Plaintiffs suffered considerable damages, and the Defendants substantially profited at their expense.

241.   The foreclosure sale of Plaintiffs' home and primary residence is advertised for sale at foreclosure on November 16, 2009.  If this foreclosure sale proceeds anew, Plaintiffs Lara/Garcias will suffer immediate, substantial, and irreparable injury.

242.   If Defendants GREENPOINT, GMAC, MERS and SIW succeed in foreclosing on Plaintiffs' home, this Court may not be able to fashion an adequate remedy to satisfy the

Plaintiff's claims since the property in dispute will no longer be in the possession of the
Plaintiffs.

243.   There is no other adequate remedy at law that can satisfy Plaintiffs' claims should
Plaintiffs succeed at trial.

244.   Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT,
MERS and GMAC did not provide a copy of the loan documents to Plaintiffs before March 10,
2006.

245.   Prior to March 10, 2006, Plaintiffs had not seen or received a copy of the Truth in
Lending disclosure statement.

246.   The Truth in Lending Disclosure statement prepared by Defendants OSSA,
MORTGAGE UNLIMITED BROKER and GREENPOINT disclosed:

> a.) an amount financed of        $569,964.00
>
> b.) a finance charge of          $1,318,678.48
>
> c.) an annual percentage rate of 7.242%, and
>
> d.) a security interest in the amount of $584,000.00 on the First Trust Note
>   on a home purchased for $730,000.00.

247.   Although the amount financed is purported to be $569,964.00, the First Trust
Note the Lara/Garcias executed is for the principal amount of $584,000.00.

248.   As of November 5, 2008, regardless of whether Plaintiffs timely made their
required first and second trust mortgage payments, because of the Negative Amortization
features of Plaintiffs' loan, the outstanding principal on the First Trust Promissory Note stood at
$641,484.63, an amount that is over $57,000.00 higher than the original principal amount

supposedly financed by Defendants OSSAS, MORTGAGE UNLIMITED BROKER,

GREENPOINT and GMAC.

249.   Up to that point, the Lara/Garcias made their monthly payment on a regular and
timely manner.

250.   Further, while the Truth in Lending Disclosure statement prepared by Defendants
OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC disclosed
an Annual Percentage Rate of 7.242%, the First Trust Note specifies that the Interests Rate Limit
"will never be greater than 9.950%".

251.   TILA requires that a proper TILA disclosure for the interest rate show the highest
interest rate that may be applicable at any time of the term of the First Trust Note. In this
instance, the TILA disclosure completely ignores and DOES NOT account for the finance
charges that are further associated with the Transaction.

252.   While the First Trust Note was executed by the Lara/Garcias for the original
principal amount of $584,000.00, the amount financed and disclosed on the TILA Disclosure is
only for $569,964. Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT,
MERS and GMAC arrived to those amounts as follows:

| | | |
|---|---|---|
| a. | TOTAL LOAN AMOUNT: | $584,000.00 |
| b. | **LESS:** Origination Fee to Broker | (10,220.00) |
| c. | Funding Fee to GPM | (    230.00) |
| d. | Tax Service Fee | (      79.00) |
| e. | Process/Admin Fee to Broker | (    350.00) |
| f. | Flood Certification Fee | (      11.00) |
| g. | Underwriting Fee to GPM | (    395.00) |

| h. | Prepaid Interest | ( 2,508.00) |
|----|------------------|-------------|
| i. | Settlement/Closing Fee | ( 195.00) |
| j. | Courier Fee to Settlement Agent | ( 48.00) |
| | EQUALS AMOUNT FINANCED: | $569, 964.00 |

253.    It is curious and telling that Defendants OSSA, MORTGAGE UNLIMITED

BROKER, GREENPOINT, MERS and GMAC would disclose minor charges of $11.00 for

Flood Certification Fee, or $48.00 for Courier Fee to Settlement Agent, but yet completely fail to

account for the additional Yield Spread Premium listed on line 815 of the RESPA HUD-1

Settlement Statement in the amount of $8,760.00 (POC) directly sent to Defendants OSSAS,

MORTGAGE UNLIMITED BROKER by GREENPOINT and GMAC, or fail to account for the

additional YSP paid for the second trust note, or more significantly, the thousands involved in

the successful securitization of Plaintiffs' notes.

254.    On its face, it seems inconceivable to be in compliance with TILA regulations and

requirements to disclose and account for or calculate *de minimis* charges paid by the

Lara/Garcias for purposes of Defendants' compliance with their TILA Disclosure, but fail to

account for a large amount of over $8,760.00 in "yield spread premium" for purposes of

"proper" TILA Disclosure and compliance thereto, or also account for the YSP paid for the

second trust note, or the many thousands of dollars involved in the successful securitization of

Plaintiffs' notes.

255.    Concealed and glaringly absent in any disclosure or documents provided to

Plaintiffs is the amount paid to Defendants MERS by any of the other Defendants for its

participation in the Transaction. In fact, even the fact that Defendant GMAC is a MERS

stockholder is never disclosed, as are the lack of disclosures about the kick-backs and illegal fee-splits that Defendants MERS received for participating in the Transaction and scheme.

256. This attempted TILA Disclosure and compliance also fails to account for the Second Trust Promissory Note in the amount of $73,000.00 that was required to complete the Transaction. Without the Second Trust Note, the Transaction as a whole would not have been possible. The Second Trust Note Transaction paid additional YSP and other charges to Defendants OSSAS and MORTGAGE UNLIMITED BROKER by GREENPOINT, MERS and GMAC.

## VII.   THE GENERAL SCHEME AND ENTERPRISE

257. What the Lara/Garcias (and the other class members) could not have known was that Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, GMAC and MERS had devised a plan to ignore the disclosure requirements of federal law, pay and obtain illegal "kickbacks," and otherwise act wrongfully to benefit themselves in a way inconsistent with applicable law.

258. The schemes began with Defendants GREENPOINT and GMAC recruiting local "headhunters" whose task was to find high credit score individuals to get placed in securitized mortgage pools. Those recruiters and lookouts for potential good or Olympic swimmers got paid higher and higher commissions if the borrowing participants were given "above par" loans.

259. Thus, the worse the interest rate for the victimized loan borrower, regardless of the initial low introductory teaser interest rate, the higher the pay out for the loan originator from the pool sponsor or conduit (Defendants GREENPOINT, MERS and GMAC).

260. In those securitized mortgage pools that the Defendants created, all loans are separated into several tranches or pieces (Senior Certificate Class, Mezzanine Certificates,

Subordinated Certificates, ... the A piece, B piece, C piece, ...M piece) where the first tranches have seniority and are exposed to the least risk possible if anything adverse happens to the mortgage pools. Any insurance or credit enhancement provisions pay out to the senior certificate holders first just like in a typical ponzi scheme.

261.     Just like in a typical ponzi scheme, the first participants or senior class certificate holders in the purchase of classes of certificates from securitized mortgage pools get paid out first. Unfortunately for the targeted and unwittingly victimized borrowers, it is high credit score individuals like them that are the foundation and the support for the securitized loan pyramids that the ponzi schemers and gamblers created.

262.     If those senior certificate classes and first investors are not properly protected, then the securities in the mortgage pools would not be as attractive to potential well heeled investors. Thus, to provide for higher security and higher insurance policies, second trusts with a higher interest rate than the first note trusts, much like Plaintiffs' second trust note, are also used as credit enhancement vehicles. That is why some of the class members who are the subject of this Complaint were given higher interest rate second liens and promissory notes. In essence, the victimized borrowers got used as "insurance providers" for their own or other separate securitized mortgage pools.

263.     Further, the ponzi schemes protected the first class of certificates and senior investors, but disregarded any provisions or any concern for the well being of the victimized borrowers.

264.     Additionally, in order to create other credit enhancement policies, and knowing that the negative amortization loans were likely to fail, especially in the early years, the ponzi

scheme and securitized mortgage pool issuers, sponsors and creators, bet that the loans would in fact default.

265.    In betting on the likely default of these type of loans, on information and belief, these schemers procured (for the benefit of the REMIC or mortgage securities SPV Defendants created or entered into) credit default swaps, credit default derivatives, interest rate swap agreements, and other forms of credit default commodities and credit enhancements.

266.    In so betting, these scheme participants and collaborators engaged in deceptive and illegal loan and credit default derivatives and commodities gambling.

267.    This gambling that the loans would likely default, especially in the early years, qualifies as an illegal gambling of commodities scheme in violation of gambling laws in the Commonwealth of Virginia.

268.    The ponzi and gambling schemes began with representatives of Defendants ANGELMAR R/E BROKER and MORTGAGE UNLIMITED BROKER identifying pool eligible borrowers, originating loans and receiving payments from Defendants GREENPOINT and GMAC for their efforts in producing "above par" loans.

269.    Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, and MORTGAGE UNLIMITED BROKER took advantage of the "hot" housing market of the early and mid 2000s by acting as a real estate and mortgage brokers, and assigning the applications to other entities for funding and servicing.

270.    One of the principal ways that Defendants OSSA AND MORTGAGE UNLIMITED BROKER originated money for themselves and made substantial profits was by obtaining commissions from Defendants GREENPOINT and GMAC in pursuit of their scheme

through so-called "yield spread premiums" paid by Defendants GREENPOINT and GMAC as the ultimate funder of the loans.

271.    These "yield spread premiums" ("YSPs") are actually kickbacks or referral fees paid to parties, like a mortgage broker, that recruited or convinced potential borrowers to commit to borrowing money from them at a rate higher than the ultimate funder's "par rate" — the lowest rate at which the funder would be willing to lend money. The "yield spread premiums" that were paid became higher as the interest rate or the "yield" of the applicable loan increased. This method of compensation gave the mortgage broker or other loan originator an incentive to "sell" a higher rate than was otherwise available or for which the Plaintiffs could have qualified. Thus, the higher the interest rate, the higher the YSP paid out.

272.    It would be difficult to continue the charade that the borrower was in fact obtaining an affordable rate and loan if the Good Faith Estimate, and other closing documents and disclosures had been clearly made and properly disclosed as required by the relevant statutes and regulations. Thus, if the high YSP paid out by the ultimate loan funder to the loan originator, is accounted for and disclosed, many borrowers would question the reason for such high "unearned fees" and back out of the loan contract altogether. The unambiguous disclosure of such a payment would almost certainly raise questions in the borrowers' minds, and could cost the Defendants some rather lucrative business. Therefore, the Defendants decided to disclose the YSP payments on the settlement sheet but conceal the effect of such payment on the cost of credit to the borrowers.

273.    The Lara/Garcias' loan, as an example, was settled on March 10, 2006. At settlement, the Lara/Garcias were not provided with a Good Faith Estimate. While the HUD-1 settlement sheet provided to the Lara/Garcias showed on Line 815 that Defendants OSSA AND

MORTGAGE UNLIMITED BROKER were receiving a Yield Spread Premium of $8,760.00, such a yield spread premium is not accounted for in the TILA Disclosure. Further, on HUD-1 Line 208, the proceeds of the Second Trust Note in the amount of $73,000.00 are disclosed, but are nowhere listed or accounted for as a disclosure in the TILA Disclosure. It takes a trained eye and legal and financial knowledge, something Plaintiffs did not have at Settlement, to realize that a proper and accurate accounting of the Finance Charges applicable to the Transaction were never made.

274.    As part of the Settlement documents executed, the Lara/Garcias also executed a Form W-9, "Request for Taxpayer Identification Number and Certification", supposedly for the purposes of verifying the Social Security number of the Borrowers.

275.    The Lara/Garcias were also required to execute a form labeled "Identity Fraud Prevention Affidavit", for the alleged purpose of verifying Plaintiffs' name, date of birth, social security number, and driver's license number. Despite having those documents available, at no time did Defendants GREENPOINT and GMAC (worse yet MERS) verify the accuracy of the Federal Loan Application contents that Defendants OSSA and MORTGAGE UNLIMITED BROKER had submitted for Defendant GREENPOINT's loan approvals.

276.    The payment to the mortgage broker of more than eight thousand seven hundred sixty dollars ($8,760.00) as an additional Yield Spread Premium for procuring the Lara/Garcias' $530,000.00 loan was of course inconsistent with the requirements of the TILA Disclosure which requires that a complete and truthful disclosure of the financing costs be provided and disclosed. If properly disclosed, Borrowers might conclude that the rate was too high, and further negotiation might well have secured a lower rate or have cancelled the Transaction in its entirety. In fact, this is precisely the theory behind the disclosure requirements of Federal law. There was

nothing in any of the documentation provided to the borrowers showing the true extent of the finance charges of the Transaction. This is in contravention of the TILA requirements. The disclosure of the fees paid to Defendant MERS was also never made.

277.    Regulation X, 24 C.F.R. § 3500.7(a) (c) provides that the Good Faith Estimate must disclose each charge that will be listed in section L of the HUD-1 settlement sheet in accordance with the regulations. Appendix A to Regulation X provides that settlement charges shall be disclosed, and that "[s]uch charges also include *indirect payments or back-funded payments to mortgage brokers.*" The official Comment to Illustration 12 of Appendix B to Regulation X states that "any other fee or payment received by the mortgage broker from either the lender or the borrower arising from the initial funding transaction, including a *yield spread premium,* is to be noted on the Good Faith Estimate and listed in the 800 series of the HUD-1 Settlement Statement."

278.    The Defendants' failure to account for the payment of these funds to the mortgage broker, and the obfuscation of the true nature of the payments, violated these and other provisions of RESPA and also constituted a violation of TILA. And because of the true nature of the Negative Amortization loan that the Lara/Garcias obtained, it failed to properly account for the effective costs of the Transaction as a whole.

279.    The payment of these fees, even if the same were disclosed, violated RESPA in other ways, as well. RESPA allows reasonable payments to be made for "settlement services" actually performed by the broker. 12 U.S.C. §§ 2607(c)(1)(c) and 2607(c)(2). However, these payments must reflect the reasonable market value of the services actually performed by the broker. 12 U.S.C. § 2607(b) ; 24 C.F.R. § 3500.14(c) and (g). If not properly reflected or accounted for, the presumption arises that such payments were made as a form of bonus merely

to create an incentive to refer the loan to that lender. Such a "referral fee" or "kickback" is illegal under Section 8 of RESPA, which provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

280. The subject YSP payments were prohibited "kickbacks." They were in an amount greatly exceeding any actual work that Defendants OSSAS and MORTGAGE UNLIMITED BROKER or GREENPOINT actually performed with respect to the loans. Further, these exaggerated payments were made with the knowledge and participation of all the Defendants (BONILLA, ANGELMAR R/E BROKER, the OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC) for the very purpose of causing the "above par" loans to be referred to Defendants GREENPOINT and GMAC. Moreover, contrary to the requirements of federal law, the fees were not properly disclosed, precisely so that the Defendants' scheme could remain concealed. The Lara/Garcias, and the other borrowing class members, ultimately paid for the illegal and improper "kickbacks" or "referral fees" through the inflated interest rates on the loans procured for them by the Defendants.

281. As a result of the Defendants' wrongdoing, the Lara/Garcias and other class members have suffered considerable damages.

## VIII.   CLASS ACTION ALLEGATIONS

282. The Lara/Garcias bring this claim on their behalf, and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

283.   The plaintiffs' class is composed of all persons, located anywhere within the Commonwealth of Virginia, who satisfy the following criteria:

a.   On or after March 10, 2006, they entered into one or more consumer credit transactions;

b.   In the case of a house purchase, used the services of Defendants BONILLA, and ANGELMAR R/E BROKER or any of its officers, directors, agents, servants or employees to purchase the property;

c.   Which loan(s) was(were) secured by one or more mortgages on their property;

d.   The application for which was taken or processed by or through Defendants OSSA and MORTGAGE UNLIMITED BROKER or any of its officers, directors, agents, servants or employees;

e.   The mortgages or deeds of trust instruments and/or notes executed in connection with such loans named Defendant GREENPOINT as the original lender, mortgagee, grantee and/or payee and Defendant MERS as the "nominee" or its other capacity as "beneficiary" under the deed of trust;

f.   Which mortgages or deeds of trust instruments and/or notes were assigned or otherwise transferred to Defendants GREENPOINT, MERS or GMAC;

g.   In connection with such transactions fees were paid to Defendants R/E Agent BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and other unidentified DOES in the Complaint;

h.   Which fees were not disclosed, or if disclosed, were not properly disclosed  as being paid to OSSA, MORTGAGE UNLIMITED BROKER, GREENPOINT,

MERS, GMAC, and other unidentified DOES in the Complaint, on the Good Faith Estimates, TILA disclosures, and HUD-1 settlement sheets prepared in connection with such Transactions.

284.    There are questions of law and fact which are common to all members of the class, which questions predominate over any question affecting only individual class members. The principal common issues are:

a.  Whether it is a violation of RESPA and Regulation X to fail to disclose on the borrowers' Good Faith Estimate and/or HUD-1 Settlement Sheet the fact that sums are to be paid by an assignee of a loan (aider and abettor and conspirator) to the original lender, and then shared by the original lender and the mortgage broker that procured the loan;

b.  Whether the payment of such sums constitutes an illegal and improper "kickback" or "referral fee" under RESPA, and thus is prohibited whether or not the same is disclosed to the borrower;

c.  Whether Defendants GREENPOINT, MERS and GMAC properly disclosed the true nature of their "above-par loan" practices when they attempted to complete and provide a TILA disclosure;

d.  Whether Defendant GREENPOINT, MERS and Defendant GMAC's obtaining of the loans in question constituted a *bona fide* secondary market transaction, or whether it was simply subterfuge to hide the fact that it was really at all times representing other conspirators in different loan ponzi schemes, racketeering activities, racketeering enterprises, and money laundering activities.

e.  Whether Defendants GREENPOINT created the impression of a *bona fide* secondary market transaction while operating as the functional equivalent of "table funding" entity;

f.  Whether fees such as yield spread premiums (especially two YSP payments for the same property at the same date and other hidden costs inherent in a Negative Amortization transaction, not to mention the thousands involved in the successful securitization process of Plaintiffs' loans) constitute a "finance charge" under TILA and Regulation Z;

g.  Whether it is a violation of TILA and Regulation Z to fail to include such fees in the "finance charge" disclosed to the borrower;

h.  Whether the disclosures made in connection with the subject loans are inaccurate or incomplete.

i.  Whether the disclosures made in connection with the subject loans are inaccurate or incomplete by a comparison among the disclosure statement and other documents surrounding the loan, and Defendants GREENPOINT, MERS and GMAC's own records of the disbursement of illegal and improper "kickbacks" or "referral fees";

j.  Whether Defendants OSSAS and MORTGAGE UNLIMITED BROKER obtained for the class members a higher rate than was available if not for the illegal and improper commissions, "kickbacks" or "referral fees";

k.  Whether Defendants R/E Agent BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC owed to the class members a fiduciary duty as their agent to obtain and

accurately complete the Federal Loan Application when originating mortgage loans;

l.  Whether Defendants R/E Agent BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, and GMAC breached this duty by failing to disclose to the class members the payment of the illegal and improper commissions, "kickbacks" or "referral fees";

m.  Whether Defendants R/E Agent BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC, when considering the totality of the circumstances, intended to obtain a higher rate than was otherwise available so that Defendants could secure for themselves the higher illegal and improper commissions, "kickbacks" or "referral fees" for procuring a more costly loan for the borrowers;

n.  Whether Defendant GREENPOINT, MERS and/or GMAC participated in or directed the actions and misrepresentations, directly or indirectly, of Defendants R/E Agent BONILLA, ANGELMAR R/E BROKER, OSSAS, and MORTGAGE UNLIMITED BROKER;

o.  Whether Defendants GREENPOINT, MERS and GMAC are jointly and severally liable for the wrongs committed by Defendants ANGELMAR R/E BROKER and MORTGAGE UNLIMITED BROKER's stockholders, officers, directors, agents and/or employees when they untruthfully completed Federal Loan Applications the reliance of which allowed them to generate mortgage loans that were in reality unaffordable;

p.  Whether the payment of the illegal and improper "kickbacks" or "referral fees" was concealed by the Defendants in order to deceive the class members;

q.  Whether the failure to disclose and active concealment of the illegal and improper "kickbacks" or "referral fees" constituted constructive fraud;

r.  Whether the Defendants conspired together to violate RESPA, TILA, HOEPA, CRESPA, various prohibited activities of RICO and various common law duties to reach the goal of maximizing their financial benefit at the expense of the class members;

s.  Whether the Defendants' actions were taken with actual malice in that they were motivated by a desire to deceive the class members, and profit from their deception;

t.  Whether the failure to disclose the true party in interest at Settlement is a harmless omission or a violation of the TILA Disclosure requirements;

u.  Whether the failure to disclose the true party in interest at Settlement is sufficient to toll the applicable TILA and RESPA statutes of limitation;

v.  Whether the failure to disclose the fees paid to Defendant MERS in the Transaction is violation of TILA and RESPA;

w.  Whether the Defendants' conducted the affairs of an enterprise through a pattern of mail and wire fraud, collection of unlawful debts, extortion, financial institution fraud, racketeering, and money laundering in violation of 18 U.S.C. § 1962(c); and

x.  The appropriate amount of compensatory, statutory, and punitive damages and other relief.

285. The Lara/Garcias' claims are typical of the claims of the class members.

286. All claims are based upon the same legal and remedial theories.

287. The Defendants' schemes operated in a virtually identical manner with respect to each class member — the only substantial difference was the amount of money involved. Thus, the only individual questions concern the identification of class members and the computation of the relief to be awarded to each class member. These questions can be determined by a simple, ministerial examination of each individual file.

288. The Lara/Garcias' will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein.

289. The Lara/Garcias are similarly situated with, and have suffered similar injuries as the members of the class they seek to represent.

290. The Lara/Garcias feel that they have been wronged, wish to obtain redress of the wrong, and want the Defendants (and others who may be contemplating similar misconduct) estopped from perpetrating similar wrongs on others. To that end, the Lara/Garcias have retained counsel competent to handle class action suits involving unfair business practices and consumer credit law.

291. Neither the named plaintiffs nor their counsel have any interest which might cause them not to vigorously pursue this action. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in that:

        i. An overwhelming majority of the individual class members may not be aware that they have been wronged,

        ii. there is possibility of redress, and,

iii. due to the nature of the financial mess these Defendants perpetrated on innocent unwitting borrowers may be unable to prosecute individual actions;

iv. Concentration of the litigation concerning this matter in one action in this court, rather than scattering the resolution of nearly a five hundred individual claims in five hundred separate suits, is desirable;

292.   The claims of the Lara/Garcias are typical of the claims of the other class members, and thus the resolution of the Lara/Garcias' claims will, in large part, obviate the need to resolve the nearly one thousand individual claims;

293.   The class is of moderate size as compared to other class actions, the identity of the class members is readily ascertainable, and the difficulties likely to be encountered in the management of a class action of this nature are not great.

294.   In compliance with the Class Action Fairness Act of 2005, the amount in controversy exceeds five million dollars ($5,000,000.00).

295.   Finally, the class, when considered as individual claims, is numerous enough so as to make it impracticable to join all members of the class as named plaintiffs. Based upon counsel's investigation, the class appears to consist of nearly five hundred members in the applicable securitized mortgage pool in Virginia.

## IX.   CONSPIRACY

296.   As aforementioned, Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy, which includes not only the Defendants, but other mortgage brokers as well.

297.    All of the practices described herein are the component parts of Defendants'
larger scheme which was designed to maximize Defendants' profits, both from the loans
themselves and from the secondary market for mortgage-backed securities.

298.    Each Defendant and all members of the conspiracy, with knowledge and intent,
agreed to the overall objective of the conspiracy, agreed to commit acts of fraud to wrongfully
obtain money from Plaintiffs and members of the Class, and actually committed such acts.

299.    Indeed, for the fraudulent scheme described above to be successful, each
Defendant and other members of the conspiracy had to agree to enact and utilize the same
devices and fraudulent tactics against Plaintiffs and members of the Class.

300.    Numerous common facts and similar activities, which reflect the above reality and
imply the existence of a conspiracy, exist among all of the Defendants and other members of the
conspiracy, including: (a) statements made to borrowers by Defendants R/E Agent BONILLA,
ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT,
MERS, GMAC, and other mortgage brokers authorized by Defendants GREENPOINT, MERS
and GMAC to sell their loan products, that the they will obtain the "best loan" for the borrower,
(b) the utilization of standardized sales manuals by GREENPOINT's brokers, (c) the utilization
of a commission structure, instituted by Defendants GREENPOINT, MERS and GMAC, for the
determination of commission rates paid to their brokers and other authorized brokers which
resulted in borrowers being driven to subprime loans when those same borrowers were otherwise
qualified to receive loans on better terms, (d) the inclusion by GREENPOINT's brokers of
certain closing fees (including fees to undisclosed real estate appraisers) payable to their
affiliates, which, when those fees were disclosed, were significantly higher than those charged
by other companies, and (e) based on information and belief, GREENPOINT's and GMAC's

failure to provide Form 1099s to the Internal Revenue Service for income paid to their authorized brokers.

301.    At all times relevant to this Complaint and during the past four years the conspiracy was conducted through, and implemented by, Defendants and supposedly independent real estate and mortgage brokers authorized to sell GREENPOINT and/or GMAC mortgage loans.

## X. RICO ALLEGATIONS: THE GREENPOINT-GMAC BROKER ENTERPRISE

302.    Plaintiffs, the Class members and Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

303.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "GREENPOINT-GMAC Broker Enterprise": (1) ANGELMAR R/E BROKER, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC, including loan servicing subsidiaries, affiliates, and partners, and (2) other mortgage brokers not named as defendants herein who have contracts with GREENPOINT and GMAC pursuant to which they sell, arrange, promote, or otherwise assist GREENPOINT and GMAC in directing borrowers into loans issued by GREENPOINT and GMAC for their securitized mortgage pools.

304.    The GREENPOINT-GMAC Broker Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

305.    While all Defendants participate in and are members and part of the GREENPOINT-GMAC Broker Enterprise, they also have an existence separate and distinct from the enterprise.

306.    In order to successfully steer as many borrowers as possible into inappropriate subprime loans, Defendants need a system that allows them to effectively promote these loans. The GREENPOINT-GMAC Broker Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. GREENPOINT's participation in the enterprise as a conduit of borrower notes allows the normal checks and balances within the mortgage process to be eliminated, permitting Defendants to advance their scheme and conceal the fraudulent activity they engage in.

307.    The Defendants control and operate the GREENPOINT-GMAC Broker Enterprise as follows: (a) Defendants issue the standardized sales manual to be followed by all GREENPOINT loan officers or designated brokers when soliciting a borrower to obtain a GREENPOINT-GMAC mortgage loan, (b) Defendants determine the commission structure to be paid to all GREENPOINT-GMAC brokers and authorized brokers, rewarding and incentivizing them (with increased commissions and rewards) to offer borrowers loans with less favorable terms than they would otherwise qualify for, and (c) Defendants provide GREENPOINT-GMAC brokers and authorized brokers access to their system, which is then utilized to steer borrowers to more costly loans.

308.    The GREENPOINT-GMAC Broker Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

## XI.    ALTERNATIVE ENTERPRISE ALLEGATIONS: THE GREENPOINT-GMAC ENTERPRISE

309.    Plaintiffs, the Class members and Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

310.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "GREENPOINT-

GMAC Enterprise": (1) GMAC, (2) MERS, (3) GREENPOINT and (4) GMAC's subsidiaries, affiliates, partners, and mortgage loan servicing entities.

311.   The GREENPOINT-GMAC Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

312.   While all Defendants participate in and are members and part of the GREENPOINT-GMAC Enterprise, they also have an existence separate and distinct from the enterprise.

313.   In order to successfully steer as many borrowers as possible into inappropriate subprime loans, Defendants need a system that allows them to effectively promote these loans. The GREENPOINT-GMAC Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme. Furthermore, the participation by its partners GREENPOINT and MERS in the GREENPOINT-GMAC Enterprise allows the enterprise to function more effectively, given that many of the functions provided by these entities, such as procuring originating loan brokers and electronic registration of the applicable loans would normally be conducted by independent entities, or, in the case of land records documents and evidence of indebtedness or assignments, by the county government land recording system. GREENPOINT's, MERS' and GMAC's participation in the enterprise allows the normal checks and balances within the mortgage process to be eliminated, thereby permitting Defendants to advance their scheme and conceal the fraudulent activity they engage in.

314.   The Defendants control and operate the GREENPOINT-GMAC Enterprise as follows: (a) Defendants issue the standardized sales manual to be followed by all GREENPOINT-GMAC loan officers when soliciting a borrower to obtain a GREENPOINT-

GMAC mortgage loan, (b) Defendants determine the commission structure to be paid to all

GREENPOINT-GMAC loan officers, rewarding and incentivizing them (with increased

commissions, and rewards) to offer borrowers loans with less favorable terms than they would

otherwise qualify for, (c) Defendants provide GREENPOINT-GMAC brokers and authorized

brokers access to its system, which is then utilized to steer borrowers to more costly loans. The

GREENPOINT-GMAC Enterprise has an ascertainable structure separate and apart from the

pattern of racketeering activity in which the Defendants engage.

## XII.  PREDICATE ACTS

315.    Section 1961(1) of RICO provides that "racketeering activity" includes any act

indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire

fraud). As set forth below, Defendants have engaged, and continue to engage in, conduct

violating each of these laws to effectuate their scheme.

## XIII.  VIOLATIONS OF 18 U.S.C. § 1341 and 18 U.S.C. § 1343

316.    For the purpose of executing and/or attempting to execute the above described

scheme to defraud or obtain money by means of false pretenses, representations or promises, the

Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized

repositories matter and things to be sent or delivered by the Postal Service, caused matter and

things to be delivered by commercial interstate carriers, and received matter and things from the

Postal Service or commercial interstate carriers, including but not limited to promotional

materials, applications, agreements, manuals, and correspondence.

317.    For the purpose of executing and/or attempting to execute the above described

scheme to defraud or obtain money by means of false pretenses, representations or promises, the

Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and

things, including but not limited to promotional materials, applications, agreements, manuals, and correspondence, and made or caused to be made false statements over the telephone, electronic mail, and internet.

318.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, *inter alia*, promotional materials, applications, agreements, manuals, correspondence, progress reports, loan application disclosures.

319.    Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

320.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the members of the Class and obtaining their property for Defendants' gain.

321.    Defendants either knew or recklessly disregarded the fact that the omissions and misrepresentations described above were material, and Plaintiffs and the Class relied upon the misrepresentations and omissions as set forth above.

322.    As a result, Defendants have obtained money and property belonging to the Plaintiffs and Class members, and the Plaintiffs and Class have been injured in their business or property by the Defendants' overt acts of mail and wire fraud.

## XIV.   GREENPOINT AND GMAC HAD A DUTY TO DISCLOSE

323.    As set forth herein, Defendants GREENPOINT, MERS and GMAC made numerous misrepresentations and half-truths in furtherance of their fraudulent scheme. Such

misrepresentations and half-truths created a false impression, necessitating full disclosure of all relevant facts necessary to correct their misrepresentations and half-truths.

324. Defendants GREENPOINT, MERS and GMAC's fraudulent scheme clearly deviated from traditional industry standards regarding underwriting of residential mortgages.

325. Defendants GREENPOINT, MERS and GMAC's deviation from traditional industry norms necessitated disclosure.

326. In order for Defendants GREENPOINT, MERS and GMAC's fraudulent scheme to be successful, however, Defendants Defendants GREENPOINT, MERS and GMAC's created and maintained the appearance of a traditional underwriting process. In order to maintain this illusion, Defendants GREENPOINT, MERS and GMAC's deceived Plaintiffs and Class members by requesting and accepting materials and information from Plaintiffs and Class members. Often, as in the case of their verifiable income, no 4506-T IRS form was ever filed with the IRS to verify borrower income.

327. Defendants GREENPOINT, MERS and GMAC's also furthered its fraudulent scheme by communicating to Plaintiffs and Class members that Plaintiffs and Class members had, in fact, "qualified" for a Defendants GREENPOINT, MERS and GMAC's mortgage.

328. As set forth above, Plaintiffs and Class members did not know and had no reason to know that Defendants GREENPOINT, MERS and GMAC's network of brokers were no longer working under the traditional model of lending and, in fact, had not conducted the necessary analysis. Accordingly, Defendants GREENPOINT, MERS and GMAC's deception, including Defendants GREENPOINT, MERS and GMAC's request for financial information and Defendants GREENPOINT, MERS and GMAC's indication that Plaintiffs and Class members had "qualified" for a given loan, furthered the deception that Defendants GREENPOINT, MERS

and GMAC had conducted an analysis to determine the borrower's ability to make payments on the particular loan.

329.    Defendants GREENPOINT, MERS and GMAC sought to create this impression through their statements and their actions. Defendants GREENPOINT, MERS and GMAC's deceptive conduct accordingly created a duty to fully disclose Defendants GREENPOINT, MERS and GMAC's underwriting and lending policies and procedures.

330.    A duty to disclose also arose as a result of the relationship between the parties. Defendants GREENPOINT, MERS and GMAC stood in a confidential relationship with Plaintiffs and Class members which gave rise to a duty to disclose.

331.    Defendants GREENPOINT, MERS and GMAC and their borrowers clearly were not on equal footing.  Defendants GREENPOINT, MERS, GMAC, and MORTGAGE UNLIMITED BROKER's knowledge regarding mortgages and underwriting was far superior to that of Plaintiffs and Class members. In fact, Defendant MORTGAGE UNLIMITED BROKER held itself out as an expert with regard to mortgages and Defendants GREENPOINT, MERS and GMAC with regard to mortgages and underwriting.

332.    Plaintiffs and Class members were vulnerable in their relationship with Defendants, and Defendants GREENPOINT, MERS and GMAC's knowingly exploited Plaintiffs' and Class members' vulnerabilities and weaknesses for their own financial purposes in filling up as many securitized mortgage loan pools as possible.

333.    Plaintiffs and Class members reposed trust and confidence in Defendants MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC with regard to determining whether the mortgages Plaintiffs and Class members could afford utilized accepted

and traditional underwriting principles both for quality of borrower and for ability to repay an applicable loan.

334.   Defendants MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC sought and accepted the trust and confidence of Plaintiffs and Class members and fostered such confidential relationships. For instance, as set forth above, and upon information and belief, Defendants MORTGAGE UNLIMITED BROKER, GREENPOINT, and GMAC sales force are required to adhere to a carefully prepared script to build rapport with potential borrowers by finding points of common interest emphasizing for instance that: "As long as you make your payments (at the alleged 1% initial teaser rate), your house will be completely paid-off and it can serve as your retirement fund" and falsely reassuring borrowers who raise concerns about their prospective mortgages.

335.   As a result of their confidential relationship with Plaintiffs and Class members, Defendants MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC had a duty to fully disclose Defendants GREENPOINT, MERS and GMAC's underwriting and lending practices and policies.

## XV.   **PATTERN OF RACKETEERING ACTIVITY**

336.   The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years. In fact, each of the Defendants has committed thousands of acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and Class members.

337.    The multiple acts of racketeering activity that Defendants committed and/or conspired to commit were related to each other, and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## XVI.  RICO VIOLATIONS

338.    Section 1962(c) of RICO provides that it:

> "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

339.    Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the GREENPOINT-GMAC Broker Enterprise, or in the alternative, the GREENPOINT-GMAC Enterprise.

340.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section."

341.    Defendants' conspiracy to secure money from Plaintiffs and Class members for their own use through the fraudulent scheme described above violates 18 U.S.C. § 1962(d).

342.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the GREENPOINT-GMAC Broker Enterprise, or in the alternative, the GREENPOINT-GMAC Enterprise, through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## XVII.  VIOLATIONS ALLEGED

## COUNT 1.   <u>LACK OF STANDING TO FORECLOSE OR COLLECT A DEBT</u>
## <u>(AS TO DEFENDANTS GREENPOINT, MERS, GMAC, SIW AND DOES)</u>

343.    None of the named Defendants can demonstrate or establish ownership of the indebtedness that Defendants are attempting to collect from Plaintiffs.

344.    None of the named Defendants can demonstrate or establish that they are the true party in interest as required by Rule 17 of the Federal Rules of Civil Procedure to attempt to either i.) collect on the debt or ii.) to declare a default  / invoke the power of sale on the indebtedness which is the subject of this Complaint.

345.    None of the named Defendants can demonstrate or establish that a default exists with respect to Plaintiffs' promissory notes.

346.    In the alternative, should it be determined that one of the named Defendants can establish some type of right of ownership of the applicable promissory notes, such Defendant still cannot demonstrate standing, or scintilla of injury to establish standing as one or more of the applicable i.) credit enhancement policies, ii.) over-collateralization, iii.) loan loss reserves pay-outs, iv.) mortgage default insurance policies pay-outs, v.) credit default swaps , and vi.) other credit derivatives have paid out and/or satisfied the alleged indebtedness which is the subject of this Complaint.

347.    It is also well established in Virginia and federal law that in the case of third party pay-outs and settlements, such pay-outs no longer confer standing on the supposedly and previously aggrieved party as any alleged injury has been cured.

348.    Further, having successfully split the promissory notes from the deed of trust or security instrument, Defendants have no standing to consummate a foreclosure in an event of an

alleged default since it is well established that foreclosure remedies are inapplicable to satisfy defaults on a negotiable instrument or security.

WHEREFORE, the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Any foreclosure proceedings currently underway be permanently stopped; (2) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (3) Pay such compensatory damages to the Plaintiffs as the jury may award; (4) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (5) Pay all costs associated with and incurred through the prosecution of this action; (6) Rescission of the subject loan such that the sum of all fees, charges, interest and prepayment penalties paid by the Plaintiffs to date be subtracted from the principal balance of the loan after accounting for all the YSPs, credit enhancements, credit default swaps, and credit derivatives that are applicable to Plaintiffs' promissory notes; (7) The dismissal of any and all ejectment actions against any class member and /or the Plaintiffs; and, (8) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

## COUNT 2.   VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)
## (AS TO DEFENDANTS GREENPOINT, MERS, GMAC, SIW AND DOES

349.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

350.   Defendants GREENPOINT, MERS, GMAC, SIW and DOES willfully violated the RESPA in one or more of the following ways, by example only and without limitation:

      a.   By failing to acknowledge receipt of and to respond to the Plaintiffs' dispute letter in the time and manner required by the RESPA (12 U.S.C. §2605(e)(l)(A) and (e)(2));

      b.   By failing to make appropriate corrections in the Plaintiffs' account and transmit written notification of such correction to the Plaintiffs (12 U.S.C. §2605(e)(2)(A));

      c.   By failing to provide the Plaintiffs with a written explanation or clarification that includes a statement of the reasons that Defendants GREENPOINT, MERS, GMAC, SIW and DOES believed the Plaintiffs' account to be correct and the name and telephone number of an individual employed by Defendants GREENPOINT, MERS, GMAC, SIW and DOES who could provide assistance to the Plaintiffs (12 U.S.C. §2605(e)(2)(B)); and

      d.   By failing to provide the Plaintiffs with a written explanation or clarification that included the information requested by the Plaintiffs or an explanation as to why the information requested was unavailable or could not be obtained by Defendants GREENPOINT, MERS, GMAC, SIW and DOES and the name and telephone number of an individual employed by Defendants GREENPOINT, MERS, GMAC, SIW and DOES who could provide assistance to the Plaintiffs (12 U.S.C. §2605(e)(2)(C)).

WHEREFORE, as a result of the aforesaid violations of RESPA, Defendants GREENPOINT, MERS, GMAC, SIW and DOES are jointly and severally liable to Plaintiffs for:

a.  Actual damages in an amount to be determined at trial;

b.  Additional statutory damages in the amount of $ 1,000.00 pursuant to 12 U.S.C. §2605(f)(l )(B);

c.  RESPA 12 U.S.C. § 2607(d)(2) provides that the Plaintiff and the Class members may recover as civil damages three times the amount of the unlawful charges or payments as referenced above.

d.  In addition, RESPA 12 U.S.C. § 2607(d)(5) permits the Plaintiff, and the Class members to recover their litigation costs and attorneys' fees occasioned by the Defendants' violations of RESPA.

## COUNT 3. VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) (AS TO DEFENDANTS GREENPOINT, MERS, GMAC, SIW AND DOES)

351.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

352.    Defendants GREENPOINT, MERS, GMAC, SIW and DOES violated the FDCPA in one or more of the following ways, without limitation:

a.  By misrepresenting the character of the debt (15 U.S.C. §§ 1692(e) and (f));

b.  By misrepresenting the legal status of the debt (15 U.S.C. §§1692(e) and (f);

c.  By misrepresenting the compensation which they could lawfully receive (15 U.S.C. §§ 1692(e) and (f));

d.  By threatening action to foreclose upon Plaintiffs' real property when such action was not lawful and/or at a time when Defendants GREENPOINT, MERS, GMAC, SIW and DOES was not authorized to take such action (15 U.S.C. §§ 1692(e) and (f));

e. By collection of amounts in the debt not authorized by the loan or by law (15 U.S.C. §1692(0);

f. By failing to cease collection of the debt upon written notice that the debt was disputed (15 U.S.C. § 1692(f));

g. By failing to cease communication with the Plaintiffs when it learned they were represented by an attorney (15 U.S.C. §§1692(c) and (d);

h. By failing to provide the warnings, disclosures and notices required by the FDCPA (15 U.S.C. § 1692(e)).

353. As a result of the FDCPA violations, the Plaintiffs have suffered substantial, actual damages including but not limited to their loss of money, emotional and mental pain and suffering, humiliation and embarrassment.

WHEREFORE, Plaintiffs are entitled to actual damages, statutory damages and attorneys' fees and costs of litigation under the FDCPA.

## COUNT 4.   VIOLATIONS OF RESPA - FEE SPLITTING
## AGAINST ALL DEFENDANTS AND DOES, EXCEPT DEFENDANT SIW

354. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

355. 12 U.S.C. § 2607(b) provides that:

"[n]o person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

356.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE
UNLIMITED BROKER, GREENPOINT, MERS and GMAC split charges between them which
were connected to transactions involving federally related mortgage loans, including but not
limited to the "yield spread premiums" described above.

357.    These "yield spread premiums" and other charges were not for settlement services
— they were simply illegal "kickbacks." However, to the extent that any of the Defendants might
be said to have rendered settlement services in exchange for the charges, the Defendants violated
Section 2607(b) by splitting the charges with those Defendants (and possibly others) who did not
render such services.

358.    As a direct result of the Defendants' violations of Section 2607(b), the Plaintiff
and the Class members have suffered, and continue to suffer, considerable damages.

359.    In the case of Defendant MERS, the fees or other consideration it received at
settlement and afterwards was never, and has never been disclosed on any settlement statement.

WHEREFORE, RESPA 12 U.S.C. § 2607(d)(2) provides that the Lara/Garcias (and the
other class members) may recover as civil damages three times the amount of the unlawful
charges or payments as referenced above. In addition, 12 U.S.C. § 2607(d)(5) permits the
Lara/Garcias (and other class members) to recover their litigation costs and attorneys' fees
occasioned by the Defendants' violations of RESPA.

## COUNT 5.    VIOLATION OF RICO 18 U.S.C. § 1962(c)
## AGAINST ALL DEFENDANTS AND DOES, EXCEPT DEFENDANT SIW

360.    Plaintiffs and Class members incorporate and reallege the preceding paragraphs as
if fully set out herein.

361.    This claim for relief arises under 18 U.S.C. § 1964(c).

362. As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the GMAC Broker Enterprise, or in the alternative, the GMAC Enterprise, through a pattern of racketeering.

363. As a direct and proximate result, Plaintiffs and Class members have been injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering activity.

364. Specifically, Plaintiffs and Class members have been injured in their business or property in a variety of ways, including the following: All borrowers who are steered into loans whose complex terms have been misrepresented or inadequately disclosed to them suffer injury in that they take on financial burdens that they would not otherwise have taken on and suffer the destructive impact on their financial well-being of having to make monthly payments they cannot afford, sometimes leading to significant prepayment penalties when they seek to refinance their mortgages at a more favorable rate, increases in the principal owed under certain types of loans, defaults on their loans, loss of their homes, destruction of their credit, bankruptcy, or financial ruin.

365. Borrowers who experience unanticipated, dramatic rate increases, as in the case of adjustable rate mortgages that have a short fixed-rate period, or in the case of pay option ARM loans, where the borrower's minimum monthly payment inevitably causes the loan to "recast" to a significantly higher monthly payment based on the negative amortization of the loan, suffer harm from the unexpected and onerous burdens created by their suddenly having to make monthly payments in amounts that greatly exceed what they committed to and can afford.

366. These borrowers are also injured when, as a result of their inability to keep up with monthly payments that are far greater than what was represented to them, the borrowers are charged late fees that they otherwise would not have incurred.

367. Additionally, all borrowers who are charged inflated loan costs and other fees suffer injury in increased out-of-pocket costs over what they should have paid.

368. Borrowers who refinance from more traditional loans or take riskier loans than they otherwise could have obtained elsewhere, in the false belief that they are obtaining a loan on favorable terms, are injured by having to pay the difference between fees and interest rates charged by Defendants GREENPOINT, MERS and GMAC and those another lender would have charged.

369. Borrowers who are forced to pay large pre-payment penalties in order to extricate themselves from the destructive and dangerous loans Defendants GREENPOINT, MERS and GMAC have steered them into, are injured by the out-of-pocket costs of the penalties which they would not otherwise have had to pay.

WHEREFORE, pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators, jointly and severally.

## COUNT 6. VIOLATION OF RICO 18 U.S.C § 1962 (d) BY CONSPIRING TO VIOLATE 18 U.S.C § 1962 (a)

### AGAINST ALL DEFENDANTS

370. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

371. At all relevant times, Plaintiffs and all class members were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

372. At all relevant times, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators were "persons" within the meaning of RICO, 18 U.S.C.

§§ 1961(3) and 1962(c).

373.    At all relevant times, Defendants BONILLA, ANGELMAR R/E BROKER,

OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and their

unnamed Co-Conspirators formed an association-in-fact for the purpose of defrauding innocent and

unsuspecting Borrowers in the Commonwealth of Virginia. This association-in-fact was an

"enterprise" within the meaning of RICO, 18 U.S.C § 1961(4).

374.    At all relevant times, this securitization mortgage pool enterprise was engaged in, and

its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. §

1962(c).

375.    At all relevant times, Defendants BONILLA, ANGELMAR R/E BROKER,

OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and their

unnamed Co-Conspirators associated with this enterprise conducted or participated, directly or

indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity"

within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

376.    Specifically, at all relevant times, Defendants BONILLA, ANGELMAR R/E

BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC,

SIW and their unnamed Co-Conspirators engaged in "racketeering activity" within the meaning of

18 U.S.C. § 1961(1) by engaging in the acts set forth in this Complaint and as more clearly

delineated below.

377.    The acts set forth above constitute a violation of one or more of the following

statutes:

    a. 18 U.S.C. § 1341 (mail fraud). Violation of this predicate act includes but is not

        limited to communications by mail, using of the posts, and faxes sent with

misrepresentations, inaccuracies, lies, deceit. The misrepresentation and use of

the mails involved activities in the origination of the mortgage loans and later in

the collection activities pending a foreclosure including fraudulent statements

used in the collection letters, activities and assertions that Defendants MERS,

GMAC and SIW were the true party in interest to collect a debt.

Violation of this predicate act applies to Defendants BONILLA,

ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED

BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of the

Does and unnamed Co-Conspirators, who each committed and/or aided and

abetted the commission of two or more of these acts of racketeering

activity;

b. 18 U.S.C. § 1343 (wire fraud). Violation of this predicate act includes but is not

limited to emails, telephone, and fax communications and  money wiring to

conduct the loan settlements.

Violation of this predicate act applies to Defendants BONILLA,

ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED

BROKER, GREENPOINT, MERS, GMAC, and one or more of the Does

and unnamed Co-Conspirators, who each committed and/or aided and abetted

the commission of two or more of these acts of racketeering activity.

c. 18 U.S.C § 1010, § 1014, and § 1344 (relating to financial institution and bank

fraud). Violation of this predicate act includes but is not limited to loan

applications filled out with misrepresentations and falsehoods by Defendants and

without the knowledge of Plaintiffs including the existence of i.) inaccurate bank

accounts, ii.) inaccurate account balances, iii.) inaccurate places of employment, iv.) inaccurate salaries, v.) inaccurate immigration status of borrowers, and vi.) inaccurate ability to pay the applicable loans. Additionally, Defendants passed this on and used the misleading information to securitize Plaintiffs loans assuring directly and indirectly the accuracy of the untruthful documentation then existing in the mortgage securitization documents and ultimately submitted to the securitized mortgage pool investor.

> Violation of this predicate act applies to Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the Does and unnamed Co-Conspirators, who each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

d. 18 U.S.C. §1951 (relating to interference with commerce, …). Violation of this predicate act includes but is not limited to i.) offering defective financial products which directly interfered with the smooth running of commercial activities, ii.) offering faulty and deceptively affordable homes and mortgage loan products, and iii.) using fabricated property loan values and appraisals which directly interfered with a true, proper and arms' length commercial transaction.

> Violation of this predicate act applies to Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the Does and unnamed Co-Conspirators, who each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

e. 18 U.S.C. §1951 (relating to ... extortion).  Violation of this predicate act includes but is not limited to i.) extortion activities in the collection of a debt not owned by the true party in interest or by the party  seeking to collect such debt, ii.) threats of foreclosure on the borrowers' homes if the alleged debts are not paid, and iii.) attempts to collect mortgage debts that are not owned by the person, entity, or debt collector.

Violation of this predicate act applies to Defendants GREENPOINT, MERS, GMAC, SIW and one or more of the Does and unnamed Co-Conspirators, who each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

f. 18 U.S.C. §1955 (relating to the prohibition of illegal gambling businesses). Violation of this predicate act includes but is not limited to illegal profits from illegal state gambling activities in the betting that borrowers' loans would default and procuring credit derivatives, credit default swaps, over-collateralization provisions or policies, and other credit enhancements to that effect.

Violation of this predicate act applies to Defendants GREENPOINT, MERS, GMAC, and one or more of the Does and unnamed Co-Conspirators, who each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

g. 18 U.S.C. §1956 (relating to the laundering of monetary instruments). Violation of this predicate act includes but is not limited to use of ill gotten gains to create more securitized mortgage pools and continuously and repeatedly launder money through the creation of more and more securitized mortgage pools

without the knowledge, consent, or privity of the Plaintiffs.

> Violation of this predicate act applies to Defendants GREENPOINT, MERS, GMAC, and one or more of the Does and unnamed Co-Conspirators, who each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

h. 18 U.S.C. §1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

Violation of this predicate act includes but is not limited to creation and operation of ponzi schemes, illegal referrals, and gambling activities, and selling of securities containing untruthful material information to the applicable securitized mortgage pools.

> Violation of this predicate act applies to Defendants GREENPOINT, MERS, GMAC, and one or more of the Does and unnamed Co-Conspirators, who each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

378.    The acts of racketeering activity referred to in the previous paragraph constituted "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

379.    The acts alleged were related to each other by virtue of common participants, a common victim (the Plaintiffs), a common method of commission, and the common purpose and common result of defrauding the Plaintiffs and others similarly situated of thousands of dollars and enriching the Conspirators at the Plaintiffs' expense while concealing the Conspirators' fraudulent activities. The fraudulent scheme continued for over four years, and threatens to continue despite the institution of this Complaint.

127

380.    As a result of Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS,

MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of

their unnamed Co-Conspirators' violation of 18 U.S.C. § 1962(c), the Plaintiffs have lost all of

their lifetime savings as a result of the racketeering activities conducted in the fraudulent scheme

and as part of the prohibited activities alleged in this Complaint.

381.    As a result of their misconduct, Defendants BONILLA, ANGELMAR R/E

BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC,

SIW and one or more of their unnamed Co-Conspirators are liable to the Plaintiffs for their losses

in an amount to be determined at trial.

382.    Should a separately numbered and labeled Claim be necessary to assert each and

every individual violation sub-enumerated in this Count, Plaintiffs respectfully reserve the right

to amend this Complaint to so allege.

WHEREFORE, pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiffs are entitled to

recover threefold their damages plus costs and attorneys' fees from Defendants BONILLA,

ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT,

MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators, jointly and severally.

**COUNT 7.    <u>VIOLATION OF RICO 18 U.S.C. § 1962(d) BY CONSPIRING TO
VIOLATE 18 U.S.C. § 1962 (c)</u>**

**<u>AGAINST ALL DEFENDANTS AND DOES, EXCEPT DEFENDANT SIW</u>**

383.    Plaintiffs and Class members incorporate and reallege the preceding paragraphs as

if fully set out herein.

384.    This claim for relief arises under 18 U.S.C. § 1964(c).

385.    In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above,

conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in

the conduct of the affairs of the GMAC Broker Enterprise, or in the alternative, the GMAC
Enterprise, through a pattern of racketeering.

386.    As a direct and proximate result, Plaintiffs and Class members have been injured
in their business or property by the predicate acts which make up the Defendants' patterns of
racketeering.

387.    Specifically, Plaintiffs and Class members have been injured in their business or
property in a variety of ways, including the following: All borrowers who are steered into loans
whose complex terms have been misrepresented or inadequately disclosed to them suffer injury
in that they take on financial burdens that they would not otherwise have taken on and suffer the
destructive impact on their financial well-being of having to make monthly payments they
cannot afford, sometimes leading to significant prepayment penalties when they seek to
refinance their mortgages at a more favorable rate, increases in the principal owed under certain
types of loans, defaults on their loans, loss of their homes, destruction of their credit, bankruptcy,
or financial ruin.

388.    Borrowers who experience unanticipated, dramatic rate increases, as in the case of
adjustable rate mortgages that have a short fixed-rate period, or in the case of pay option ARM
loans, where the borrower's minimum monthly payment inevitably causes the loan to "recast" to
a significantly higher monthly payment based on the negative amortization of the loan, suffer
harm from the unexpected and onerous burdens created by their suddenly having to make
monthly payments in amounts that greatly exceed what they committed to and can afford.

389.    These borrowers are also injured when, as a result of their inability to keep up
with monthly payments that are far greater than what was represented to them, they are charged
late fees that they otherwise would not have incurred.

390.    Additionally, all borrowers who are charged inflated loan costs and other fees suffer injury in increased out-of-pocket costs over what they should have paid. Borrowers who refinance from more traditional loans or take riskier loans than they otherwise could have obtained elsewhere, in the false belief that they are obtaining a loan on favorable terms, are injured by having to pay the difference between fees and interest rates charged by Defendant GMAC and those another lender would have charged.

391.    Borrowers who are forced to pay large prepayment penalties in order to extricate themselves from the destructive and dangerous loans GMAC has steered them into are injured by the out-of-pocket costs of the penalties, which they would not otherwise have had to pay.

WHEREFORE, pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators, jointly and severally.

## COUNT 8.    RICO CONSPIRACY

## AGAINST ALL DEFENDANTS

392.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

393.    At all relevant times, the Plaintiffs were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

394.    At all relevant times, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and their unnamed Co-Conspirators were each a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

395.    At all relevant times, Defendants and the Conspirators formed an association-in-fact

for the purpose of defrauding the Plaintiffs and the class members. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

396. At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

397. As set forth in Count Two, Defendants and each of the other Conspirators associated with this enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

398. At all relevant times, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

399. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators committed and caused to be committed a series of overt acts in furtherance of the Conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

400. As a result of Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators' violations of 18 U.S.C. § 1962(d), the Plaintiffs and the class members Plaintiffs represent have lost thousands of dollars in the fraudulent schemes Defendants

created, organized, serviced, and continue to operate and run.

401.     As a result of the Conspiracy, Defendants are liable to the Plaintiffs for their

losses in an amount to be determined at trial.

WHEREFORE, pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiffs and the class

members Plaintiffs represent are entitled to recover threefold their damages plus costs and

attorneys' fees from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS,

MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of

their unnamed Co-Conspirators, jointly and severally.

## COUNT 9.   RICO EXTORTION

## AGAINST DEFENDANTS GREENPOINT, MERS, GMAC, SIW, AND DOES

402.     Plaintiffs and Class members reallege and incorporate by reference all paragraphs above,

as though fully set forth in this COUNT.

403.     At all relevant times, the Plaintiffs were "persons" within the meaning of RICO,

18 U.S.C. §§ 1961(3) and 1964(c).

404.     At all relevant times, Defendants GREENPOINT, MERS, GMAC, SIW, and one or

more of their unnamed Co-Conspirators were each a "person" within the meaning of RICO, 18

U.S.C. §§ 1961(3) and 1962(d).

405.     At all relevant times, Defendants GREENPOINT, MERS, GMAC, and SIW and one

or more of their unnamed Co-Conspirators formed an association-in-fact for the purpose of

defrauding the Plaintiffs and the class members. This association-in-fact was an "enterprise"

within the meaning of RICO, 18 U.S.C. § 1961(4).

406.     At all relevant times, this enterprise was engaged in, and its activities affected,

interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

407.     As set forth in Count Three above, Defendants GREENPOINT, MERS, GMAC,

and SIW, and one or more of their unnamed Co-Conspirators associated with this enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

408.     At all relevant times, Defendants GREENPOINT, MERS, GMAC, and SIW and one or more of their unnamed Co-Conspirators each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

409.     Defendants GREENPOINT, MERS, GMAC, and SIW and one or more of their unnamed Co-Conspirators committed and caused to be committed a series of overt acts in furtherance of the Conspiracy and to affect the objects thereof, including but not limited to the acts set forth above and including repeated threats of foreclosure in an effort to deprive Plaintiffs of their legal, equitable and beneficial interest in their homes if Plaintiffs did not pay the unlawful loans that Defendants created for Plaintiffs.

410.     Defendants GREENPOINT, MERS, GMAC, and SIW and one or more of their unnamed Co-Conspirators committed and caused to be committed a series of overt acts in furtherance of the Conspiracy and to affect the objects thereof, including but not limited to the acts set forth above and including repeated threats of foreclosure in an effort to deprive Plaintiffs of their legal and beneficial interest in their homes if they did not pay the unlawful loans that Defendants created for Plaintiffs, even without establishing that these Defendants actually owned the promissory notes and debts that are the subject of this litigation.

411.     As a result of GREENPOINT, MERS, GMAC, and SIW and one or more of their

unnamed Co-Conspirators' violations of 18 U.S.C. § 1962(b)(c), the Plaintiffs and the class members Plaintiffs represent have lost thousands of dollars in the fraudulent schemes Defendants created, organized, serviced, and continue to operate and run. The threat of imminent foreclosure is but one of the unlawful activities that Defendants engage in through a pattern of racketeering activity and the collection of unlawful debts.

412.    As a result of the Defendants actions and associations with an enterprise engaged in interstate and foreign commerce, Defendants GREENPOINT, MERS, GMAC, and SIW and one or more of their unnamed Co-Conspirators are liable to the Plaintiffs for their losses in an amount to be determined at trial.

WHEREFORE, pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiffs and the class members they represent are entitled to recover threefold their damages plus costs and attorneys' fees from Defendants GREENPOINT, MERS, GMAC, SIW and one or more of their unnamed Co-Conspirators, jointly and severally.

### COUNT 10.   TILA VIOLATIONS
### AGAINST ALL DEFENDANTS AND DOES, EXCEPT DEFENDANT SIW

413.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

414.    The disclosure statement issued in conjunction with this consumer credit transaction by Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC, and one or more of their un-named DOE Co-Conspiratos violated the requirements of Truth in Lending and Regulation Z in the following and other respects:

a.   By failing to provide the required disclosures prior to consummation of the transaction in violation of 15 U.S.C. § 1638(b) and Regulation Z § 226.17(b).

b.  By failing to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 226.17(a).

c.  By failing to properly identify property subject to a security interest in violation of 15 U.S.C. § 1638(a)(9) and Regulation Z § 226.18(m).

d.  By failing to include in the finance charge certain charges imposed by defendant payable by Plaintiffs incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z § 226.4, thus improperly disclosing the finance charge in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z §

226.18(d). Such amounts include, but are not limited to:

i.  Loan Origination Fee 1.75% to Mortgage Unlimited Broker $10,220.00

ii.  Appraisal Fee to Mortgage Unlimited Broker                400.00

This is an example of illegal fee splitting and improper collected charges.

iii.  Credit Report to Mortgage Unlimited Broker                30.62

This is an example of illegal fee splitting and improper collected charges.

iv.  Processing/Admin Fee to Mortgage Unlimited Broker          350.00

v.  Tax Service Fee to GreenPoint                               79.00

vi.  Funding Fee to GreenPoint                                 230.00

vii.  Flood Certification Fee to GreenPoint                     11.00

This is an example of illegal fee splitting and improper collected charges. GreenPoint is not in the business of Surveying or assessing location of geographic flood areas

viii.  Underwriting Fee to GreenPoint                          395.00

ix.  Yield Spread Premium to Mortgage Unlimited Broker      $8,760.00

e.  By improperly including certain charges in the amount financed as finance charges, including but not limited to those itemized in the paragraph herein,

Defendants GREENPOINT and GMAC improperly disclosed the amount financed in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z § 226.18(b).

f.  By calculating the annual percentage rate (APR) based upon improperly calculated and disclosed finance charges and amount financed, 15 U.S.C. § 1606, Regulation Z § 226.22, the defendant understated the disclosed annual percentage rate in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 226.18(c). Further, Defendants' feigned TILA Disclosure compliance entirely failed to account for the second trust note, the second trust loan charges, and its effects on the complete finance charge calculations of the Transcation.

g.  TILA and Reg. Z were further violated when the TILA disclosures provided at Settlement in all securitized transactions which are the subject of this litigation failed to accurately and properly identify from the beginning the "actual" or "proper creditor/lender" that had an interest in the applicable promissory notes – as for instance the applicable loan trust or class of certificates where all Defendants (with the exception of Defendant SIW and some of the JOHN & JANE DOES Defendants who had not yet reserved or purchased REMIC certificates) knew the loans were being placed.

h.  TILA and Reg. Z were further violated when the TILA Disclosures provided at Settlement in all securitized transactions which are the subject of this litigation failed to accurately and properly disclose from the beginning the fees paid to Defendant MERS as a result of MERS' participation in the scheme. In fact, upon information and belief, Defendant MERS' fees in all of the settlement statements applicable to the class, have never been disclosed.

i.   TILA and Reg. Z were further violated when the TILA Disclosures provided at Settlement in all securitized transactions which are the subject of this litigation failed to accurately and properly disclose from the beginning the fees obtained by all participants in the scheme, including Defendant MERS, for the securitized mortgage pool YSPs.  In fact, upon information and belief, Defendants YSP securitization profits and YSPs have yet to be disclosed or accounted for.

j.   Moreover, as a result of these violations, the Lara/Garcias' (and other class members') right to rescind the loan transactions was extended for three years pursuant to 15 U.S.C. § 1635 and Reg. Z § 226.23, and in fact, since the proper and accurate disclosures with respect to true persons of interest or actual fees paid (as in the failure to disclose Defendant MERS' fees at any time) the TILA statute of limitations has not even begun to run.

WHEREFORE, by reason of the aforesaid violations of TILA and Regulation Z, Defendants are liable to Plaintiffs in the amount of twice the finance charge, actual damages to be established at trial, attorneys fees and costs in accordance with 15 U.S.C. § 1640, and any other damages to which Plaintiffs is entitled, or this Court deems appropriate.

## COUNT 11.   BREACH OF CONTRACT

## AGAINST ALL DEFENDANTS AND DOES EXCEPT DEFENDANT SIW

415.   Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

416.   Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC expressly or impliedly promised

the Plaintiffs and the Class members that they would secure for the Plaintiffs the right property accompanied by the right mortgage loans available with an implied duty of good faith and fair dealing based on Plaintiffs' particulars and financial situation at the time.

417.   Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, and MORTGAGE UNLIMITED BROKER, were retained by the Plaintiffs as their agents to obtain for them the most affordable house and mortgage loan Plaintiffs could afford based on their verifiable salaries. In the case of the Lara/Garcias, they properly disclosed a gross salary of $5,833.333 per month.

418.   This fiduciary duty included, among other things, the duty to complete the Federal Loan Application accurately, to disclose to the Plaintiffs all material facts concerning their mortgage loans and settlement process, and to disclose all transactions whereby Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, and MORTGAGE UNLIMITED BROKER would themselves benefit from the principal/agent relationship.

419.   Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, and their affiliates, officers, directors and employees, breached their fiduciary duties to the Plaintiffs by concealing, receiving and/or actually paying, the illegal and improper "kickbacks" and "referral fees" described in this Complaint, as well as by failing to properly disclose other material facts as required by TILA, RESPA, and CRESPA.

420.   Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC failed to act in good faith and to act fairly when they inaccurately and intentionally completed, underwrote, and accepted the Federal Loan Application for the Plaintiffs. In fact, if the Lara/Garcias earned over $17,500.00 per month as Defendants OSSAS and MORTGAGE UNLIMITED BROKER overstated on the

Federal Loan Application, why would they qualify the Lara/Garcias for a Negative Amortization loan that the Lara/Garcias could barely afford with their real and verifiable income of $5,833.33 per month.

421.    It is only through understanding Defendants "aig" that Plaintiff now realizes that instead of falling prey to Defendants' shenanigans, Plaintiffs could have easily qualified for a regularly amortizing loan with a fixed interest rate on a more affordable property if the choice had been given or offered to them.

422.    As such, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, and MORTGAGE UNLIMITED BROKER, owed the Lara/Garcias (and the other class members) a fiduciary duty of the highest degree of loyalty, diligence and fidelity.

423.    By obtaining a Negative Amortization Loan for the Plaintiffs, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC created the impression that the loan could be easily affordable and was a manageable financial obligation for the Plaintiffs.

424.    When considering the totality of the circumstances, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, and MORTGAGE UNLIMITED BROKER, and their associates, in fact obtained for the Lara/Garcias a higher rate than was available from lenders and Defendants GREENPOINT, MERS and GMAC in particular, simply so that all of them could directly benefit from breaching their contract with Plaintiffs.

425.    Specifically, the types of loans Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC gave and obtained for the Plaintiffs actually created: (a) higher real estate commissions for Defendants BONILLA and ANGELMAR R/E BROKER; and (b) higher Yield Spread Premium

for Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and

GMAC.

426.    As a direct result of Defendants BONILLA, ANGELMAR R/E BROKER,

OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC's breach

of contract, the Plaintiffs have suffered, and will continue to suffer, considerable damages.

WHEREFORE by reason of the aforementioned violations and breach of contract,

Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED

BROKER, GREENPOINT, MERS and GMAC are jointly and severally liable for their Breach

of Contract to Plaintiffs, and to the Class members, and therefore Plaintiffs respectfully requests

that this Honorable Court award damages, in the case of Plaintiff Lara/Garcias, in the amount of

$730,000.00, attorney's fees, and costs. In the case of other class members, Defendants

BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER,

GREENPOINT, MERS, GMAC, and one or more of their un-named Co-Conspirators are jointly

and severally liable for their Breach of Contract to the class members in the amount of the loan

principals involved.

## COUNT 12.   NEGLIGENCE

### AGAINST ALL DEFENDANTS AND DOES

427.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs

above, as though fully set forth in this COUNT.

428.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE

UNLIMITED BROKER, GREENPOINT, MERS, GMAC and SIW, and one or more of the

fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint,

were negligent in their respective roles of originating, underwriting, processing, closing, funding,

purchasing, servicing, and commencement of foreclosure proceedings of the first trust note and loan.

429.    The acts of negligence committed by all Defendants, including the fictitiously named Defendants, were committed under circumstances of malice and bad faith.

430.    The Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, are jointly and severally liable for their negligence since these Defendants owed a duty to the Plaintiffs to properly disclose to them the true terms of the loan and to collect payments, distribute payments, debit the Plaintiffs' account and credit the Plaintiffs' account.  Defendants also owed to the Plaintiffs a duty not to assess illegal, unauthorized or improper charges and to service the loan in a commercially reasonable manner so as to not create a false default or a default not based in fact.

431.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW, and one or more of the fictitiously named Defendants and Co-Conspirators, breached their duty to the Plaintiffs by not properly disclosing the true terms of the loan; by not crediting the Plaintiffs' account or distributing the Plaintiffs' payments appropriately; by applying to the Plaintiffs' account charges which are illegal, unauthorized or improper; by servicing the Plaintiffs' loan in a manner that is commercially unreasonable; and, by creating a false default or exacerbating a default for the purposes of unjustly enriching the Defendants.

432.    Further, Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators negligently failed to conduct reasonable due diligence on Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, and

MORTGAGE UNLIMITED BROKER before agreeing to accept the transactions and loans these Defendants originated.

433.   Defendants GREENPOINT, MERS, and GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators, negligently failed to conduct reasonable due diligence and/or quality control on the transactions and loans originated by Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, after agreeing to accept their loans.

434.   By negligently failing to conduct reasonable pre-contractual due diligence and post-contractual quality control in regards to Defendants BONILLA, ANGELMAR R/E BROKER, the OSSAS, and MORTGAGE UNLIMITED BROKER, Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, created an unreasonable and foreseeable risk of harm to Virginia consumers including the Plaintiffs.

435.   By their agreements, acts and omissions Defendants OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint "financed the fraud" and accepted the "fruits of the fraud" of and through the wrongful acts of Defendants OSSAS and MORTGAGE UNLIMITED BROKER.

436.   Defendants GREENPOINT, MERS, and GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, as the alleged "lender" in the subject transaction, breached their duty of care to the Plaintiffs by violating various federal lending statutes in the origination of the loan including but not limited to 15 U.S.C §1635 Federal Truth in Lending Act.

437.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint owed a duty of care and had an obligation not to breach that duty of care to the detriment of the Plaintiffs based upon the regulations governing this federally related mortgage and the foreseeability of harm resulting from Defendants' conduct.

438.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint breached their legal, contractual and/or assumed duty of reasonable care to the Plaintiffs.

439.    As a direct and proximate result, the Plaintiffs were damaged as set out below.

WHEREFORE, the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Any foreclosure proceedings currently underway be permanently stopped; (2) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (3) Pay such compensatory damages to the Plaintiffs as the jury may award; (4) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (5) Pay all costs associated with and incurred through the prosecution of this action; (6) Rescission of the subject loan such that the sum of all fees, charges, interest and prepayment penalties paid by the Plaintiffs to date be subtracted from the principal balance of the loan; (7) The dismissal of any and all ejectment actions against any class member and /or the Plaintiffs; and, (8) Such other relief as

this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

**COUNT 13.** **NEGLIGENT SUPERVISION**

**AGAINST ALL DEFENDANTS AND DOES**

440. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

441. Defendants ANGELMAR R/E BROKER, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, negligently trained and/or supervised their agents, assignees, assignors, brokers, and employees. These Defendants negligently failed to promulgate, implement, communicate and enforce rules, systems and/or procedures which, if reasonable, would have prevented the wrongful conduct afore-stated. The acts or omissions of negligence were committed with bad faith, and malice.

442. Defendants ANGELMAR R/E BROKER, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, owed a duty of care to properly supervise the activities of their agents, officers, and employees and had an obligation not to breach that duty of care in the supervision of their agents, officers, and employees' activities in the performance of their duties and responsibilities in the course of their employment and agency for the benefit of their employers and principals. This duty of care in the supervision of those agents and employees was not be breached in a way that it detrimentally harmed Plaintiffs. Further, such duty of care was to be exercised, particularly in the instance of the Transaction and is also based

upon the regulations governing this federally related mortgage and the foreseeability of harm resulting from Defendants' conduct.

443.    As a direct and proximate result, the Plaintiffs were damaged as set out below.

**WHEREFORE,** the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, SIW and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Any foreclosure proceedings currently underway be permanently stopped. (2) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (3) Pay such compensatory damages to the Plaintiffs as the jury may award; (4) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (5) Pay all costs associated with and incurred through the prosecution of this action; (6) Rescission of the subject loan such that the sum of all fees, charges, interest and prepayment penalties paid by the Plaintiffs to date be subtracted from the principal balance of the loan; (7) The dismissal of any and all ejectment actions against any class member and /or the Plaintiffs; and, (8) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

**COUNT 14.   <u>COMMON LAW FRAUD — CONCEALMENT</u>**

**<u>AGAINST ALL DEFENDANTS AND DOES EXCEPT DEFENDANT SIW</u>**

444.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

445.    Pursuant to RESPA, TILA, CRESPA and the common law, Defendants
BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER,
GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-
Conspirators as described in the caption of this Complaint had a duty to properly disclose to the
Lara/Garcias (and the other class members) that Plaintiffs had entered into an agreement
whereby illegal and improper "kickbacks" or "referral fees" were to be paid and split between
Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED
BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants
and Co-Conspirators as described in the caption of this Complaint, as well as a duty to properly
disclose the other material facts set forth above and required to be disclosed by RESPA, TILA,
and CRESPA. The Defendants' agreement to pay, the actual payment of these fees, and the other
facts set forth above, were material facts.

446.    The Defendants failed and/or refused to properly disclose these material facts to
the Plaintiffs (and the other class members) despite, and in violation of, Defendants' statutory
and common law duties to do so.

447.    The concealment and obfuscation of Defendants' agreements, the actual payment
of these fees and the other material facts were undertaken by the Defendants to deceive the
Plaintiffs and the other class members, and to keep Plaintiffs in the dark and keep Plaintiffs from
"asking questions" concerning the interest rates at which the money was lent to them, the loan
characteristics, the procedures used to qualify Plaintiffs for the loans, were done in order to
maximize the Defendants' benefits and profits  from the Transactions.

448.    The Defendants' actions of concealment and obfuscation were taken intentionally
and with actual malice.

146

449.    The Lara/Garcias and the other class members reasonably relied upon Defendants' concealment by following through with the transactions, and not questioning the same.

450.    As a direct result of the Defendants' fraudulent concealment, the Lara/Garcias and the other class members have suffered considerable damages.

451.    As a direct and proximate result, the Plaintiffs were damaged as set out below.

**WHEREFORE,** the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Any foreclosure proceedings currently underway be permanently stopped. (2) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (3) Pay such compensatory damages to the Plaintiffs as the jury may award; (4) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (5) Pay all costs associated with and incurred through the prosecution of this action; (6) Rescission of the subject loan such that the sum of all fees, charges, interest and prepayment penalties paid by the Plaintiffs to date be subtracted from the principal balance of the loan; (7) The dismissal of any and all ejectment actions against any class member and /or the Plaintiffs; and, (8) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

## COUNT 15.   DECLARATORY ACTION - THE CONTRACT IS VOID ILLEGAL "PYRAMID SCHEMES"

### AGAINST ALL DEFENDANTS AND DOES

452.   Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

453.   Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint provided Plaintiffs with deceptively affordable loans when in reality those loans from the point of origination, forward, were destined and were calculated to default.

454.   Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint provided Plaintiffs with deceptively affordable loans when in reality those loans from the point of origination, forward, formed part of a scheme to securitize mortgage loans and unbeknownst to Plaintiffs, to participate in ponzi schemes set up by Defendants.

455.   In the securitization of mortgage loans, Defendants specifically set up unwitting borrowers in those securitizing mortgage pools and ponzi schemes.

456.   Further, Plaintiffs and other class member borrowers were set up, drafted, solicited, and promoted loans as putatively affordable loans, when in reality those loans were anything but affordable and beneficial to the borrowers and Plaintiffs.

457.   In fact the loans set up for Plaintiffs were predatory and qualify as toxic sub-prime loans.

458.   Defendants promoted their scheme in such a way as to generate for themselves and their securitized mortgage pool sponsor, issuers, creators, gamblers, trustees, and ponzi scheme creators, substantial illegal compensation and profits in complete disregard for Plaintiffs' ability to pay on their loan mortgage obligations.

459.   In these securitized mortgage pool schemes, borrowers like Plaintiffs were unwittingly induced and enticed to participate to their detriment. Further, all of these securitizing mortgage pool schemes have all the indicia of "pyramid promotional schemes" specifically prohibited by Virginia law in Virginia Code § 18.2-239.

460.   Further, Virginia Code § 18.2-239 specifically states that pyramid promotional schemes are illegal and any contracts arising therefrom are void, unenforceable, and are against public policy.

461.   Specifically, in plain language, the statute states that:

> Virginia Code § 18.2-239 Pyramid promotional schemes; misdemeanor; definitions; contracts void
>
> Every person who contrives, prepares, sets up, operates, advertises or promotes any pyramid promotional scheme shall be guilty of a Class 1 misdemeanor. For the purposes of this section:
>
> (1) "Compensation" means the transfer of money or anything of value. "Compensation" does not mean payment based on sales of goods or services to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme;
>
> (2) "Consideration" means the payment of cash or the purchase of goods, services, or intangible property;
>
> (3) "Promotes" means inducing one or more other persons to become a participant; and
>
> (4) "Pyramid promotional scheme" means any plan or operation by which a person gives consideration for the opportunity to receive compensation a majority of which is derived from the introduction of other persons into the plan or operation

rather than from the sale or consumption of goods, services, or intangible property by a participant or other persons introduced into the plan or operation.

All contracts and agreements, now existing or hereafter formed, whereof the whole or any part of the consideration is given for the right to participate in pyramid promotional scheme programs, are against public policy, void and unenforceable.

462.    Plaintiffs were the unwitting participants of the securitized mortgage pools Defendants set up. Further, Plaintiffs never consented to being placed in those securitized mortgage pools.

463.    By nature of Plaintiffs unwitting involvement and participation without consent in the mortgage pools Defendants set up, the plain language of this Virginia statute establishes that all of the contracts are illegal, and any contracts arising therefrom are void, unenforceable, and are against public policy.

464.    By nature of Plaintiffs unwitting involvement and participation without consent in the mortgage pools Defendants set up, Plaintiffs have been irreparably harmed.

465.    As a direct and proximate result, the Plaintiffs were damaged as set out below.

**WHEREFORE,** the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently underway be permanently stopped; (2) Declare as required by this anti-ponzi scheme statute in Virginia, all contracts and the loans associated with the Transactions illegal, and any contracts arising therefrom void, unenforceable, and against public policy; (3) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (4) Pay such compensatory

damages to the Plaintiffs as the jury may award; (4) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (6) Pay all costs associated with and incurred through the prosecution of this action; (7) Dismiss any and all ejectment actions against any class member and /or the Plaintiffs; and (8) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

### COUNT 16.   DECLARATORY ACTION -- THE CONTRACT IS VOID "UNTRUE AND DECEPTIVE PRACTICES"

### AGAINST ALL DEFENDANTS AND DOES

466.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

467.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, provided Plaintiffs with loans that Plaintiffs could not realistically afford.

468.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, ignored Plaintiffs' ability to pay, or much less re-pay those loans.

469.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, completed

Plaintiffs' loan application with a plethora of fraudulent and deceitful assertions and representations.

470.   Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, induced Plaintiff into entering loan obligations that, when the terms of the loans were disclosed, deceptively misled Plaintiffs into believing that Plaintiff could afford to pay.

471.   Such untrue, deceptive and misleading activities are specifically prohibited by Virginia law in Virginia Code §18.2-216 which specifically states that:

Untrue, deceptive or misleading advertising, inducements, writings or documents

Any person, firm, corporation or association who, with intent to sell or in anywise dispose of merchandise, securities, service or anything offered by such person, firm, corporation or association, directly or indirectly, to the public for sale or distribution or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, makes, publishes, disseminates, circulates or places before the public, or causes, directly or indirectly to be made, published, disseminated, circulated or placed before the public, in a newspaper or other publications, or in the form of a book, notice, handbill, poster, blueprint, map, bill, tag, label, circular, pamphlet or letter or in any other way, an advertisement of any sort regarding merchandise, securities, service, land, lot or anything so offered to the public, which advertisement contains any promise, assertion, representation or statement of fact which is untrue, deceptive or misleading, or uses any other method, device or practice which is fraudulent, deceptive or misleading to induce the public to enter into any obligation, shall be guilty of a Class 1 misdemeanor.

(Code 1950, § 59.1-44; 1968, c. 439; 1975, cc. 14, 15, 507; 2005, c. 150.)

**WHEREFORE,** the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently underway be permanently stopped; (2) Declare as

required by this untrue and deceptive practices statute in Virginia, all contracts and the loans associated with the Transactions illegal, and any contracts arising therefrom void, unenforceable, and against public policy; (3) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (4) Pay such compensatory damages to the Plaintiffs as the jury may award; (5) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (6) Pay all costs associated with and incurred through the prosecution of this action; (7) Dismiss any and all ejectment actions against any class member and /or the Plaintiffs; and (8) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

### COUNT 17. DECLARATORY ACTION - THE CONTRACT IS VOID "PROHIBITED REFERRAL TRANSACTIONS"

### AGAINST ALL DEFENDANTS AND DOES EXCEPT DEFENDANT SIW

472. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

473. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, provided Plaintiffs with loans that Plaintiffs could not realistically afford.

474. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously

named Defendants and Co-Conspirators as described in the caption of this Complaint ignored

Plaintiffs' ability to pay, or much less re-pay those loans.

475. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE

UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously

named Defendants and Co-Conspirators as described in the caption of this Complaint, completed

Plaintiffs' loan application with a plethora of fraudulent and deceitful assertions and

representations.

476. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE

UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously

named Defendants and Co-Conspirators as described in the caption of this Complaint, induced

Plaintiff into entering loan obligations that, when the terms of the loans were disclosed,

deceptively misled Plaintiffs into believing that Plaintiff could afford to pay.

477. In the course of setting up Plaintiffs to participate in these deceptively affordable

loans, Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE

UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously

named Defendants and Co-Conspirators as described in the caption of this Complaint, Defendants

did in fact represent that the applicable loans were affordable, and if paid on time for the life of the

loan, the applicable properties would be paid off at the end of the 30 year time period.

478. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE

UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously

named Defendants and Co-Conspirators as described in the caption of this Complaint, failed to

disclose or succeeded in concealing from Plaintiffs material information that would warned

Plaintiffs about the true nature of the Transaction.

479.    Further, in misrepresenting their activities, Defendants BONILLA, ANGELMAR

R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS,

GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in

the caption of this Complaint, referred transactions to each other without disclosure and without

consent of the Plaintiffs.

480.    In misrepresenting their activities, Defendants BONILLA, ANGELMAR R/E

BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC,

and one or more of the fictitiously named Defendants and Co-Conspirators as described in the

caption of this Complaint, also failed to disclose material facts to regarding Plaintiffs' loans

including the fact that the loans would be (1) "securitized" and (2) as part and parcel of the

securitization process Defendants envisioned for Plaintiffs' loans, Defendants would be

incentivizing several individuals and entities (such as Defendants BONILLA, ANGELMAR R/E

BROKER, OSSAS, MORTGAGE UNLIMITED BROKER) to refer borrowers and pool

participants (swimmers) to their securitizing pools.

481.    The more swimmers Defendants BONILLA, ANGELMAR R/E BROKER,

OSSAS, and MORTGAGE UNLIMITED BROKER, identified and recruited for the securitized

pools set up by their other Co-conspirators, and the more that those swimmers were enticed to

belong to the negative amortization pools, the higher the referral fees and commissions these

Defendants received from Defendants GREENPOINT, MERS and GMAC. The higher the rate

given to the Plaintiffs as compared to the "par value," the higher the rebate given to the

participating Defendants.

482.    In the case of Defendant MERS, its participation in the securitized pool was noted

in the first deed of trust as "nominee," but the payments for its participation or its rebate has

never been disclosed or acknowledged by all Defendants, including Defendant MERS itself.

483.    Such referral transactions in the sale of consumer sales (the giving of a loan

qualifies as a "consumer sale"), are specifically prohibited by Virginia law in:

Virginia Code § 18.2-242.1 Certain referral transactions in connection with consumer

sales or leases prohibited; effect of such transactions.

(a) For the purpose of this section, the term "consumer sale or lease of goods or services" means the sale or lease of goods or services which are purchased or leased by a natural person primarily for a personal, family or household purpose, and not for resale.

(b) With respect to a consumer sale or lease of goods or services, no seller or lessor shall give or offer to give a rebate or discount or otherwise pay or offer to pay value to the buyer or lessee as an inducement for the sale or lease in return for the buyer's giving to the seller or lessor the names of prospective buyers or lessees, or otherwise aiding the seller or lessor in entering into a transaction with another buyer or lessee, if the earning of the rebate, discount, or other value is contingent upon the occurrence of any sale, lease, appointment, demonstration, interview, conference, seminar, bailment, testimonial or endorsement subsequent to the time the buyer or lessee enters into the agreement of sale or lease.

(c) Agreements made in whole or in part pursuant to a referral transaction as above described shall be void and unenforceable by the seller or lessor. The buyer or lessee shall be entitled to retain the goods, services or money received pursuant to a referral transaction without obligation to make any further or future payments of any sort on the transaction total, or he shall be entitled to avoid the transaction and to recover from the seller or lessor any sums paid to the seller or lessor pursuant to the transaction.

(Code 1950, § 59.1-68.02; 1975, c. 3; 1976, c. 641.)

484.    Due to the concealed nature of the scheme and the deceptive referral system used

by Defendants to fill their securitized mortgage pools, Plaintiffs have been directly, proximately,

and irreparably harmed.

485.    By nature of Plaintiffs unwitting involvement and participation without consent in the mortgage pools Defendants set up, and the deceptive manner in which the securitizing entities conducted their activities, Plaintiffs have been directly, proximately, and irreparably harmed.

486.    As a direct and proximate result, the Plaintiffs were damaged as set out below.

**WHEREFORE,** the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently underway be permanently stopped; (2) Declare as required by this Virginia unlawful referral statute, all contracts and the loans associated with the Transactions illegal, and any contracts arising therefrom void, unenforceable, and against public policy; (3) Declare that Plaintiffs, as required by the Virginia unlawful referral statute that the Plaintiffs "…shall be entitled to retain the goods, services or money received pursuant to a referral transaction without obligation to make any further or future payments of any sort on the transaction total, or [Plaintiffs] shall be entitled to avoid the transaction and to recover from the seller [Defendants GREENPOINT, MERS, GMAC, and one or more of the DOES identified in this Complaint]…any sums paid to the seller or lessor pursuant to the transaction…; (4) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (5) Pay such compensatory damages to the Plaintiffs as the jury may award; (6) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (7) Pay all costs associated with and incurred through the prosecution of this action; (8) Dismiss any and all ejectment actions against any class member and /or the Plaintiffs; and (9) Such

other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

### COUNT 18. DECLARATORY ACTION - THE CONTRACT IS VOID "ILLEGAL MONEY LAUNDERING"

### AGAINST ALL DEFENDANTS AND DOES EXCEPT DEFENDANT SIW

487. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

488. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, provided Plaintiffs with deceptively affordable loans when in reality those loans from the point of origination, forward, were destined and were calculated to fail and default.

489. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, provided Plaintiffs with deceptively affordable loans when in reality those loans from the point of origination, forward, formed part of a scheme to securitize mortgage loans and unbeknownst to Plaintiffs, to participate in ponzi schemes set up by Defendants.

490. In the securitization of mortgage loans, Defendants specifically set up unwitting borrowers in those securitizing mortgage pools and ponzi schemes.

491. Further, Plaintiffs and other class member borrowers were set up, drafted, solicited, and promoted loans as putatively affordable loans, when in reality those loans were anything but affordable and beneficial to the borrowers and Plaintiffs.

492.   In fact the loans set up for Plaintiffs were predatory and qualify as toxic sub-prime loans, and are inherently detrimental to any borrower set up in these types of loans.

493.   Defendants promoted their scheme in such a way as to generate for themselves and their securitized mortgage pool sponsor, issuers, creators, gamblers, trustees, and ponzi scheme creators, substantial illegal compensation and profits in complete disregard for Plaintiffs' ability to pay on their loan mortgage obligations.

494.   The more securitized pools Defendants generated, completed and sold, the more substantial profits Defendants derived from their illegal activities.

495.   The more securitized pools Defendants generated, completed and sold, and the more substantial profits Defendants derived from their illegal activities, the more outlets Defendants had to re-use the money that Defendants generated from their illegal activities, including their illegal money laundering activities.

496.   In these securitized mortgage pool schemes, borrowers like Plaintiffs were unwittingly induced and enticed to participate to their detriment in the securitized pools Defendants set up with ill gotten gains.

497.   Money laundering is specifically prohibited by Virginia law in <u>Virginia Code Sec. 18.2-246.1 Title,</u> the "Virginia Comprehensive Money Laundering Act", which also provides for specific penalties and serves as another predicate act of the RICO enterprise Defendants conducted.

498.   <u>Virginia Code Sec. 18.2-246.3 Money laundering; penalties</u> provides:

> A. It shall be unlawful for any person knowingly to conduct a financial transaction where the person knows the property involved in the transaction represents the proceeds of an activity which is punishable as a felony under the laws of the Commonwealth, another state or territory of the United States, the District of Columbia, or the United States. A violation of this section is

punishable by imprisonment of not more than forty years or a fine of not more than $500,000 or by both imprisonment and a fine.

B. Any person who, for compensation, converts cash into negotiable instruments or electronic funds for another, knowing the cash is the proceeds of some form of activity which is punishable as a felony under the laws of the Commonwealth, another state or territory of the United States, the District of Columbia, or the United States, shall be guilty of a Class 1 misdemeanor. Any second or subsequent violation of this subsection shall be punishable as a Class 6 felony.

(1999, c. 348.)

499. By nature of Plaintiffs' unwitting involvement and participation without consent in the securitized mortgage pools Defendants set up, and the deceptive manner in which the securitizing entities conducted their activities, and laundered their illegal profits, Plaintiffs have been directly, proximately, and irreparably harmed.

500. As a direct and proximate result, the Plaintiffs were damaged as set out below.

**WHEREFORE,** although Plaintiffs cannot enforce or prosecute Virginia's criminal laws, the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently underway be permanently stopped; (2) Declare as required by this Virginia money laundering statute all contracts and the loans associated with the Transactions illegal, and any contracts arising therefrom void, unenforceable, and against public policy; (3) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (4) Pay such compensatory damages to the Plaintiffs as the jury may award; (5) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (6) Pay all costs associated with and incurred through the prosecution of this action; (7) Dismiss any

160

and all ejectment actions against any class member and /or the Plaintiffs; and (8) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

### COUNT 19.  DECLARATORY ACTION - THE CONTRACT IS VOID "VIRGINIA STATE RICO STATUTE"

### AGAINST ALL DEFENDANTS AND DOES EXCEPT DEFENDANT SIW

### (VIOLATIONS OF THE VIRGINIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, VIRGINIA CODE § 18.2-512

501.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

502.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, provided Plaintiffs with deceptively affordable loans when in reality those loans from the point of origination, forward, were destined and were calculated to fail and default.

503.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, provided Plaintiffs with deceptively affordable loans when in reality those loans from the point of origination, forward, formed part of a scheme of racketeering activities and enterprise.

504.    Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint created this

racketeering enterprise and conducted their racketeering activities in such a way as to deceptively create securitize mortgage pools in which unbeknownst to Plaintiffs and without Plaintiffs consent, Plaintiffs were made unwitting victims of Defendants racketeering activities and enterprises.

505. In the securitization of mortgage loans, Defendants specifically and intentionally set up unwitting borrowers in those securitizing mortgage pools to be the victims of Defendants', ponzi schemes, racketeering activities and racketeering enterprises.

506. Further, Plaintiffs and other class member borrowers were set up, drafted, solicited, and promoted loans as putatively affordable loans, when in reality those loans were anything but affordable and beneficial to the borrowers and Plaintiffs.

507. In fact the loans set up for Plaintiffs by Defendants were predatory and qualify as toxic sub-prime loans, and are inherently detrimental to any borrower set up in these types of loans.

508. Defendants promoted their racketeering activities and schemes in such a way as to generate for themselves and their securitized mortgage pool sponsor, issuers, creators, gamblers, trustees, and ponzi scheme creators, substantial illegal compensation and profits in complete disregard for Plaintiffs' well being or Plaintiffs' ability to pay the loan mortgage obligations.

509. The more securitized pools Defendants generated, completed and sold, the more substantial profits Defendants derived from their illegal activities.

510. The more securitized pools Defendants generated, completed and sold, and the more substantial profits Defendants derived from their illegal activities, the more outlets Defendants had to re-use the money that Defendants generated from their illegal activities,

including their illegal money laundering activities, illegal racketeering activities, and illegal racketeering enterprises.

511.    In these securitized mortgage pool schemes, borrowers like Plaintiffs were unwittingly induced and enticed to participate to their detriment in the securitized mortgage pools Defendants set up with their racketeering activities, ill gotten gains, and illegal money transmittal.

512.    Racketeering activities and racketeering enterprises are specifically prohibited by Virginia law in Virginia Code § 18.2-513, the "Virginia Racketeer Influenced and Corrupt Organization (RICO) Act." which also provides for specific penalties and serves as another predicate act of the RICO enterprise Defendants conducted.

513.    By nature of Plaintiffs unwitting involvement and participation without consent in the securitized mortgage pools Defendants set up, and the deceptive manner in which the securitizing entities conducted their activities, laundered their illegal profits, conducted their racketeering activities, and set up their racketeering enterprise, Plaintiffs have been directly, proximately, and irreparably harmed.

514.    As a direct and proximate result, the Plaintiffs were damaged as set out below.

**WHEREFORE,** although Plaintiffs cannot enforce or prosecute Virginia's criminal laws on their own,  the Plaintiffs demand equitable and monetary relief from Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently underway be permanently stopped; (2) Declare as required by this Virginia criminal RICO statute all contracts and the loans associated with the Transactions

illegal, and any contracts arising therefrom void, unenforceable, and against public policy; (3) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (4) Pay such compensatory damages to the Plaintiffs as the jury may award; (5) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (6) Pay all costs associated with and incurred through the prosecution of this action; (7) Dismiss any and all ejectment actions against any class member and /or the Plaintiffs; and (8) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

## COUNT 20. DECLARATORY JUDGMENT - VIRGINIA CODE ANN. §8.01-184 AGAINST DEFENDANTS GREENPOINT, MERS, GMAC, SIW AND DOES

515. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

516. Defendants GREENPOINT, MERS, GMAC, SIW and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, have no legal or equitable right or interest in the Promissory Note and/or Deed of Trust, or in the alternative, the obligation has been extinguished, satisfied, is void, is unsecured, is "unperfected," or has been split from the Deed of Trust resulting in an unsecured Note, and, consequently, enter an Order declaring the all foreclosure activity cease, desist, and permanently stop.

WHEREFORE, Plaintiffs Lara/Garcias respectfully requests that this Court declare that, as a result of the securitization process to which the Promissory Note has been subjected, the Defendants have no legal or equitable interest in the Property, have no authority to enforce the

164

security instrument and/or Promissory Note, and that the foreclosure activities that have been commenced cease, desist, and permanently stop.

## COUNT 21. UNJUST ENRICHMENT

### AGAINST ALL DEFENDANTS AND DOES EXCEPT DEFENDANT SIW

517. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

518. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, engaged in predatory lending; fraud; bad faith and wantonness, concealment and suppression in order to originate, service and foreclose a high cost loan with no net tangible benefit to the Plaintiffs.

519. Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint collected substantial fees from the origination of the loan and then collected interest payments and assessed fees to the loan until the loans became unaffordable and were scheduled for foreclosure.

520. The only benefit of the subject loan flowed to the Defendants at the expense of the Plaintiffs.

521. The actions of Defendants BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, was either illegal, wrong in character, wrong in amount, unauthorized, concealed, suppressed, misrepresented or otherwise improper and resulted in the Defendants being unjustly

enriched.

522.    As a result of the Defendants' unjust enrichment, the Plaintiffs have been damaged as set forth below.

523.    The Plaintiffs claim all damages allowable under law and equity as a result of the Defendant's wrongful conduct and unjust enrichment.

**WHEREFORE,** Plaintiffs demand equitable and monetary relief from Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently underway be permanently stopped; (2) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (3) Pay such compensatory damages to the Plaintiffs as the jury may award; (4) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiffs; (5) Pay all costs associated with and incurred through the prosecution of this action; (6) Dismiss any and all ejectment actions against any class member and /or the Plaintiffs; and (7) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiffs and deter all of the named Defendants in this Count from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

## COUNT 22.   DECLARATORY ACTION – THE CONTRACT IS VOID "ILLEGAL GAMBLING"

### AGAINST DEFENDANTS GREENPOINT, MERS, GMAC AND DOES

524.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

525. Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint provided Plaintiffs with unaffordable loans that Defendants knew Plaintiffs would not be able to afford.

526. Once those loans were furnished, Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint packaged and securitized the mortgage notes in a securitized mortgage pool.

527. Once the mortgage notes were securitized and as an inducement to their investors, the securitization agents obtained credit enhancement policies, credit default swaps, credit default derivatives, and other credit default insurances which paid out on Defendants' bet that Plaintiffs would default on the loans provided by Defendants.

528. This gambling is specifically prohibited in the Commonwealth of Virginia as illegal gambling in Virginia Code § 18.2-325(1).

529. Virginia Code § 18.2-325(1) specifically provides:

> The making, placing or receipt, of any bet or wager in this Commonwealth of money or other thing of value, made in exchange for a chance to win a prize, stake or other consideration or thing of value, dependent upon the result of any game, contest or any other event the outcome of which is uncertain or a matter of chance, whether such game, contest or event, occurs or is to occur inside or outside the limits of this Commonwealth.

530. Having gambled with Plaintiffs' savings and Property, Defendants acted in Bad Faith.

531. As a direct consequence of Defendants illegal gambling activity, Plaintiffs have been directly harmed.

**WHEREFORE,** as a result of Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this

Complaint illegal gambling activities, the Plaintiffs demand equitable and monetary relief from all

Defendants, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently

underway to be permanently stopped; (2) In the case of class members that have already

experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (3)

Declare all contracts and the loans associated with the Transactions illegal, and any contracts

arising therefrom void, unenforceable, and against public policy; (4) In the case of class

members that have already experienced a foreclosure of their homes, that the foreclosure be

voided or otherwise set aside; (5) Pay such compensatory damages to the Plaintiff as the jury may

award; (6) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiff; (7) Pay all

costs associated with and incurred through the prosecution of this action; (8) The dismissal of any

and all ejectment actions against the Plaintiff; (9) Pay such punitive damages to the Plaintiff as the

jury may award and, (10) Such other relief as this Honorable Court or the empanelled Jury deems

necessary to compensate the Plaintiff and deter these Defendants from committing the same or

substantially similar wrongful acts against other Virginia consumers in the future.

## COUNT 23.   DECLARATORY ACTION - THE CONTRACT IS VOID "ACCESSORIES TO ILLEGAL GAMBLING"

### AGAINST DEFENDANTS GREENPOINT, MERS, GMAC AND DOES

532.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs

above, as though fully set forth in this COUNT.

533.    Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously

named Defendants and Co-Conspirators as described in the caption of this Complaint, provided

Plaintiffs with unaffordable loans that Defendants knew Plaintiffs would not be able to afford.

534.    Once those loans were furnished, Defendants packaged and securitized the

mortgage notes in a securitized mortgage pool.

535.    Once the mortgage notes were securitized and as an inducement to their investors, the securitization agents obtained credit enhancement policies, credit default swaps, credit default derivatives, and other credit default insurances which paid out on Defendants' bet that Plaintiffs would default on the loans provided by Defendants.

536.    For those individuals and entities participating in this gambling activity, the Commonwealth of Virginia prohibits illegal gambling activities in Virginia Code § 18.2-330.

537.    Virginia Code § 18.2-330 states:

> Any person, firm or association of persons, other than those persons specified in other sections of this article, who knowingly aids, abets or assists in the operation of an illegal gambling enterprise, activity or operation, shall be guilty of a Class 1 misdemeanor.

538.    Having gambled with Plaintiff' savings and Property, and Defendants having participated in that activity, they acted in Bad Faith and the contract is void and unenforceable.

539.    As a direct consequence of Defendants participation in that illegal gambling activity, Plaintiff has been directly harmed.

**WHEREFORE,** as a result of Defendants GREENPOINT, MERS, GMAC, and one or more of the fictitiously named Defendants and Co-Conspirators as described in the caption of this Complaint illegal gambling activities, the Plaintiffs demand equitable and monetary relief from all Defendants, jointly and severally, as follows: (1) Declare any foreclosure proceedings currently underway to be permanently stopped; (2) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (3) Declare all contracts and the loans associated with the Transactions illegal, and any contracts arising therefrom void, unenforceable, and against public policy; (4) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (5) Pay such compensatory damages to the Plaintiff as the jury may

award; (6) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiff; (7) Pay all

costs associated with and incurred through the prosecution of this action; (8) The dismissal of any

and all ejectment actions against the Plaintiff; (9) Pay such punitive damages to the Plaintiff as the

jury may award and, (10) Such other relief as this Honorable Court or the empanelled Jury deems

necessary to compensate the Plaintiff and deter these Defendants from committing the same or

substantially similar wrongful acts against other Virginia consumers in the future.

<h3 style="text-align:center">COUNT 24.   BAD FAITH AND WANTONNESS</h3>

<h3 style="text-align:center">AGAINST ALL DEFENDANTS AND DOES</h3>

540.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs

above, as though fully set forth in this COUNT.

541.    Each and every wrongful act or omission alleged above by Defendants BONILLA,

ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT,

MERS, GMAC, SIW and one or more of the fictitiously named Defendants and Co-Conspirators as

described in the caption of this Complaint was committed, intentionally, recklessly, wantonly and

with bad faith with the purpose of generating as much profit as possible for the Defendants.

542.    As a direct and proximate result of Defendants' bad faith, and intentional, reckless,

wanton conduct and activities, the Plaintiffs were damaged as set out below.

**WHEREFORE,** the Plaintiffs demand equitable and monetary relief from Defendants

BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER,

GREENPOINT, MERS, GMAC, SIW and one or more of the fictitiously named Defendants and

Co-Conspirators as described in the caption of this Complaint, jointly and severally, as follows: (1)

Declare any foreclosure proceedings currently underway to be permanently stopped; (2) In the

case of class members that have already experienced a foreclosure of their homes, that the

foreclosure be voided or otherwise set aside; (3) Declare all contracts and the loans associated

with the Transactions illegal, and any contracts arising therefrom void, unenforceable, and against public policy; (4) In the case of class members that have already experienced a foreclosure of their homes, that the foreclosure be voided or otherwise set aside; (5) Pay such compensatory damages to the Plaintiff as the jury may award; (6) Pay the reasonable attorney's fees incurred and to be incurred by the Plaintiff; (7) Pay all costs associated with and incurred through the prosecution of this action; (8) The dismissal of any and all ejectment actions against the Plaintiff; (9) Pay such punitive damages to the Plaintiff as the jury may award and, (10) Such other relief as this Honorable Court or the empanelled Jury deems necessary to compensate the Plaintiff and deter these Defendants from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

## COUNT 25.   QUIET TITLE

## AS TO ALL DEFENDANTS

543.     Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

544.     At all times herein, Defendants committed acts of misrepresentations and fraud as to the terms of the loan, mortgage, and value of the property with the intent to exert undue influence.

545.     Plaintiffs were under unfair persuasion amounting to undue influence because Defendants positioned themselves in the market where the Plaintiffs was justified in assuming that the Defendants would not act in a manner inconsistent with Plaintiffs welfare and best interests.

546.     At all time herein, Defendants gained unfair persuasion and undue influence by improper means including but not limited to misrepresentations, undue flattery, and fraud.

547.    Defendants by fraud received an iniquitous deed of trust to secure debt to the Property for a loan that Plaintiffs should not have given or been allowed to take. This loan would not have taken place but for Defendants' wrongful conduct.

548.    Defendants have created an illegal cloud on title. Plaintiffs have suffered severe financial hardship as a result. Plaintiffs request that the Court invalidate the deed of trust on the Property.

**COUNT 26.  FORECLOSURE PROCEEDINGS FRAUD**

**AGAINST DEFENDANTS GMAC, MERS, SIW, AND DOES**

549.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

550.    This action will determine the rights of the parties to the Property.

551.    Defendants GMAC, MERS and SIW scheduled and threatened a foreclosure against Plaintiffs' Property stipulating in their DEED OF SUBSTITUTE TRUSTEE that

> ...by virtue of the authority contained in the aforementioned deed of trust, the undersigned being the **present owner and holder of the note** secured thereby does hereby remove the Original Trustee(s) as Trustee(s), and does also hereby remove any substitute trustee or trustees who may have been previously appointed in place of the Original Trustee(s), ... **[emphasis added]**

The "undersigned" was not the present owner of the note.

552.    This action will determine the rights of the parties to the Property.

553.    Based on such misrepresentations, Defendant GMAC, MERS, and one or more of their un-named Co-Conspirators, Defendant SIW was named Substitute Trustee, and fraudulently misrepresented and ascertained their authority to schedule and conduct a foreclosure.

554.    The Deed of Trust, if anything, mentions only the "Lender" as having any such authority.

555.    Defendants, by their misrepresentations and without establishing their standing, or demonstrating to the Plaintiffs, the Judicial system and the Courts of the Commonwealth of Virginia, that Defendants are the true parties in interest with respect to properties throughout the Commonwealth and specifically the Property, have fraudulently set themselves up as having the right to commence or effectuate foreclosures in the Commonwealth of Virginia.

556.    Defendants, by their misrepresentations and without establishing their standing, or demonstrating to the Plaintiffs, and without worrying or attempting to preserve the sanctity of the Commonwealth of Virginia's Land Recording System and Land Records, have falsely, inaccurately and fraudulently set themselves up as having the right to commence or effectuate foreclosures in the Commonwealth of Virginia.

557.    In submitting sworn and notarized incorrect, inaccurate and false documents to the Land Records of Prince William County and proffering those documents as averring the veracity of the contents therein to the Circuit Court, Defendants GMSC, MERS, and Defendant SIW have perpetrated a fraud upon the Plaintiffs, the Court, the residents of this County, and the Commonwealth of Virginia as a whole.

558.    In submitting false, inaccurate, and incorrect sworn and notarized documents to the Land Records of Prince William County and proffering those documents as averring the veracity of the contents therein to the Court, Defendants GMAC, MERS and SIW have perpetrated a fraud upon the Plaintiffs, the Court, the residents of Prince William County, and the Commonwealth of Virginia as a whole.

**WHEREFORE,** Plaintiffs respectfully requests that this Court find Defendants GMAC, MERS, SIW, and one or more of their un-named Co-Conspirators have engaged in fraud upon the Court and Plaintiffs, and award the Plaintiffs damages against these named Defendants jointly and severally, in the amount of $730,000.00, attorney's fees, costs and punitive damages.

**COUNT 27. SPECIFIC PERFORMANCE**

**AGAINST DEFENDANTS OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS, GMAC AND DOES**

559.    Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

560.    Plaintiffs were deceptively given a loan with a teaser rate and a negative amortization which had the immediate result of stripping any equity Plaintiffs had on the Property.

561.    The contractual expectations of Plaintiffs when Plaintiffs were asked to execute the loan documents were that Plaintiffs would be able to make all the payments and in fact, re-pay the loan.

562.    Just like with an interest only loan, and in fact far worse than an interest only loan payment, a payment of a negative amortization loan does not constitute a repayment of a subject loan at all.

563.    This is so especially when a teaser rate of 1.000% was presented to Plaintiffs to pay for Plaintiffs' loan.

564.    When the interest rate changed within thirty the first (30) days to actually reflect the true cost of the loan given to Plaintiffs, the loans immediately became unaffordable loans and the Plaintiffs were not aware that from day one their loans would become unaffordable.

565.    Assuming arguendo that the foreclosing entities are indeed owed the principal on any alleged loan, then Plaintiffs request that Defendants be ordered to give the specific performance expectations that Defendants created when the loan was given.

566.    More importantly, to stop the abuse of equity stripping that is predominant with these negative amortization loans, the negative amortization aspects of the loan should be set against the offending party and document drafter, not against the unwitting borrower.

567.    In effect, what is good for the goose is good for the gander, and the foreclosing entities are better positioned to feel the effect of the "positive negative amortization" against them as Plaintiffs request herein.

WHEREFORE, assuming arguendo that this Court or the empanelled Jury determine that Plaintiffs owe any of the named Defendants any principal or interest due to alleged note defaults due to Defendants' proof of unqualified ownership of the loans which are the subject of this litigation, then Plaintiffs respectfully requests that this Court order Defendants GREENPOINT, GMAC, MERS, SIW, and one or more of their un-named Co-Conspirators Specific Performance of a 1% loan with a "positive negative amortization" on a 30 year loan with the negative amortization being applied against the loan providers and drafters of the deceptive loan documents Defendants R/E AGENT BONILLA, ANGELMAR R/E BROKER, OSSAS, MORTGAGE UNLIMITED BROKER, GREENPOINT, MERS and GMAC, jointly and severally, plus attorney's fees, costs and punitive damages retroactively to account for all the payments, fees, and costs Plaintiffs already made since inception of the loans, plus all the undisclosed payments, fees, costs, and securitization pool profits applicable to Plaintiffs' pool.

## XVIII. DEMAND FOR JURY TRIAL

568. Plaintiffs and Class members reallege and incorporate by reference all paragraphs above, as though fully set forth in this COUNT.

569. Pursuant to Fed. R. Civ. P. 38(b), the Plaintiffs demand a trial by jury of all issues raised in this Complaint and triable as of right by a jury.

## XIX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray as set forth below that this Court:

1. The Plaintiffs adopt and re-allege all Paragraphs above as if fully restated herein.

2. Assume jurisdiction of this case;

3. Sit a Jury and Certify the Class Action;

4. Award Plaintiffs compensatory and actual damages in an amount sufficient to compensate Plaintiffs for the significant damages Plaintiffs have suffered and established at trial;

5. Award Plaintiffs statutory damages in the amount provided by the relevant statutes;

6. Award Plaintiffs punitive damages as established by a Jury in an amount necessary to deter the wrongful conduct herein described in the future;

7. Award Plaintiffs costs and reasonable attorneys fees in accordance with applicable statutes and common law;

8. Award Plaintiffs those damages set forth in the Ad Damnum clause within each Count and elsewhere;

9. Award Plaintiffs any applicable post-judgment interest;

10. Issue Declaratory Orders as enumerated by the relevant Declaratory Judgment Count of this Complaint;

11. Issue a Declaratory Injunction permanently stopping any foreclosure activity currently underway by any of the named Defendants with respect to any Negative Amortization loan that is the subject of this Class Action;

12. Quiet Title on Plaintiffs' Property as to all named Defendants;

13. Award such other legal and equitable relief and damages as this Honorable Court deems necessary and appropriate to compensate the Plaintiffs and deter the named Defendants from committing the same or substantially similar wrongful acts against other Virginia consumers in the future.

Dated this November 12, 2009

LUIS LARA and OLGA GARCIA
By Counsel,

Brown, Brown & Brown, P.C.

By:     /S/ Christopher E. Brown
        Christopher E. Brown (VSB# 39852)
        Edwin C. Brown, Jr., Esq.
        R. Michael Smith, Esq.
        6269 Franconia Road
        Alexandria, VA 22310
        7032.924.0223
        Fax 703.924.1586
        brownfirm@lawyer.com

*Counsel for Plaintiffs*